**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **HARRY D. MITTS, Jr.,** | ) | **CASE NO.  1:03 CV 1131** |
| | ) | |
| **Petitioner,** | ) | **JUDGE DAN AARON POLSTER** |
| | ) | |
| **vs.** | ) | <u>**MEMORANDUM OF OPINION**</u> |
| | ) | <u>**AND ORDER**</u> |
| **MARGARET BAGLEY,** | ) | |
| | ) | |
| **Respondent.** | ) | |

Before the Court is the Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus filed by

Petitioner Harry D. Mitts on October 16, 2003 ("Petition").[1]  **(ECF No. 27).**  Mitts challenges the

constitutional sufficiency of his convictions by a jury for aggravated murder of Dennis Glivar and John

Bryant and attempted murder of Thomas Kaiser and John Mackey.  Mitts also challenges the

constitutionality of the imposition of a sentence of death.

---

[1]On June 6, 2003, Mitts filed a notice of intent to file a habeas petition.  *ECF No. 1.*  On
July 30, 2003, before Mitts had filed the actual petition, Respondent filed a Motion to Dismiss on the
grounds that a habeas petition would be untimely.  *ECF No. 12.*  On January 21, 2004, after
extensive briefing by the parties, *see ECF Nos. 26, 28, 30, 35, 36, 43,* the Court held that the
petition was timely filed and denied the motion.  *ECF No. 44.*

On December 15, 2003, Respondent Margaret Bagley filed a Return of Writ.  *ECF No. 37, Return of Writ* ("Return of Writ").  On March 15, 2004, Mitts filed a Traverse.  *ECF No. 51, Petitioner's Traverse* ("Traverse").  On March 24, 2004, Respondent filed a Sur-Reply.  *ECF No. 53, The Warden's Sur-Reply* ("Sur-Reply").  On March 31, 2004, the parties jointly requested, and obtained, permission to conduct discovery on the claims alleged in the habeas petition.  *ECF Nos. 54, 55*.  The parties deposed Dr. James Eisenberg (a psychologist who testified during the mitigation phase), Susan Evanson (a mitigation specialist who assisted Dr. Eisenberg in preparing mitigation), and petitioner Harry Mitts.  The parties then filed supplemental briefs discussing the implications of discovery.  *ECF Nos. 65, 66, 70, 71*.  The Court granted the parties an opportunity to file motions for an evidentiary hearing if they wished to do so by October 5, 2004.  *ECF No. 62*.  Petitioner did not file such a motion.  *See ECF No. 69*.

For the reasons set forth below, Mitts's petition for a writ of habeas corpus is **DENIED.**

## <u>OUTLINE OF ISSUES</u>

I.     **FACTUAL BACKGROUND** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1**

        A.    Substantive Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
        B.    Indictment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4
        C.    Trial & Sentencing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

II.    **PROCEDURAL BACKGROUND** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **7**

        A.    Direct Appeal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

                1.    Court of Appeals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7
                2.    Supreme Court of Ohio . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

        B.    State Post-conviction Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

                1.    Trial Court . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51
                2.    Court of Appeals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65
                3.    Supreme Court of Ohio . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

        C.    *Murnahan* Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

                1.    Court of Appeals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74
                2.    Supreme Court of Ohio . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

        D.    Federal Habeas Petition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

III.   **INITIAL CONSIDERATIONS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **87**

        A.    Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

        B.    Exhaustion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

        C.    Procedural Default . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

                1.    Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  92
                2.    Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  98

IV.   **GROUNDS FOR RELIEF** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  132

V.    **CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **193**

I.    **FACTUAL BACKGROUND**

    A.    <u>**Substantive Facts**</u>

    The Supreme Court of Ohio set forth the factual background of this case in *State v. Mitts*, 690

N.E.2d 522 (Ohio 1998):

> On the evening of August 14, 1994, Timothy Rhone helped his
> sister and brother-in-law, Jeff Walters, move into their apartment. The
> apartment was on the second floor in the same building where Mitts
> lived. Between 7:00 and 8:00 p.m., Rhone noticed a man, who he later
> learned was Mitts, carrying a gun tucked into the small of his back.
> Fifteen to thirty minutes later, Mitts, who was wearing blue target-
> shooting earmuffs, confronted Rhone in the hallway. According to
> Rhone, Mitts pointed a "black and huge" laser-sighted gun at Rhone's
> head and "told [him] to get out or [he] was going to fucking die." When
> Rhone replied that he did not understand, Mitts said, "I'm not joking, get
> out now." Rhone backed away and asked his mother and sister to call
> 9-1-1 because "a man with a gun [was] threatening to shoot people."
>     A short time later, Tracey Griffin and her boyfriend, John
> Bryant, saw Mitts walking toward them wearing yellow glasses or
> goggles and carrying a gun. Griffin knew Mitts because they lived in the
> same apartment complex and their daughters had played together.
> Mitts's gun emitted a light, and Griffin saw a dot of red light appear on
> Bryant's chest. Mitts said, "[N]iggers, niggers, I'm just sick and tired of
> niggers." Mitts aimed directly at Bryant, Griffin heard a shot, and Bryant
> fell down.

> Mitts then walked away, sporadically firing his gun, and later
> walked back toward Griffin, still firing his weapon, but now in her
> direction. In the meantime, Walters and Terry Rhone, Timothy's
> brother, came out to help Bryant. Mitts aimed his gun and shouted at
> them, "Leave him there, don't move." Walters and Terry Rhone
> disregarded Mitts's instruction and carried Bryant into their second-floor
> apartment.

> Around 8:15 p.m., Patrolman John Cermak arrived, and a
> bystander saw Mitts put a new clip in his gun. Taking "a ready [firing]
> position," Mitts fired several shots at Patrolman Cermak, forcing
> Cermak to drive his car up on a lawn and take cover. Lt. Kaiser and

1

Sergeant Dennis Glivar then arrived. After firing at Patrolman Cermak, Mitts retreated to his first-floor apartment. Patrolman Cermak searched for Mitts, and Lt. Kaiser and Sgt. Glivar went to the apartment building's second floor, where they found Griffin, Bryant, and the Rhone family. After calling paramedics, Lt. Kaiser and Sgt. Glivar walked down to the first floor.

As Lt. Kaiser and Sgt. Glivar approached Mitts's apartment, Mitts flung his apartment door open and opened fire with a gun in each hand. Mitts repeatedly shot Sgt. Glivar, forcing him to drop his shotgun, and he shot Lt. Kaiser in the chest and right hand. Lt. Kaiser switched his pistol to his left hand and forced Mitts to retreat by firing three or four times. Lt. Kaiser returned to the Rhone apartment, where he kept a watch on Mitts's apartment, and radioed for police assistance including the area S.W.A.T. team.

Although wounded, Lt. Kaiser attempted for twenty to thirty minutes to talk Mitts into surrendering, but Mitts replied, "[T]he only way we're going to end this is if you kill me. You have to come down, you have to do your job and you have to kill me." Mitts, who had overheard Lt. Kaiser's S.W.A.T. request over Sgt. Glivar's abandoned police radio, additionally told Lt. Kaiser, "Go ahead, bring the S.W.A.T. team in, I have thousands of rounds of ammunition. I'll kill your whole S.W.A.T. team. I'll kill your whole police department * * *."

Mitts also threatened Griffin; Mitts told Lt. Kaiser that he was "going to come up and kill that nigger-loving bitch that's upstairs with you." Mitts also told Lt. Kaiser that he had been drinking bourbon and was angry because the Grand River Police Chief "stole [his] wife." Eventually, Patrolman Cermak dragged Sgt. Glivar's body from the hallway and Patrolman Cermak and others used a ladder and rescued Rhone's family and Lt. Kaiser from the upstairs apartment.  During the standoff, Mitts called his ex-wife, Janice Salerno, and her husband, Grand River Police Chief Jonathon Salerno. Chief Salerno thought Mitts was joking when Mitts told him that "it's all over with now, I shot a couple of cops and I killed a fucking nigger." Chief Salerno, who believed Mitts was drunk, tried to talk him into surrendering, but Mitts refused. Mitts claimed that he had intended to kill both Salerno and his wife, but did not because Mitts's daughter, Melanie, lived with the Salernos.

2

Around 8:40 p.m., Maple Heights Police Officer John Mackey responded to the call for police assistance from the city of Garfield Heights. After helping Patrolman Cermak rescue Lt. Kaiser and the Rhone family, Officer Mackey, Sergeant Robert Sackett, and others took tactical positions in the hallway outside Mitts's apartment. Taking over Lt. Kaiser's role as a negotiator, Officer Mackey talked with Mitts for over thirty minutes, but Mitts refused to surrender and, at various times, continued to fire shots. Using Sgt. Glivar's shotgun, Mitts fired twice into a mailbox across the hall, and he also emptied ten pistol shots into that mailbox. According to Officer Mackey, Mitts's voice appeared calm, and he "never showed any anger or * * * animosity towards" the officers.

Around 9:30 p.m., Mitts discerned Officer Mackey's position in the upstairs apartment from the sound of his voice and fired up the stairway and through a wall, hitting Officer Mackey's leg with a bullet fragment. Other police officers returned fire and rescued Officer Mackey.

Around 1:00 a.m., the S.W.A.T. team injected tear gas into Mitts's apartment and finally subdued Mitts around 2:00 a.m. Mitts, who had been shot during the standoff, was taken by ambulance to a local hospital, then transported by helicopter to a trauma center at Cleveland's MetroHealth Medical Center. At 3:43 p.m., a blood sample was drawn from Mitts, and his blood-alcohol level was later determined to be .21 grams per one hundred milliliters.

After arresting Mitts, detectives searched his apartment and found two sets of shooting earmuffs, a yellow pair of glasses customarily used on shooting ranges, a .44 caliber magnum revolver, a 9 mm automatic pistol, a .22 caliber pistol, a laser gun-sight, thousands of rounds of ammunition in boxes, and two nearly empty liquor bottles. The police later learned that Mitts had spent the afternoon target shooting at the Stonewall Range, a firing range. Upstairs in apartment 204, detectives found Bryant's body.

Dr. Heather Raaf, a forensic pathologist, performed autopsies on John Bryant and Sgt. Dennis Glivar. Bryant bled to death within thirty minutes as a result of a single gunshot wound to his chest piercing both lungs and tearing the aorta. Sgt. Glivar died within "a few minutes" from five gunshots to the trunk causing perforations of his lung, heart, liver,

3

kidney, stomach, and intestines. Sgt. Glivar also had been shot in the left shoulder and forearm. Dr. Raaf recovered multiple bullets or fragments from Sgt. Glivar's body and one small-caliber bullet from Bryant's body.

**B.**    **<u>Indictment</u>**

Based on these facts, a grand jury issued a four-count indictment against Harry D. Mitts Jr. on August 25, 1994.  *State v. Mitts*, No. 68612, 1996 WL 732452, at *1 (Ohio Ct. App. Dec. 19, 1996)  The indictment charged as follows:

<u>COUNT 1:</u>

**AGGRAVATED MURDER**
        The Jurors of the Grand Jury of the State of Ohio, within and for the body of the County aforesaid, on their oaths, IN THE NAME AND BY THE AUTHORITY OF THE STATE OF OHIO, Do find and present that the above named Defendant(s), on or about the date of the offense set forth above, in the County of Cuyahoga, unlawfully purposely with prior calculation and design, caused the death of another, to-wit: Dennis Glivar.

**<u>SPECIFICATION ONE:</u>  (Firearm)**
        The Grand Jurors further find and specify that the offender had a firearm on or about his person or under his control while committing the offense charged in this count of the indictment.
**<u>SPECIFICATION TWO:</u>  (Killing an Officer Engaged in His Duties)**
        The Grand Jurors further find and specify that at the time of the offense presented above, the victim, Dennis Glivar, was a peace officer as defined in Section 2935.01 of the Revised Code whom the offender knew to be such, and who at the time was engaged in his duties.
**<u>SPECIFICATION THREE:</u>  (Mass Murder)**
        The Grand Jurors further find and specify that the offense presented above was part of a course of conduct in which the offender purposely killed John Bryant.
**<u>SPECIFICATION FOUR:</u>  (Mass Murder)**
        The Grand Jurors further find and specify that the offense presented above was part of a course of conduct in which the offender purposely attempted to kill Thomas Kaiser.
**<u>SPECIFICATION FIVE:</u>  (Mass Murder)**
        The Grand Jurors further find and specify that the offense presented above was part of a course of conduct in which the offender purposely attempted to kill John Mackey.

4

**COUNT 2:**
**AGGRAVATED MURDER**

The jurors of the Grand Jury of the State of Ohio, within and for the body of the County aforesaid, on their oaths, IN THE NAME AND BY THE AUTHORITY OF THE STATE OF OHIO, Do find and present, that the above named Defendant(s), on or about the date of the offense set forth above, in the County of Cuyahoga, unlawfully purposely with prior calculation and design, caused the death of another, to-wit:  John Bryant.

**SPECIFICATION ONE:  (Firearm)**

The Grand Jurors further find and specify that the offender had a firearm on or about his person or under his control while committing the offense charged in this count of the indictment.

**SPECIFICATION TWO:  (Mass Murder)**

The Grand Jurors further find and specify that the offense presented above was part of a course of conduct in which the offender purposely killed Dennis Glivar.

**SPECIFICATION THREE:  (Mass Murder)**

The Grand Jurors further find and specify that the offense presented above was part of a course of conduct in which the offender purposely attempted to kill Thomas Kaiser.

**SPECIFICATION FOUR:  (Mass Murder)**

The Grand Jurors further find and specify that the offense presented above was part of a course of conduct in which the offender purposely attempted to kill John Mackey.


**COUNT 3:**
**ATTEMPTED MURDER**

The Jurors of the Grand Jury of the State of Ohio, within and for the body of the County aforesaid, on their oaths, IN THE NAME AND BY THE AUTHORITY OF THE STATE OF OHIO, Do find and present, that the above named Defendant(s), on or about the date of the offense set forth above, in the County of Cuyahoga, unlawfully did purposely attempt to cause the death of Thomas Kaiser.

**SPECIFICATION ONE:  (Firearm)**

The Grand Jurors further find and specify that the offender had a firearm on or about his person or under his control while committing the offense charged in this count of the indictment.

**SPECIFICATION TWO:  (Peace Officer)**

The Grand Jurors further find and specify that the victim of the offense is a peace officer, as defined in Section 2935.01 of the Revised Code.


**COUNT 4:**
**ATTEMPTED MURDER**

The Jurors of the Grand Jury of the State of Ohio, within and for the body of the

County aforesaid, on their oaths, IN THE NAME AND BY THE AUTHORITY OF THE STATE OF OHIO, Do find and present, that the above named Defendant(s), on or about the date of the offense set forth above, in the County of Cuyahoga, unlawfully did purposely attempt to cause the death of John Mackey.

**SPECIFICATION ONE:**  **(Firearm)**

The Grand Jurors further find and specify that the offender had a firearm on or about his person or under his control while committing the offense charged in this count of the indictment.

**SPECIFICATION TWO:**  **(Peace Officer)**

The Grand Jurors further find and specify that the victim of the offense is a peace officer, as defined in Section 2935.01 of the Revised Code.

*ECF No. 14*, *Appendix, Volume I of XI*, at 23-26.

Mitts pleaded not guilty and not guilty by reason of insanity to all charges.  *ECF No. 14, Appendix, Volume I,* at 28-29.

### C.       Trial & Sentencing

On August 30, 1994, the trial court granted Mitts's motion for referral to the court psychiatric clinic for a determination of Mitts's competency to stand trial and of his sanity at the time of the act. *ECF No. 14, Appendix, Volume I,* at 39; *ECF No. 39, Transcript, Volume I,* at 25.  In her sanity report, Dr. Sonia McKee of the court psychiatric clinic concluded as follows:  "[I]t is my opinion with reasonable medical certainty that Mr. Mitts did not have a severe mental disease or defect on August 14, 1994."  *ECF No. 17, Appendix, Volume IV,* at 267, *First Amended Petition, etc. Exh. I-11.* On September 21, 1994, psychiatrist Dr. McKee testified that in her opinion, with reasonable medical certainty, Mitts was competent to stand trial.  *Tr., Volume I,* at 47.  On the same day, the trial court ruled that Mitts was competent to stand trial.  *Id*. at 121.  On September 26, 1994, defense counsel requested appointment of Dr. James Eisenberg to examine Mitts and to appear as a defense witness at trial.  *Id.* at 54.  On September 29, 1994, the motion was granted.  *Id.* at 56.

6

On October 24, 1994, the matter proceeded to a jury trial.  *Id.*  Mitts was represented at trial by attorneys Thomas M. Shaughnessy, Thomas O'Malley, and Mark Rudy.  *Petition,* at 6.  On November 3, 1994, the jury returned unanimous verdicts finding Mitts guilty of all counts and specifications.  *ECF No. 42, Transcript, Volume IV,* at 1371-74.[2]  The mitigation phase of the trial began on November 14, 1994.  *Return of Writ, Exh. A,* at 2.  On November 15, 1994, the jury returned a recommendation that Mitts be sentenced to death on counts one and two of the indictment.  *Tr.*, *Volume IV,* at 1580-81.  On November 22, 1994, the trial court filed a written opinion accepting the jury recommendation and thereby sentenced Mitts to death.  *ECF No. 14, Appendix, Volume I,* at 124-25.  The trial court ordered that Mitts be sentenced to three (3) years imprisonment for conviction of a felony with a firearm, the sentence to be served prior to and consecutive with the death sentence.  *Id*. at 125.  Mitts was also sentenced to consecutive terms of 10 to 25 years imprisonment on Count 3 and Count 4.  *Id.*

## II.      PROCEDURAL BACKGROUND

### A.      Direct Appeal

#### 1.      Court of Appeals

Represented by David L. Doughten and Thomas M. Shaughnessy, Mitts appealed his conviction and death sentence to the Ohio Court of Appeals, Eighth District, raising the following eleven assignments of error:

       1.      The trial court abused its discretion when it refused to charge the jury on the defense of voluntary intoxication.

---

[2]The trial transcripts, which are located at *ECF Nos. 40-42,* will hereinafter be referenced as "Tr."

2.      The trial court erred by prohibiting an expert witness from answering a hypothetical question in violation of the appellant's right to compulsory process.

3.      The trial court erred by failing to merge capital specification II, III, and IV which resulted in jury consideration of duplicative specifications.

4.      The refusal of the trial court to allow the jury to recommend consecutive sentences for each count of aggravated murder violated Mitts's rights under the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution.

5.      Mitts was deprived of his constitutional right to deliberations by a jury that was fully cognizant of its responsibilities and duties when the trial court instructed the jury that its death verdict was only a recommendation but a life verdict was binding on the court.

6.      The trial court's inaccurate penalty phase instructions misguided the jury as to their duties under the law rendering the resultant sentence unreliable and violative of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Article I, §§ 9, 10 and 16 of the Ohio Constitution.

7.      Where trial counsel fails to object to erroneous jury instructions and improper comments of the prosecutor, the defendant is denied effective assistance of counsel where there is a reasonable probability that the death sentence would not have been recommended had the objections been made.

8.      The trial court erred by refusing to provide a mitigating instruction as to Mitts's intoxication at the time of the offense in contravention of the Fifth, Eighth and Fourteenth Amendments to the United States Constitution.

9.      The aggravating factors present in Mitts's case do not outweigh the mitigating factors pursuant to R.C. 2929.03, thereby rendering the death sentence violative of the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution and Article I, §§ 9 and 16 of the Ohio Constitution.

10.     The trial court improperly weighed the relevant sentencing factors in violation of R.C. 2929.03(F).

11.     Imposition of the death sentence violates the Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Article I, §§ 2, 9, 10 and 16, of the Ohio Constitution.

8

*ECF No. 15, Volume II,* at 55, *Appellant's Brief and Assignments of Error,* at 1-2 (filed Feb. 12, 1996).

On December 19, 1996, the Court of Appeals issued a decision affirming the Common Pleas Court judgment. *Mitts,* No. 68612, at *1. As to the first assignment of error, Mitts argued that the trial court committed reversible error in the guilt phase when it refused to instruct the jury on the defense of intoxication. The court of appeals disagreed, stating:

> The general rule in American jurisprudence is that voluntary intoxication is not a defense to any crime. *State v. Wolons* (1989), 44 Ohio St.3d 64, 68. See, also, ALI Model Penal Code Art. 2, Section 2.08. Ohio concurs with this general rule. *State v. Wolons, supra.* However, voluntary intoxication is a defense in Ohio where specific intent is a necessary element of the crime and "the intoxication was such as to *preclude* the formation of such intent * * *." *State v. Hicks* (1989), 43 Ohio St.3d 72, 75, quoting *State v. Fox* (1981), 68 Ohio St.2d 53, 55. In order to raise this defense, "evidence of a nature and quality sufficient to raise the issue must be introduced, from whatever source * * *," i.e., evidence which, if believed, would support an acquittal. *State v. Hicks, supra,* quoting *State v. Robinson* (1976), 47 Ohio St.2d 103, 112. Moreover, it has been stated that "[t]he only persons who could successfully raise a reasonable doubt as to their capacity to form specific intent essential to the felony charged must * * * be so intoxicated as to be mentally unable to intend anything * * *." Wertheimer, Diminished Capacity Defense to Felony-Murder, 23 Stanford L.Rev. 799, 805, quoted in *State v. Jackson* (1972), 32 Ohio St.2d 203, 206. Accord *State v. Otte* (1996), 74 Ohio St.3d 555, 564.

> Ohio law is also clear that it is within the sound discretion of the trial court to determine whether the evidence presented is sufficient to require a jury instruction, *State v. Wolons, supra; State v. Hicks, supra,* due to "deep seated distrust of the reliability of such evidence." *Id.,* quoting *State v. Fox, supra.* The *Fox* Court explained:

>> Given the admissibility of evidence of intoxication, the issue is whether the trial court erred by refusing to go further and charge the jury on the

9

possibility intoxication negated formation of the specific intent to attempt murder.

This court first addressed this precise issue in *Nichols v. State* (1858), 8 Ohio St. 435. In that case Caleb Nichols was tried by jury for attempted murder. On appeal, Nichols claimed, among other errors, the failure of the trial court to instruct that drunkenness should be considered by the jury in determining the existence of the malicious intent charged. After 'somewhat anxious deliberation,' we concluded that 'a proper regard to the public safety in the practical administration of criminal justice' mandated introduction of the evidence of intoxication, 'to show that the accused did not at the time intend to do the act which he did do.' *Nichols, supra,* at 439. But we refused to require a jury instruction to be given on the question, stating as follows:

> ' * * * [W]hen we admit evidence of intoxication to rebut * * * a charge of deliberation and premeditation, * * * we think we have gone far enough; and that, looking to the practical administration of the criminal law, a due regard to the public safety requires that the mere question of malice should be determined by the circumstances of the case, aside from the fact of intoxication, as in other cases.' *Id.*

This court's denial of a right to a jury charge in *Nichols* was based on a deep seated distrust of the reliability of such evidence:  ' Intoxication is easily simulated. It is often voluntarily induced for the sole purpose of nerving a wicked heart to the firmness requisite for the commission of a crime soberly premeditated, or as an excuse for such crime.' *Id.* Rather than impose a strict rule of criminal procedure, we left the trial judge with discretion to handle the

10

evidence and submit it to the jurors in the appropriate
manner.

Subsequent cases decided by this court have
recognized the appropriateness of a special jury charge
on the effect of intoxication on formation of intent when
that issue is properly raised by the evidence. But this
court has never found it necessary to promulgate a rule
to regulate judges in this matter.

Nor is this court well suited to make such a rule.
This matter is best left to the discretion of the
experienced trial judge.

*State v. Fox, supra,* at 55-56.

Finally, the mere fact that a defendant is intoxicated does not
make him incapable of acting with purpose. *State v. Huertas* (1990),
51 Ohio St.3d 22, 28. Intoxication, even severe intoxication, can co-
exist with purpose. *State v. Hicks, supra,* at 74.

Even if we assume for purposes of this assignment of error that
the jury may reasonably have concluded that defendant was intoxicated,
the jury could not reasonably have doubted that defendant acted with
purpose. *Accord State v. Hicks, supra,* at 75. He left his apartment wearing
glasses and an ear set used for shooting, fixed a laser scope
onto John Bryant's chest, uttered a racial epithet, and shot Bryant in the
chest mortally wounding him.

Similarly, the jury could not have reasonably doubted that
defendant purposefully killed Sgt. Glivar in order to elude capture and
arrest for shooting Bryant. His statements to Lt. Kaiser and
Chief Salerno immediately thereafter show that he knew he was in
jeopardy for this act and that he probably would not leave his apartment
alive.

Defendant's overall conduct reveals clearheadedness in light of
his purposeful actions of threatening but not harming Rhone, calling
Chief Salerno and describing to him what he had just done, conversing
with the officers about his ex-wife, surreptitiously leaving the apartment
to fire upon the officers then fleeing back into the apartment, aiming and

11

shooting Sgt. Glivar's shotgun at a predesignated target then evaluating his aim, shooting at Officer Mackey while still eluding capture, and tenaciously fighting the officers even after being wounded. There is no evidence to "negate a conscious awareness of the circumstances and events that transpired." See *State v. Wolons,* at 69. Finally, even though Chief Salerno and Det. Arko thought that defendant was intoxicated, "the record overall indicates that he was not so intoxicated that he was not fully aware of the events taking place around him." See *State v. Wolons, supra,* at 69.

Moreover, defendant's own expert Sonya McKee, M.D., confirmed that notwithstanding her conclusion that defendant was intoxicated, he could nonetheless act purposely at this time and form a specific intent to kill. (Tr. 1201, 1222-1223). Dr. McKee also noted that defendant had "rational reasons" for his actions and he expressed a clear choice to kill some people and not others. (Tr. 1225).

In short, we find that the evidence of intoxication did not negate specific intent and therefore the trial court did not abuse its discretion in denying an instruction on voluntary intoxication. The first assignment of error is overruled.

*State v. Mitts*, No. 68612, 1996 WL 732452, at *6-8 (Ohio Ct. App. Dec. 19, 1996).

In the second assignment of error, Mitts argued that the trial court violated the constitutional provisions guaranteeing compulsory process and Federal Rules of Evidence 702, 703, and 705, when it refused to allow Dr. McKee to answer a hypothetical question addressing the issue of specific intent to kill.  The appeals court disagreed:

In *State v. Cooey* (1989), 46 Ohio St.3d 20, 26, the Supreme Court held that a criminal defendant may not offer expert psychiatric testimony, unrelated to the insanity defense, to show that due to intoxication or any other reason, he lacked the mental capacity to form the specific mental state required for a particular crime. The Court stated:

[A defendant] may not offer expert psychiatric testimony, unrelated to the insanity defense, to show that

12

> * * * [he] lacked the mental capacity to form the
> specific mental state required for a particular crime or
> degree of crime. *State v. Wilcox* (1982), 70 Ohio
> St.2d 182, 24 O.O.3d 283,      436 N.E.2d 523,
> paragraph two of the syllabus.
>
> The *Wilcox* rule is based on a mistrust of the
> ability of 'psychiatry to accurately 'fine-tune' degrees of
> capacity among offenders who are sane--i.e., who have
> the minimal capacity to act voluntarily. *Wilcox, supra,*
> at 190- 194, 24 O.O.3d at 289-291, 436 N.E.2d at
> 528-530. It is irrelevant, in our view, whether the
> asserted incapacity to form *mens rea* is caused by a
> mental disorder, by intoxication, or (as Cooey contends
> here) by a combination of the two. We are offered
> nothing to convince us that psychiatric 'fine-tuning'
> would be any more accurate where the asserted
> incapacity is caused by intoxication.
>
> As we noted in *Wilcox,* lay jurors need no
> expert testimony to determine whether the accused was
> too intoxicated to be able to intend anything. *Wilcox,*
> *supra,* at 194, 24 O.O.3d at 291, 436 N.E.2d at 530.
>
> To allow psychiatric testimony on specific intent
> would bring into Ohio law, under another  guise, the
> diminished capacity defense we rejected in *Wilcox.*
>
> *Id.*  See, also, *State v. Slagle* (1992), 65 Ohio St.3d
> 597, 607.
>
> The second assignment of error is overruled.

*Mitts*, No. 68612, at *8-9.

In the third assignment of error, Mitts argued that the presence of three separate mass murder

specifications in Counts One and Two caused the jury to consider duplicative specifications within the

penalty phase.  The court of appeals responded:

13

It is well-established that where specifications arise from the same act or indivisible course of conduct, and are committed with the same animus, they are duplicative and must be merged for purposes of sentencing. *State v. Jenkins* (1984), 15 Ohio St.3d 164, paragraph five of the syllabus. Should merging take place upon appellate review of the death sentence, resentencing is not automatically required where the reviewing court independently determines that the remaining aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt and the jury's consideration of duplicative aggravating circumstances in the penalty phase did not affect the verdict. *Id.* Accord *State v. Garner* (1995), 74 Ohio St.3d 49, 54-55 (application of the *Jenkins* test during independent review does not violate the right to trial by jury). See, also, *State v. Combs* (1991), 62 Ohio St.3d 278, 286.

In *State v. Garner, supra,* the Supreme Court set forth a corollary to its earlier pronouncements in *State v. Jenkins, supra,* regarding merger, and stated:

> We believe it is a necessary corollary to *Jenkins* that, where a jury in the guilt phase of a capital trial has found the defendant guilty of duplicative specifications, a trial court should instruct the jury in the penalty phase that those duplicative specifications must be considered merged for purposes of weighing the aggravating circumstances against the mitigating factors.

*Id*., at 53.

As to the specific question presented herein, we further note that R.C. 2929.04(A)(5) provides for mass murder specifications and states as follows:

> Prior to the offense at bar, the offender was convicted of an offense an essential element of which was the purposeful killing of or attempt to kill another, or the offense at bar was part of a *course of conduct involving the purposeful killing of or attempt to kill two or more persons* by the   offender. (Emphasis added).

14

Thus, by definition, this specification contemplates the purposeful killing or attempt to kill two or more persons within a single course of conduct. Moreover, this specification has been applied where there were long time lapses between killings. See *State v. Silva* (February 11, 1991), Stark App. No. CA-8047, unreported, and citations listed therein. Thus, it is clear that where a jury has returned guilty verdicts upon two or more mass murder specifications within a single count of aggravated murder and each specification arises from a single course of conduct, the specifications are duplicative and must be merged for sentencing. We therefore hold that a trial court may not, in its penalty phase instructions, instruct the jury regarding a separate mass murder aggravating circumstance for each victim within a course of conduct involving the purposeful killing or attempted killing of two or more persons. Rather, the court may present the jury with no more than one mass murder aggravating circumstance, which includes all of the victims within the course of conduct as determined in the guilt proceeding, for each applicable count of aggravated murder.

Applying the foregoing with regard to the death penalties returned in this matter, it is clear that the trial court erred in instructing the jury regarding separate mass murder aggravating circumstances for each victim within the course of conduct as determined in the guilt proceeding, for each count of aggravated murder, and in failing to instruct on a single mass murder aggravating circumstance which included all of the victims within the course of conduct for each count of aggravated murder. We find beyond a reasonable doubt, however, that the trial court's failure to instruct the jury that duplicative aggravating circumstances should be considered merged did not influence the jury to recommend death rather than life imprisonment. That is, merger of the duplicative mass murder aggravating circumstances for each separate shooting victim into a single mass murder aggravating circumstance which lists each shooting victim within a single course of conduct, would not change the nature of the evidence which the jury was statutorily required to consider in making its recommendation as to a possible sentence of death. Moreover, the jury was not expressly instructed that its finding of guilt on multiple specifications should be deemed to increase the weight it accorded the aggravating circumstances. Cf. *State v. Penix* (1987), 32 Ohio St.3d 369, 372. We find that the weight of the aggravating circumstances was not inflated as the result of the trial court's failure to instruct the jury that it was to consider the duplicative specifications merged. Consistent with the analysis of *Garner, supra,*

15

although the trial court erred in not merging the specifications, the weight
of the aggravating circumstances was not inflated, rendering the
weighing process invalid.

Finally, Supreme Court precedent clearly demonstrates that our
application of the *Jenkins* test for merger and the *Garner* corollary to
that test does not abridge defendant's right to trial by jury, see *Garner,
supra*. Likewise, no constitutional violation occurs where errors found
to have occurred in the penalty phase of a capital trial are deemed cured
upon independent review by the court of appeals as required by R.C.
2929.05. *Id.,* at 55; accord State v. Combs, supra; see, also, *State v.
Fox* (1994), 69 Ohio St.3d 183, 191-192.

Defendant's third assignment of error is overruled.

*State v. Mitts*, No. 68612, 1996 WL 732452, at *9-11 (Ohio Ct. App. Dec. 19, 1996).

In the fourth assignment of error, Mitts contended that the trial court erred in denying his request

to instruct the jury that it could recommend that Mitts receive consecutive life sentences for his

convictions for aggravated murder.  Mitts also contended that the trial court refused to allow the jury to

recommend consecutive sentences in response to a jury question during sentencing deliberations.  The

appeals court responded:

This contention was rejected in *State v. Grant* (1993), 67 Ohio
St.3d 465, 482. The Court stated:

In proposition of law twenty-seven, Grant
claims that the trial court erred by refusing to instruct the
jury that the court could impose consecutive life
sentences. However, 'the subject of disposition is a
matter for the court and not for the jury and, thus, need
not be considered by the    jury.' *State v. Rogers*
(1985), 17 Ohio St.3d 174, 182, 17 OBR 414, 421,
478 N.E.2d 984, 992. In  this case the jury was
properly instructed as to their possible sentencing
recommendations: death, life with possibility of parole
after twenty years, and life with possibility of parole

16

> after thirty years. The jury does *not* have an option of recommending whether life sentences shall run consecutively or concurrently.
>
> By application of the foregoing, defendant's fourth assignment of error is without merit.

*Mitts*, No. 68612, at *11.

In the fifth assignment of error, Mitts argued that the trial court's instruction that a death verdict is only a recommendation diminished the jury's sense of responsibility in sentencing Mitts to death, as prohibited by *Caldwell v. Mississippi*, 472 U.S. 320, 328-29 (1985).  The court of appeals determined:

> Subsequent to its decision in *Caldwell,* the United States Supreme Court held that "[t]o establish a *Caldwell* violation, a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law." See *Dugger v. Adams* (1989), 489 U.S. 401, 407. Thus, where the challenged instruction accurately states Ohio law, a *Caldwell* challenge will be rejected. See *State v. Hicks* (1989), 43 Ohio St.3d 72, 80. See, also, *State v. Durr* (1991), 58 Ohio St.3d 86, 93.
>
> In this instance, the jury was instructed that a verdict for the sentence of death is a recommendation which was not binding upon the trial court and that the final decision was placed upon the court, but a verdict for a life sentence is binding upon the court. (Tr. 1569). The Supreme Court has repeatedly stated its preference that no comment be made regarding ultimate responsibility for determining the appropriateness of a death sentence, but it has also repeatedly held that such instruction accurately states Ohio law and does not constitute reversible error.  See, e.g., *State v. Loza* (1994), 71 Ohio St.3d 61, 74.
>
> Accordingly, this assignment of error is overruled.

*Mitts*, No. 68612, at *11-12.

In the sixth assignment of error, Mitts argued that the trial court's instructions during the penalty phase regarding reasonable doubt, consideration of lesser penalties, and the omission of sympathy were prejudicially erroneous.  As to the court's instruction on reasonable doubt, Mitts alleged that the trial court erred in giving the jury the following instruction:  "Reasonable doubt is present when after you have carefully considered and compared all the evidence, you cannot say you are firmly convinced of *the truth of the charge*."  *Tr.,* at 1562-1563 (emphasis added).  The appeals court stated as follows:

> Defendant concedes that this language is part of the statutory definition of reasonable doubt set forth in R.C. 2901.05(D). He asserts, however, that the court's use of the term "truth of the charge" during the penalty phase instructions precluded any meaningful weighing of the aggravating and mitigating factors since the jury had already found defendant guilty of the "charge" during the penalty phase.

> This contention was found to be "totally devoid of merit" in *State v. Spirko* (1991), 59 Ohio St.3d 1, 17. The court stated:

> > * * * defendant ignores the requirement that the jury must weigh the aggravating circumstances against the mitigating factor(s), and the trial court so stated at least three times during its instruction at the penalty phase.

> See, also, *State v. Davis* (June 8, 1995), Cuyahoga App. No 64270, unreported, ("the aggravating circumstance is the 'charge' that the jury in comparing the state's evidence must be convinced beyond a reasonable doubt outweighs whatever mitigating circumstance appellant presented[;] * * * there is no error in the instruction.")

As to the court's instruction regarding consideration of lesser penalties, Mitts argued that the court erroneously gave an "acquittal first" instruction which improperly required the jury to reject the death penalty before considering the life sentence options. This section of the charge provided as follows:

18

   * * * you must determine beyond a reasonable doubt whether the aggravating circumstances, which the defendant, Harry D. Mitts, Jr., was found guilty of committing in the separate counts, are sufficient to outweigh the mitigating factors you find are present in this case.

   When all 12 members of the jury find by proof beyond a reasonable doubt that the aggravating circumstances in each separate count with which Harry D. Mitts, Jr., has been found guilty of committing outweigh the mitigating factors, if any, then you must return such finding to the Court.

   I instruct you as a matter of law that if you make such a finding, then you must recommend to the Court that the sentence of death be imposed on the defendant Harry D. Mitts, Jr.

       * * *

   I will now read to you the verdict forms which will apply in this case. *No inference is to be drawn from the order in which I read these forms to you.* (Emphasis added.) (Tr. 1568-1570).

The court of appeals responded:

   Under *State v. Brooks* (1996), 75 Ohio St.3d 148, 159-160, the supreme court held that a penalty phase instruction that "you are now required to determine unanimously that the death penalty is inappropriate before you can consider a life option" was plainly incorrect and contrary to R.C. 2929.03(D)(2), which contains no limiting language as to when a jury may contemplate a life sentence.

R.C. 2929.03(D)(2) provides as follows:

    If the jury unanimously finds by proof beyond a reasonable doubt, that the aggravating  circumstances the offender was found guilty of committing outweigh the mitigating factors, the trial jury shall recommend to the court that the sentence of death be imposed on the offender. Absent such a finding, the jury shall recommend that the offender be sentenced to life imprisonment with parole eligibility after serving twenty full years imprisonment or to life imprisonment with parole eligibility after serving thirty full years of

19

imprisonment.

Applying the foregoing, we hold that the trial court's instruction did not inform the jury that it was required to determine that the death penalty was inappropriate before it could consider life imprisonment. Rather, the court's charge tracked R.C. 2929.03(D)(2) and informed the jury that life imprisonment could be considered if the jury failed to find that the aggravating circumstances outweighed the mitigating factors beyond a reasonable doubt. This conclusion is bolstered, moreover, by the jury question submitted to the court prior to the issuance of the death verdicts, which inquired as to whether terms of life imprisonment would be served consecutively or concurrently. (Tr. 1579).

As to the court's instruction that the jury "must not be influenced by any consideration of sympathy or prejudice," the Ohio Court of Appeals stated as follows:

[I]n *State v. Landrum* (1990), 53 Ohio St.3d 107, 123, the supreme court approved such an instruction and noted that it is intended to ensure that sentencing is based on reviewable guidelines, not a juror's personal bias or sympathy. See, also, *State v. Jenkins, supra,* paragraph three of the syllabus.

In any event, the court did subsequently instruct the jury that mitigating factors "are factors that while not justifying or excusing the offense or offenses, may in fairness and mercy be considered by you as extenuating or reducing the degree of the defendant's responsibility or punishment." (Tr. 1565). This charge constitutes adequate instruction concerning the extension of mercy to a capital defendant. *State v. Garner, supra,* at 57.

The sixth assignment of error is overruled.

*State v. Mitts*, No. 68612, 1996 WL 732452, at *12-14 (Ohio Ct. App. Dec. 19, 1996).

In the seventh assignment of error, Mitts argued that he was denied effective assistance of counsel because trial counsel did not object to the court's instructions regarding aggravating circumstances and reasonable doubt, the court's "acquittal-first" instruction, the use of the term

20

recommendation throughout the trial and in the jury instructions, and the court's submission of

duplicative specifications to the jury.  The appeals court responded:  "As we have previously determined

there is no underlying error, we will not credit defendant's claim that counsel was ineffective.  *Accord*

*State v. Henderson* (1989), 39 Ohio St.3d 24, 33.  The seventh assignment of error is overruled."[3]

*Mitts*, No. 68612, at *14.

In the eighth assignment of error, Mitts argued that the trial court erred in refusing to specifically

instruct the jury that it could consider as mitigating the fact that Mitts was highly intoxicated at the time of

the offenses.  The court of appeals responded:

> With regard to the substantive value of such evidence, we note
> that in *State v. D'Ambrosio* (1995), 75 Ohio St.3d 141, 145, the
> Supreme Court held that "in certain circumstances, voluntary
> intoxication can constitute a mitigating factor, albeit a weak one."
> Accord *State v. Lawson* (1992), 64 Ohio St.3d 336, 352 ("Another
> potential mitigating factor is appellant's heavy drug and alcohol
> consumption prior to the murder. Any impact, however, is weakened by
> the fact that appellant had no difficulty driving to the murder scene.")
> But, see, *State v. Slagle* (1992), 65 Ohio St.3d 597, 614 (alcoholism,
> addiction, and voluntary intoxication are not mitigating factors).
>
> Further, in *State v. Sowell* (1988), 39 Ohio St.3d 322, 336-
> 337, the supreme court concluded that a claim of intoxication is entitled
> to little or no mitigating weight where the evidence established that
> defendant possessed the capacity to form a specific intent and to
> appreciate the wrongfulness of his conduct at the time of the crime.
>
> With regard to the procedure by which such evidence is to be
> considered, the *Sowell* Court has stated:
>
> R.C. 2929.04(B)(7), which directs the

---

[3]Within this assignment of error, Mitts also claimed that the trial court erroneously defined
the term "aggravating circumstances."  However, Mitts did not provide any argument in support of
this claim, and the trial court did not review it.

21

> sentencer to consider "[a]ny other factors that are
> relevant to the issue of whether the offender should be
> sentenced to death * * *," is relevant in that appellant
> claims to have been intoxicated at the time of the
> offense.

> *Id.*  In *State v. Landrum* (1990), 53 Ohio St.3d 107, 122, the
> court noted that a trial court is permitted to give a general instruction
> under this provision and is not required under the law to separately
> instruct upon each factor which is framed by defense counsel under this
> provision. The *Landrum* Court stated:

>> While the trial judge might have tailored the
>> instructions more to the evidence, such an approach is
>> not required. The trial judge did not misstate the law.
>> Nor did he exclude consideration of possible mitigating
>> factors as in *Lockett v. Ohio* (1978), 438 U.S. 586.
>> Hence, there was no error.

> Applying the foregoing, we conclude that the trial court did not
> err in this instance. Defendant offered evidence of intoxication for
> mitigation purposes, and the trial court was not required to give a
> separate instruction on voluntary intoxication.

> The eighth assignment of error is without merit.

*Mitts*, No. 68612, at *14-15.

In the ninth assignment of error, Mitts challenged the jury's determination that the aggravating

circumstances of which he was found guilty outweighed the mitigating factors beyond a reasonable

doubt.  Mitts argued that the duplicative specifications should have been merged and that he presented

evidence which significantly mitigated his culpability.  The appeals court responded:

> The standard of review used by this court to assess the validity
> of a claim that the verdict is against the manifest weight of the evidence
> was set forth in *State v. Martin* (1983), 20 Ohio  App.3d 172, 175, as
> follows:

22

The court reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.

We further note that the weight to be given the evidence and credibility of the witnesses are primarily for the trier of fact. *State v. DeHass* (1967), 10 Ohio St.2d 230, paragraph two of the syllabus. Likewise in capital cases, the weight to be given mitigation is best left to the trial court. *State v. Lott* (1990), 51 Ohio St.3d 160, 171; *State v. Lundgren* (1995), 73 Ohio St.3d 474, 493.

In this instance, the evidence presented in connection with defendant's conviction for the aggravated murder of John Bryant demonstrated that the aggravating circumstances which defendant was convicted of committing are that the offense was part of a course of conduct in which defendant (1) purposely killed Sgt. Glivar; (2) purposely attempted to kill Lt. Kaiser; and (3) purposely attempted to kill Officer Mackey.

The evidence presented in connection with defendant's conviction for the aggravated murder of Sgt. Glivar demonstrated that the offense was part of a course of conduct in which defendant (1) purposely killed Bryant; (2) purposely killed a uniformed police officer; (3) purposely attempted to kill Lt. Kaiser; and (3) [*sic*] purposely attempted to kill Officer Mackey.

For mitigation, defendant presented evidence that he had no prior criminal history, had served in the Coast Guard, had a history of steady employment, and was a devoted father and friend. He also presented some evidence that the offenses were related to his consumption of alcohol on the date of the offense, and defendant expressed remorse for his actions.

In *State v. Steffen* (1987), 37 Ohio St.3d 111, paragraph two of the syllabus, however, the supreme court stated:

23

> While R.C. 2929.04(B)(7) evidences the
> legislature's intent that a defendant in a capital case be
> given wide latitude to introduce any evidence that the
> defendant considers to be mitigating, this does not mean
> that the court is necessarily required to accept as
> mitigating everything offered by the defendant and
> admitted. The fact that an item of evidence is admissible
> under R.C. 2929.04(B)(7) does not automatically mean
> that it must be given any weight.
>
> That is, evidence of the offender's history, background and
> character which the jury considered, but did not find to be mitigating,
> need be given little or no weight against the aggravating circumstances.
> *State v. Stumpf* (1987), 32 Ohio St.3d 95, 101. In *Stumpf,* the finder
> of fact considered proffered mitigating evidence that the defendant "was
> a follower and not a leader, that he was generally a hard worker, that he
> had never had behavioral problems, that he had no significant criminal
> record, that he had a strong family background and that he was
> emotionally stable" but found that with the exception of his relatively
> young age, and lack of a significant criminal background, "he had not
> established any mitigating factors by a preponderance of the evidence."
> The supreme court concluded that the finder of fact did not err in its
> weighing of the aggravating circumstances against the mitigating factors.
> By application of the foregoing, we are unable to conclude that the jury
> lost its way and created a manifest miscarriage of justice in this instance.
>
> The ninth assignment of error is overruled.

*State v. Mitts*, No. 68612, 1996 WL 732452, at *15-16 (Ohio Ct. App. Dec. 19, 1996).

In the tenth assignment of error, Mitts contended that the trial court's separate opinion, in which

it found that the aggravating circumstances outweighed the mitigating factors beyond a reasonable doubt,

did not comply with the requirements of Ohio Revised Code 2929.03(F).  In support of this claim, Mitts

argued that the court did not weigh each aggravated murder conviction separately, did not list the

aggravating circumstances, failed to consider Mitts's lack of a criminal record as mitigating in violation of

24

Ohio Revised Code 2929.04(B)(5), and failed to give any weight to other evidence offered in the

mitigation phase.  The appeals court responded:

> R.C. 2929.03(F) provides in relevant part as follows:

>> The court * * * when it imposes sentence of death, shall state in a separate opinion its specific findings as to the existence of any of the mitigating factors set forth in division (B) of section 2929.04 of the Revised Code, the existence of any other mitigating factors, the aggravating circumstances the offender was found guilty of committing, and the reasons why the aggravating circumstances the offender was found guilty of committing were sufficient to outweigh the mitigating factors.

> See, also, *State v. Maurer* (1984), 15 Ohio St.3d 239, paragraph three of the syllabus.

> In *State v. Maurer, supra,* the supreme court noted the importance of the trial court's duty under this provision:

>> The failure of the trial court to comply with this aspect of R.C. 2929.03(F) disrupts the review procedures enacted by the General Assembly by depriving the defendant and subsequent reviewing courts of the trial court's perceptions as to the weight accorded all relevant circumstances. In a closer case, those perceptions could make a difference in the manner in which a defendant pursues his appeal and in which a reviewing court makes its determination.

> *Id.,* at 247. The supreme court has also held, however, that even where a trial court fails to meet the requirements of the statute, subsequent independent review renders such error harmless. *State v. Scott* (1986), 26 Ohio St.3d 92, 105.

> In addition, it is well settled that the trial court is not required to accept as mitigating everything offered by the defendant and admitted. See, e.g., *State v. Murphy* (1992), 65 Ohio St.3d 554, 577.

In this instance, the trial court's opinion did not separately address each aggravated murder conviction and did not list the aggravating circumstances and the reasons why the aggravating circumstances outweighed the mitigating factors. It therefore did not meet the full requirements of R.C. 2929.03(F). Nonetheless, we do not believe this is a "close case" as alluded to in *State v. Maurer, supra.* Moreover, our independent review undertaken pursuant to R.C. 2929.05, *infra,* affirms the trial court's conclusions. We are therefore unable to find the trial court's omissions to be prejudicially erroneous.

Defendant's tenth assignment of error is overruled.

*State v. Mitts*, No. 68612, 1996 WL 732452, at *16-17 (Ohio Ct. App. Dec. 19, 1996).

In the eleventh assignment of error, Mitts raised twenty-one challenges to the State's

death penalty provisions.  The court of appeals held as follows:

Defendant first asserts that the death penalty deprives capitally charged defendants of life without due process of law since there is no indication that it is the least restrictive means of furthering a compelling state interest. This claim was rejected in *State v. Jenkins, supra,* at 167-168 and *State v. Apanovich* (1989), 33 Ohio St.3d 19, 26. See, also, *State v. Mills* (1992), 62 Ohio St.3d 357, 372.

Defendant next asserts that capital punishment constitutes cruel and unusual punishment. This claim was also rejected in *Jenkins, supra,* at 168-169. See, also, *State v. Coleman* (1989), 45    Ohio St.3d 298, 308.

Defendant additionally contends that the death penalty procedures permit arbitrary charging decisions which may result in discriminatory, arbitrary, or freakish imposition of the death penalty. This argument was rejected in *State v. Jenkins, supra,* 169-170, and State v. Coleman, supra.

Defendant also claims that the bifurcated system which has the same jury determine culpability then recommend punishment violates an accused's rights to effective assistance of counsel. Defendant maintains that if defense counsel does not prevail in the guilt phase, his credibility

26

is diminished in the penalty proceedings before the same jury. In a related argument, defendant asserts that a bifurcated procedure which relies upon a single jury deprives an accused of his right to a fair trial before an impartial jury. Defendant also asserts that the initial death qualifying procedure creates a negative view that the defense will not prevail in the guilt phase. These arguments were rejected in *State v. Mapes* (1985), 19 Ohio St.3d 108, 117, and *State v. Zuern* (1987), 32 Ohio St.3d 56, 63.

Defendant next claims that language within the death penalty statutory scheme that "the aggravating circumstances * * * outweigh the mitigating factors" unconstitutionally invites reliance

upon the burden of proof by a mere preponderance of the evidence. This claim was likewise rejected in State v. Jenkins, supra.

Defendant also asserts that the scheme is devoid of specific, detailed guidance and objective standards for weighing the aggravating circumstances against the mitigating factors. This claim was rejected in *State v. Jenkins, supra;* and *State v. Buell* (1986), 22 Ohio St.3d 124, 139-140.

Defendant additionally maintains that the death penalty scheme unconstitutionally impairs an accused's right to a jury trial and to be free from compulsory self-incrimination because the fear   of receiving the death penalty forces guilty pleas and/or the submission of mitigating factors. These claims were rejected in *State v. Buell,* at 137-138; and *State v. Seiber* (1990), 56 Ohio          St.3d 4, 15-16.

Within his next argument, defendant asserts that the statutory scheme does not contain an adequate check against the random, disproportionate, or arbitrary imposition of the death penalty since it does not require juries to identify the mitigating factors relied upon when a life sentence is recommended. In a related argument, defendant asserts that the omission of this information precludes meaningful appellate and supreme court review. In *State v. Jenkins, supra,* the supreme court noted that proportionality review is not constitutionally mandated. The court further stated, as follows:

We first observe that appellant's argument that proportionality review is constitutionally required is

27

without merit. In *Pulley v. Harris* (1984), 465 U.S. 37, 79 L.Ed.2d 29, the Supreme Court held that neither *Gregg, Proffitt* nor *Jurek* established proportionality review as a constitutional requirement. *Id.* at 39. In reaching this conclusion, the court reasoned as follows:

> Needless to say, that some schemes providing proportionality review are constitutional does not mean that such review is indispensable. We take statutes as we find them. To endorse the statute as a whole is not to say that anything different is unacceptable. As was said in *Gregg,* '[w]e do not intend to suggest that only the above-described procedures would be permissible under *Furman* or that any sentencing system constructed along these general lines would inevitably satisfy the concerns of *Furman,* for each distinct system must be examined on an individual basis.' 428 U.S., at 95 * * *. Examination of our 1976 cases makes clear that they do not establish proportionality review as a constitutional requirement.

Thus, although viewed as commendable, the decision in *Pulley* demonstrates that proportionality review is not constitutionally required in every case. Other factors which minimize the risk of arbitrary and capricious sentencing include bifurcated proceedings, the limited number of chargeable capital crimes, the requirement that at least one aggravating circumstance be found to exist and the consideration of a broad range of mitigating circumstances. In conjunction with prior United States Supreme Court decisions, the General Assembly incorporated the aforementioned factors in Ohio's death penalty statutes, as well as providing proportionality review--a meaningful function which reduces the arbitrary and capricious imposition of death

28

sentences.

The question remains whether the absence of a requirement that juries specify the mitigating factors which they found to exist, and why these factors outweigh aggravating circumstances, creates a fatal defect in the statutes. We hold that it does not.

The fundamental purpose behind proportionality review is to ensure that sentencing authorities do not retreat to the pre-*Furman* era when sentences were imposed arbitrarily, capriciously and indiscriminately. To achieve this result, state courts traditionally compare the overall course of conduct for which a capital crime has been charged with similar courses of conduct and the penalties inflicted in comparable cases. See *Gregg* at 204-206, and *Proffitt* at 259-260.

The system currently in place in Ohio enables this court to obtain a vast quantity of information with which to effectuate proportionality review, beginning with data pertinent to *all* capital indictments and concluding with the sentence imposed on the defendant, whether or not a plea is entered, the indictment dismissed or a verdict is imposed by the sentencing authority. See R.C. 2929.021, *supra,* at fn. 13. Although appellant would have this court require juries returning a life sentence to specify which mitigating factors were found to exist and why they outweigh aggravating circumstances, we conclude that such information is not an indispensable ingredient in assisting us to determine whether the imposition of a death sentence is disproportionate to sentences imposed for similarly proscribed courses of conduct.

*Id.,* at 176-177. Thus, the supreme court has clearly rejected these arguments, and we therefore likewise reject them herein.

In his next argument, defendant complains that the further review provisions of R.C. 2929.05 are illusory since they contemplate comparison only to other capital cases. This claim was rejected in *State v. Davis* (1992), 63 Ohio St.3d 44, 50 ("[T]he proportionality review

29

mandated by R.C. 2929.05(A) does not require a review of those cases in which a sentence of life imprisonment is imposed.")

Defendant next maintains that since the death penalty scheme does not require findings regarding arbitrariness, passion, or prejudice, it lacks a fundamental safeguard against the capricious imposition of the death penalty. In *State v. Buell, supra,* at 144 and *State v. Cook* (1992), 65 Ohio St.3d 516, 529, the supreme court held that Ohio's mandatory review procedures of R.C. 2929.05 serve as a safeguard against arbitrary or capricious imposition of the death penalty.

Accordingly, we find this claim to lack merit.

Defendant additionally argues that the death penalty statute impermissibly mandates imposition of the death penalty in the absence of mitigation or when the aggravating circumstances outweigh the mitigating factors. This claim was rejected in *State v. Jenkins, supra;* and *State v. Williams* (1995), 73 Ohio St.3d 152, 173.

In his next argument, defendant contends that the state death penalty scheme does not provide a sufficiently individualized sentence since it does not provide for a jury instruction regarding mercy. As we noted previously, the supreme court has held that an instruction to exclude bias, sympathy or prejudice is intended to ensure that sentencing is based on reviewable guidelines, not a juror's personal bias or sympathy. *State v. Landrum, supra.* See, also, *State v. Jenkins, supra,* paragraph three of the syllabus; *State v. Lorraine* (1993), 66 Ohio St.3d 414. In any event, the court did subsequently instruct the jury that mitigating factors "are factors that while not justifying or excusing the offense or offenses, may in fairness and mercy be considered by you as extenuating or reducing the degree of the defendant's responsibility or punishment." (Tr. 1565). This charge constitutes adequate instruction concerning the extension of mercy to a capital defendant. *State v. Garner, supra,* at 57.

In a related argument, defendant asserts that the scheme is flawed since it does not require any determination that death is the only appropriate punishment. This claim was rejected in *State v. Buell, supra,* at 136-137; and *State v. Williams, supra,* 172-173.

Defendant additionally maintains that the death penalty

30

provisions unconstitutionally authorize the imposition of the death penalty where there is no demonstration that the accused acted with a conscious desire to kill, premeditation, or deliberation. This claim was considered and rejected in *State v. Jenkins, supra,* at 170-171; and *State v. Scott* (1986), 26 Ohio St.3d 92, 109.

Defendant also claims that since the death penalty is profoundly different from all other penalties, the state must be required to prove beyond all doubt that the aggravating circumstances outweigh the mitigating factors. In a related argument, defendant asserts that the statutory definition of "reasonable doubt" is insufficient to meet the requirement set forth in *In re Winship* (1970), 397 U.S. 358, 364, that the fact finder must be convinced of guilt "with utmost certainty." In *State v. Jenkins, supra,* paragraph eight of the syllabus, the supreme court held, "[t]he standard of proof in a capital prosecution is proof beyond a reasonable doubt as defined in R.C. 2901.05 and not proof beyond all doubt." The court explained:

> * * * We are cognizant of the difficulty inherent in any attempt to define this abstract legal concept. The United State Supreme Court recognized this problem in *Miles v. United States* (1880), 103 U.S. 304, at page 312: 'Attempts to explain the term 'reasonable doubt' do not usually result in making it any clearer to the minds of the jury.' Scrutiny of the definition provided by the General Assembly in R.C. 2901.05 reveals a substantial similarity to the explanation of 'reasonable doubt' upheld in *Holland v. United States* (1954), 348 U.S. 121. In *Holland, supra,* at page 140, the United States Supreme Court found, concerning 'reasonable doubt,' that 'the instruction as given was not of the type that could mislead the jury into finding no reasonable doubt when in fact there was some. * * * '

> The General Assembly has attempted, in R.C. 2901.05 and the definition of 'reasonable doubt' therein, to provide not only a degree of consistency as to the meaning of the term throughout the courts of this state, but also to have a definition comprehensible to all the members of the jury and not merely those trained in the subtle nuance of legalese. Considering the inherent

difficulty in defining this abstract concept of reasonable doubt, the similarity of the definition under consideration with that in *Holland, supra,* and the beneficial aspects of the legislative mandated definition, we find that the General Assembly has pronounced a rational definition of 'reasonable doubt' which, when taken as a whole correctly conveyed the concept of 'reasonable doubt' to the jury. (Footnote omitted).

Consequently, the standard of proof in a capital prosecution is proof beyond a reasonable doubt as defined in R.C. 2901.05 and not proof beyond all doubt.

*Id.* at 211, citing *State v. Nabozny* (1978), 54 Ohio St.2d 195, 202- 203. See, also *State v. Lundgren* (1995), 73 Ohio St.3d 474, 493. Accordingly, these claims lack merit.

Defendant next asserts that the felony murder aggravating circumstance contained in R.C. 2929.04(A)(7) merely duplicates the felony murder offense found in R.C. 2903.01(B) and does not genuinely narrow the class of persons eligible for the death penalty. Defendant additionally maintains that this specification unconstitutionally subjects those who commit felony murder to a  harsher penalty than that imposed upon those who commit premeditated murder. The supreme court rejected these claims in *State v. Jenkins, supra,* at 177- 178, and *State v. Henderson, supra,* at 28-29. In any event, defendant was neither charged with nor convicted of this aggravating circumstance, so these claims are ultimately moot herein.

Finally, defendant asserts that the statutory scheme is void for failing to require the state to prove the absence of any mitigating factor and that shifting the burden to defendant to establish the existence of a mitigating factor beyond a reasonable doubt prevents the jury from considering relevant mitigating evidence. This claim was rejected in *State v. Jenkins, supra,* at 171-172. The court noted that pursuant to R.C. 2929.03(D)(1), the defendant has the burden of going forward with evidence of any factors in mitigation, and the prosecution has the burden of proving, beyond a reasonable doubt, that the aggravating circumstances that the defendant was found guilty of committing outweigh the mitigating factors. The court then explained:

32

> " * * * the state carried the burden of proving by proof beyond a reasonable doubt that the aggravating circumstances appellant was found guilty of committing outweighed the mitigating factors. Since the trial court correctly interpreted the standards governing the burden of proving mitigating factors and by what degree, we are unable to find merit in this assignment of error.
>
> Accord *State v. Lawrence* (1989), 44 Ohio St.3d 24, 27. Likewise, we reject this claim herein.

*State v. Mitts*, No. 68612, 1996 WL 732452, at *17-22 (Ohio Ct. App. Dec. 19, 1996).

The court of appeals then conducted an independent review pursuant to R.C. 2929.05:

> With regard to the first count of aggravated murder, the evidence established that defendant killed Sgt. Glivar, a peace officer, as part of a course of conduct involving the killing of Bryant and the attempted killing of Lt. Kaiser and Officer Mackey. With regard to the second count of aggravated murder, the evidence established that defendant killed Bryant as part of a course of conduct involving the purposeful killing of Sgt. Glivar and the attempted killing of Lt. Kaiser and Officer Mackey.
>
> As to the mitigating evidence offered in relation to both counts, there was no evidence of any mitigating factors relating to the commission of the crime, as the victims neither induced nor facilitated the offenses. R.C. 2929.04(B)(1). The defendant did not claim that he committed the offenses as the result of duress or coercion. R.C. 2929.04(B)(2). There was no evidence that defendant, due to a mental disease or defect, was unable to conform his conduct to the requirements of the law. R.C. 2929.04(B)(3). Similarly, defendant was 42 years old at the time of the offenses and was therefore not a youthful offender. R.C. 2929.04(B)(4). He was the principal offender. R.C. 2929.04(B)(6).
>
> Defendant did present uncontroverted evidence that he had no significant history of criminal convictions. R.C. 2929.04(B)(5). Nonetheless, little weight should be accorded this factor since his "entry into the criminal ranks was terrifyingly brutal." See *State v. Grant*,

33

*supra,* at 486.

>    With regard to other factors, defendant presented some
>    evidence that the offenses had some association to intoxication due to
>    voluntary alcohol consumption. Such claim is entitled to little or no
>    mitigating weight as the evidence established that defendant possessed
>    the capacity to form a specific intent and to appreciate the wrongfulness
>    of his conduct at the time of the crime. *State v. Sowell, supra,* at 322.
>    Also within this factor, defendant had several good family relationships,
>    a steady work history, had served his country, and expressed deep
>    remorse for the killings. These factors are entitled to some weight.
>    Nonetheless, it is our considered view with regard to both aggravated
>    murder counts, that the aggravating circumstances outweigh the
>    mitigating factors beyond a reasonable doubt, and the death penalty is
>    an appropriate punishment for each offense.
>
>    We are also charged with determining whether the death penalty
>    is disproportionate to the penalty imposed in similar cases. We conclude
>    that it is proportionate herein when compared to other cases of murder
>    as a course of conduct involving the purposeful killing of two or more
>    persons. See *State v. Frazier* (1991), 61 Ohio St.3d 247; *State v.*
>    *Combs* (1991), 62 Ohio St.3d 278; *State v. Montgomery* (1991), 61
>    Ohio St.3d 410.

*Mitts*, No. 68612 at *22-23.

With this, the Ohio Court of Appeals affirmed the trial court's judgment. *Id*. at *23.

## 2.     The Supreme Court of Ohio

Represented now by David L. Doughten and John P. Parker, Mitts appealed the Ohio

Court of Appeals' decision to the Supreme Court of Ohio, asserting the following propositions of law:

> 1.     In a capital murder trial, the court must instruct the jury that it may recommend
>        consecutive life sentences where the defendant has been convicted of two
>        separate and distinct counts of aggravated murder.  The failure to instruct
>        properly is violative of the Fifth, Eighth, and Fourteenth Amendments to the
>        United States Constitution.

34

2.      The trial court may not prohibit an expert witness from answering a hypothetical question where it is relevant and would assist the jury in analyzing the evidence.

3.      Failing to merge capital specifications which results in jury consideration of duplicative aggravating factors cannot be held as harmless error where significant factors in mitigation were introduced into evidence.

4.      The trial court must charge the jury on the defense of voluntary intoxication where a reasonable jury could find that the defendant could not form the requisite intent due to his or her inebriation.  The failure to provide the instruction is a violation of the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Article I, §§ 9 and 16 of the Ohio Constitution.

5.      The trial court may not instruct the jury that its death verdict was only a recommendation but a life verdict was binding on the court.

6.      Inaccurate penalty phase instructions that misguide the jury as to their duties under the law render the resultant sentence unreliable and violative of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Article I, §§ 9, 10 and 16 of the Ohio Constitution.

7.      Where trial counsel fails to object to erroneous jury instructions and improper comments of the prosecutor, the defendant is denied effective assistance of counsel where there is a reasonable probability that the death sentence would not have been recommended had counsel made the objections.

8.      The trial court may not refuse to provide relevant mitigating instructions to the penalty phase jury.  The refusal to instruct is in contravention of the Fifth, Eighth and Fourteenth Amendments to the United States Constitution.

9.      Where the proven aggravating factors present in the evidence do not outweigh the mitigating factors present pursuant to Ohio Revised Code  2929.03, a sentence of death is violative of the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution and Article I, §§ 9 and 16 of the Ohio Constitution.

10.     The trial court improperly weighed the relevant sentencing factors in violation of Ohio Revised Code 2929.03(F).

11.     Imposition of the death sentence violates the Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Article I, §§ 2, 9, 10 and 16 of the Ohio Constitution.

35

*ECF No. 16, Appendix, Volume III, Merit Brief of Appellant,* at i-vi.  On March 11, 1998, the Ohio

Supreme Court affirmed the judgment of the Ohio Court of Appeals upholding Mitts' convictions and

death sentence.  *State v. Mitts*, 690 N.E.2d 522 (Ohio 1998).

 In the first proposition of law, Mitts argued that the trial court erred when it denied his

request to instruct the jury that it could recommend that he receive consecutive life sentences on the two

counts of aggravated murder.  The Ohio Supreme Court ruled as follows:

> The court did not err by refusing to give Mitts's requested
> instruction because it is not an accurate statement of the law. See *State
> v. Scott* (1986), 26 Ohio St.3d 92, 101, 26 OBR 79, 87, 497 N.E.2d
> 55, 63. Under Ohio law, "[a] jury has no option of recommending
> whether life sentences  should run consecutively or concurrently." *State
> v. Allard* (1996), 75 Ohio St.3d 482, 492, 663 N.E.2d 1277, 1287,
> citing *State v. Grant* (1993), 67 Ohio St.3d 465, 482, 620 N.E.2d 50,
> 69; see, also, R.C. 2929.03(D)(2).

 During penalty deliberations, the jury asked the trial court whether a verdict of life imprisonment

on counts one and two would be served consecutively or concurrently.  The court responded that the

aggravated murder counts were separate and distinct counts, and the question of consecutive or

concurrent sentencing was up to the trial court.  Mitts argued that the jury might have recommended a

life sentence had it been assured that the judge would or could order that the sentences be served

consecutively.  The supreme court responded:

> In *State v. Allard,* 75 Ohio St.3d at 492, 663 N.E.2d at 1287,
> when faced with the same issue, we responded that "assertions
> regarding the jury's possible motives for asking about consecutive and
> concurrent sentences are purely speculative" and "the trial court's
> response to the jury's question was proper, since a jury has no option of
> recommending whether life sentences should run consecutively or
> concurrently."

36

Mitts relies on *Simmons v. South Carolina* (1994), 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133. *Simmons* held that a trial judge violated an accused's due process rights by refusing to instruct the jury that a life sentence, under the facts and the applicable law, carried with it no possibility of parole. Mitts's reliance on *Simmons* is misplaced. In *Simmons,* South Carolina statutes prohibited Simmons's release on parole. This information was relevant given the prosecution's argument of Simmons's future dangerousness and the evidence that the public misunderstood the meaning of "life imprisonment" in South Carolina. In *Simmons,* a plurality reasoned that, to the extent that the jury's misunderstanding (that Simmons could be released on parole) pervaded the jury's deliberations, it had the effect of creating a false choice between sentencing petitioner to death and sentencing him to a limited period of incarceration. *Id.* By contrast, in Mitts's case the prosecutor did not argue future dangerousness and there was no misunderstanding by the jury--the law in Ohio is that the judge is to make the determination of whether sentences will be served concurrently or consecutively.  Moreover, counsel's argument that it was unrealistic to think that the trial judge would impose concurrent sentences here is speculative. Accordingly we overrule Mitts's first proposition of law.

*Mitts*, 690 N.E.2d at 528-29.

In the second proposition of law, Mitts argued that the trial court violated the constitutional provisions guaranteeing compulsory process and Federal Rules of Evidence 702, 703, and 705, when it refused to allow Dr. Sonya McKee, a psychiatrist, to answer a hypothetical question addressing the issue of specific intent to kill. The Ohio Supreme Court disagreed:

At trial, the defense called Dr. McKee, who testified that she had examined Mitts and found him competent, not suffering from any mental disease or defect, and responsible for his acts.

Dr. McKee did think that Mitts was intoxicated on the day of the offenses and suffering from impaired memory as a result, and she answered various hypothetical questions on those points. But the court sustained the state's objection to a question concerning a hypothetical man, "B," who hated "black people [and] police officers," then got

37

drunk, and shot a black man and a police  officer. This question contrasted "B" with a hypothetical person, "A," presumably Mitts, who did not dislike blacks or police officers.

Initially, we note that Mitts did not preserve this issue for review by proffering the substance of the excluded testimony. See Evid.R. 103(A)(2); *State v. Gilmore* (1986), 28 Ohio St.3d 190, 28   OBR 278, 503 N.E.2d 147, syllabus. Even if it was properly preserved, we would find no abuse of discretion in the exclusion of this evidence. See *State v. Williams* (1996), 74 Ohio St.3d 569,     576, 660 N.E.2d 724, 732, citing *State v. Williams* (1983), 4 Ohio St.3d 53, 4 OBR 144, 446 N.E.2d 444, syllabus. Under Evid.R. 403(A), the trial court must exclude evidence "if its probative value is substantially outweighed by the danger of * * * confusion of the issues, or misleading the jury." Defense counsel's attempt to secure Dr. McKee's opinion contrasting two hypothetical persons was misleading and confusing.

Moreover, the trial court could have excluded the testimony because, except in the mitigation phase, "a defendant may not offer expert psychiatric testimony, unrelated to the insanity defense, to show that, due to mental illness, intoxication, or any other reason, he lacked the mental capacity to form the specific mental state required for a particular crime or degree of crime." *State v. Cooey* (1989), 46 Ohio St.3d 20, 26, 544 N.E.2d 895, 906; accord *State v. Wilcox* (1982), 70 Ohio St.2d 182, 194, 24 O.O.3d 284, 291, 436 N.E.2d 523, 530; *State v. Slagle* (1992), 65 Ohio St.3d 597, 607, 605 N.E.2d 916, 927; *State v. Huertas* (1990), 51 Ohio St.3d 22, 27, 553 N.E.2d 1058, 1065 (rejecting expert witnesses as to the effect of intoxication). Thus, we reject Mitts's second proposition of law.

*Mitts*, 690 N.E.2d at 526-27.

In the third proposition of law, Mitts argued that the trial court's failure to merge duplicative capital specifications was prejudicial error because there was significant mitigating evidence.  He argued that the failure to merge duplicative specifications prior to the penalty phase allowed the government to cumulate them in a manner which made it impossible for the jury to properly weigh the aggravating

38

circumstances and the mitigating factors.  *ECF No. 16, Appendix, Volume III,* at 42, *Merit Brief of*

*Appellant,* at 18.  The supreme court ruled as follows:

> Both aggravated murder counts charged Mitts with three course-of-conduct specifications, R.C. 2929.04(A)(5). For example, Count One, alleging the aggravated murder of Sgt. Glivar, included specification three, a course-of-conduct specification in which Bryant was killed. Specification four alleged a course of conduct in which Mitts attempted to kill Lt. Kaiser, and specification five alleged a course of conduct in which Mitts attempted to murder Officer Mackey. Count Two, alleging the aggravated murder of Bryant, included three similar specifications concerning Sgt. Glivar, Lt. Kaiser, and Officer Mackey.

> Multiple course-of-conduct specifications are duplicative and must be merged at the sentencing phase. See *State v. Jenkins* (1984), 15 Ohio St.3d 164, 194-200, 15 OBR 311, 337-342, 473 N.E.2d 264, 292-296. In fact, such multiple course-of-conduct specifications should not even be included in an indictment. In *State v. Spisak* (1988), 36 Ohio St.3d 80, 84, 521 N.E.2d 800, 803,   this court held that "[e]ach aggravated *murder* count should thus contain only one specification that appellant's acts were part of a course of conduct." Further, if such multiple specifications are   included in an indictment, the "trial court should instruct the jury in the penalty phase that those duplicative specifications must be considered merged for purposes of weighing the aggravating     circumstances against the mitigating factors." *State v. Garner* (1995), 74 Ohio St.3d 49, 53, 656 N.E.2d 623, 630. No such instruction was given in this case. To determine whether that omission constituted reversible error we must engage in a two-pronged analysis. *Id.,* citing *State v. Jenkins,* 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, at paragraph five of the syllabus. In the first prong we determine "whether the specifications at issue 'ar[o]se from the same act or indivisible course of conduct,' and were thus, in fact, duplicative." *Id.,* quoting *State v. Jenkins,* 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, at paragraph five of the syllabus.  The court of appeals correctly held, and the state concedes, that the specifications were duplicative.

> For the second prong, we must "determine whether the jury's penalty-phase consideration of those duplicative aggravating circumstances affected its verdict, and independently determine

39

whether the merged aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt." *Id.* "[M]erging of aggravating circumstances [can] take place upon appellate    review," and "resentencing is not automatically required." *State v. Jenkins,* 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, at paragraph five of the syllabus; *State v. Garner,* 74 Ohio St.3d at 53, 656 N.E.2d at 630; *State v. Spisak,* 36 Ohio St.3d at 84, 521 N.E.2d at 803.

We find that the trial court's failure to instruct the jury that the duplicative specifications should be considered merged did not influence the jury to recommend the death penalty rather than life imprisonment. The outcome of the penalty hearing did not hinge on the failure to merge these three course-of-conduct specifications. We agree with the appellate court that merger of the duplicative course-of-conduct specifications into a single specification listing each shooting victim would not change the nature of the evidence which the jury was statutorily required to consider. Furthermore, the judge did not instruct the jury that its finding of guilt of multiple specifications should be deemed to increase the weight given the aggravating circumstances. Cf. *State v. Penix* (1987), 32 Ohio St.3d 369, 372, 513 N.E.2d 744, 747.

Moreover, our independent weighing of the mitigating factors against the properly merged aggravating circumstances may be used to cure the penalty-phase error. *State v. Combs* (1991), 62 Ohio St.3d 278, 286, 581 N.E.2d 1071, 1079; *Clemons v. Mississippi* (1990), 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725.  Accordingly, we reject Mitts's third proposition of law.

*Mitts*, 690 N.E.2d at 529-30.

In the fourth proposition of law, Mitts challenged the trial court's refusal to instruct the jury on voluntary intoxication when "a reasonable jury could find that the defendant could not form the requisite intent due to * * * inebriation."  The supreme court responded:

As we recognized in *State v. Fox* (1981), 68 Ohio St.2d 53, 54-55, 22 O.O.3d 259, 260, 428 N.E.2d 410, 411, "[t]he common law and statutory rule in American jurisprudence is that voluntary intoxication is not a defense to any crime." Nonetheless, "where specific

40

intent is a necessary element, * * * if the intoxication was such as to preclude the formation of such intent, the fact of intoxication may be shown to negative this element." *Fox,* 68 Ohio St.2d at 55, 22 O.O.3d at 260, 428 N.E.2d at 411-412.

In denying the defense request for an instruction on intoxication, the trial court relied on *State v. Hicks* (1989), 43 Ohio St.3d 72, 538 N.E.2d 1030. In *Hicks,* the trial court did not instruct on voluntary intoxication despite evidence of intoxication. On appeal Hicks claimed that he was so intoxicated, through cocaine, that he could not form the specific intent to kill. The *Hicks* court     recognized that "[t]he issue of intoxication is not raised as a defense to the element of purpose * * * merely because the evidence suggests reduced inhibitions, impaired judgment or blurred appreciation by the defendant of the consequences of his conduct." *Id.* at syllabus.

It is within the sound discretion of the trial court to determine whether the evidence is sufficient to require a jury instruction on intoxication. *State v. Wolons* (1989), 44 Ohio St.3d 64, 541 N.E.2d 443, paragraph two of the syllabus; *State v. Fox,* 68 Ohio St.2d 53, 22 O.O.3d 259, 428 N.E.2d 410. Evidence of intoxication is sufficient to raise the intoxication defense only where, if believed, it would support acquittal. *State v. Hicks,* 43 Ohio St.3d at 75, 538 N.E.2d at 1034.

Here, there was evidence that Mitts was intoxicated during the police standoff, but the jury still could not have reasonably found that he lacked the capacity to form a specific intent to kill at the time of the murders. Testimony from witnesses who observed Mitts before or during the shootings does not support a finding that Mitts was so intoxicated that he did not intend what he was doing when he shot the victims. Around 8:00 p.m., when Timothy Rhone encountered Mitts in the hallway, Mitts displayed no signs of intoxication. Mitts held the gun "[p]erfectly steady" when he aimed it at Rhone's head. After 8:00 p.m., when Griffin saw Mitts walk up, aim, and shoot Bryant, Mitts was not staggering. Daniel O'Brien saw Mitts just after he killed Bryant and when Mitts shot at the first responding police car. O'Brien testified that Mitts was not staggering as he walked around, and he had no trouble ejecting the clip from his weapon, reloading, and firing several times at a police car.

41

Between 8:30 and 9:00 p.m., after Mitts shot Lt. Kaiser and Sgt. Glivar, Lt. Kaiser tried to negotiate with Mitts for twenty or thirty minutes. Mitts threatened to kill Bryant's girlfriend, Griffin, as well as the entire police department. By refusing to surrender and demanding that the police come to his apartment and kill him, Mitts demonstrated that he was acting purposefully and knew what he had done and what he was doing. At that time, Mitts said he had been drinking, but he did not say how much and his speech was not slurred.

Officer Mackey, who talked with Mitts even later, also noted that Mitts said he had been drinking, but Mitts was "calm" and "never angry," and his speech pattern did not indicate intoxication. Further, Mitts read the label on Glivar's shotgun and fired it twice, although he was unfamiliar with that weapon. Sgt. Robert Sackett, who joined in Mitts's lengthy conversations with Officer Mackey, thought Mitts seemed "completely sober."

Chief Salerno, who first talked with Mitts around 8:30 p.m. during the police standoff, testified that Mitts would "giggle and laugh" at times, and at other times would "start getting angry." Mitts told Salerno that he had finished drinking a bottle of bourbon and was now drinking scotch. Salerno thought Mitts was drunk, but Mitts told him exactly what he had done, *i.e.,* killed a black man and shot two police officers. Detective Ronald Arco also thought Mitts was intoxicated when he overheard Mitts on the telephone around 9:42 p.m.

Police Sergeant Gary Wolske, who stayed with Mitts after he was arrested around 2:00 a.m., described him as quiet, neither combative nor confused, and apparently sober. A nurse who first treated Mitts testified that he displayed no signs of intoxication. A Life Flight nurse, who saw Mitts later, thought he had been drinking, but his speech was not impaired. Mitts indicated that he knew what he had done because he told the nurse, "I'm a cop killer and you might as well kill me now." Mitts also said, "I think I killed a nigger."

Mitts's strongest evidence of intoxication is his blood-alcohol level of .21 grams per one hundred milliliters taken at 3:43 a.m. Although the blood-alcohol level is evidence that Mitts was intoxicated at the time of the blood test, more than six hours after the shootings, it does not compel an intoxication instruction because the jury could not have inferred from it that the intoxication precluded Mitts from forming

42

the intent to purposefully commit the murders.

The evidence of intoxication could not have supported a verdict of acquittal. The trial court was correct in determining that an intoxication instruction was not required. Accordingly, we reject the fourth proposition of law.

*State v. Mitts*, 690 N.E.2d 522, 527-28 (Ohio 1998).

In the fifth proposition of law, Mitts claimed that the trial court erred when it instructed the jury that its death verdict was only a recommendation and not binding on the court, but that a life sentence was binding on the court.  The Supreme Court of Ohio disagreed:

Mitts's counsel failed to object at trial and waived all but plain error. *State v. Slagle* (1992), 65 Ohio St.3d 597, 605, 605 N.E.2d 916, 925. Plain error is an obvious error or defect in the trial proceedings that affects a substantial right. Crim.R. 52(B). Under this standard, reversal is warranted only when the outcome of the trial would have been different without the error. *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph two of the syllabus.

This court has previously held that the trial court does not err by referring to the jury's verdict as a recommendation or by recognizing that the trial court would make the final decision on       the death penalty. See, *e.g., State v. Woodard* (1993), 68 Ohio St.3d 70, 77, 623 N.E.2d 75, 80-81; *State v. DePew* (1988), 38 Ohio St.3d 275, 280, 528 N.E.2d 542, 550; *State v. Jenkins*, 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, at paragraph six of the syllabus. Accordingly, we overrule Mitts's fifth proposition of law.

*Mitts*, 690 N.E.2d at 530.

In the sixth proposition of law, Mitts raised three additional penalty-phase issues.   The Ohio Supreme Court stated that Mitts's counsel failed to object or request additional instructions and waived all but plain error.  *Id.* at 530-31.  First, Mitts argued that the trial court erred by providing the statutory

43

definition of "reasonable doubt," as contained in R.C. 2901.05(D).  The instruction stated that

reasonable doubt is present when the jury could not say it was convinced of the "truth of the charge."

Mitts argued that by providing this instruction, the trial court mandated a sentence of death because the

jury had already indicated – by convicting Mitts during the guilt phase – that it was convinced of the

truth of the charge.  Mitts claimed that such an instruction improperly shifted the burden of proof to the

defendant.  The supreme court disagreed:

> While this specific reference is inappropriate in the penalty-
> phase context, this deficiency was not outcome-determinative. See
> *State v. Taylor* (1997), 78 Ohio St.3d 15, 29, 676 N.E.2d 82, 96;
> *State v. Woodard,* 68 Ohio St.3d at 76-77, 623 N.E.2d at 80; *State
> v. Spirko* (1991), 59 Ohio St.3d 1, 17, 570 N.E.2d 229, 248.

Second, Mitts alleged that the trial court gave an improper "acquittal-first" instruction during

sentencing deliberations in violation of *State v. Thomas*, 533 N.E.2d 286 (1988), when  instructing the

jury that it must reject the death penalty before considering the life option.  The supreme court

disagreed:

> The court did *not* instruct the jury that it could consider lesser
> penalties only if it first unanimously rejected the death penalty. Instead,
> the court instructed that if all twelve members of the jury found that the
> state had not proved that the aggravating circumstances outweighed
> mitigating factors, then it must choose between the possible life
> sentences. That instruction is consistent with R.C. 2929.03(D)(2) and
> does not constitute error. *State v. Taylor,* 78 Ohio St.3d at 28-29, 676
> N.E.2d at 95; *State v. Davis* (1996), 76 Ohio St.3d 107, 116- 118,
> 666 N.E.2d  1099, 1108-1109.

Third, Mitts challenges the trial court's instruction that the jury "must not be influenced by any

consideration of sympathy or prejudice," arguing that the trial court should have used the term "*mere*

sympathy."  The supreme court disagreed:

44

> Again, this issue lacks merit. Sympathy is not a relevant sentencing criteria, and "[t]here is no practical difference between 'mere sympathy' and 'any sympathy' in this context." *State v. Taylor,* 78 Ohio St.3d at 30, 676 N.E.2d at 96. The court's instruction to the jury not to consider sympathy or prejudice was a correct statement of the law. *State v. Allen* (1995), 73 Ohio St.3d 626, 638, 653 N.E.2d 675, 687; *State v. Steffen* (1987), 31 Ohio St.3d 111, 125, 31 OBR 273, 285, 509 N.E.2d 383, 396; *State v. Jenkins,* 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, at paragraph three of the syllabus. Thus, we reject Mitts's sixth proposition of law.

*Mitts*, 690 N.E.2d at 530-31.

In the seventh proposition of law, Mitts argued that trial counsel's failure to object to erroneous jury instructions and improper comments of the prosecutor deprived him of his constitutional right to the effective assistance of counsel. Specifically, Mitts argued that counsel's failure to object to the trial court's definition of aggravating circumstances and reasonable doubt, the trial court's "acquittal-first" instruction during the penalty phase, duplicative capital specifications pursuant to R.C. § 2929.04(A)(5), and the use of the term recommendation throughout the trial and in the jury instructions caused unfair prejudice by denying Mitts the proper consideration of the relevant factors. The supreme court disagreed:

> Reversal of a conviction or sentence on the grounds of ineffective assistance of counsel requires that the defendant show, first, that counsel's performance was deficient and, second, that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial. *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693. To demonstrate that counsel is deficient, appellant must show that counsel's performance fell below an objective standard of reasonable representation. *State v. Bradley* (1989), 42 Ohio St.3d  136, 538 N.E.2d 373, paragraph two of the syllabus. To demonstrate prejudice, appellant must prove that there exists a reasonable probability that were it not for counsel's error, the result of the trial would have been different. *Id.* at paragraph three of the

45

syllabus.

Mitts's claims of ineffective assistance do not meet the *Strickland* standard. Since we have previously concluded that the trial court's "acquittal first" instruction, "reasonable doubt" definition, and use of the term "recommendation" were not erroneous, counsel's performance was not deficient for failing to raise these issues. (See discussion of Propositions of Law V and VI, above.)

As we discussed under Proposition of Law III, the course-of-conduct death-penalty specifications should have been merged. Any deficiency in counsel's failure to raise this issue, however, did not prejudice the defendant because, as we determined, the failure to merge was not outcome-determinative.

Mitts also raises his counsel's failure to object to prosecutorial misconduct. On that point, however, Mitts fails to describe specifically any alleged prosecutorial misconduct. Hence, we reject this proposition of law.

*Mitts*, 690 N.E.2d at 531-32.

In the eighth proposition of law, Mitts argued that the trial court erred in refusing to instruct the jury that it could consider as mitigating the fact that Mitts was highly intoxicated at the time of the offense.  The Ohio Supreme Court disagreed, stating:

The court, however, followed the statutory language in R.C. 2929.04(B), and accurately stated the law by instructing the jury to consider the accused's "history, character and background," as well as his lack of a criminal record and "[a]ny other factors that are relative [*sic* ] to the issue whether defendant should be sentenced to death."

Thus, the jury was allowed to consider all of the mitigation evidence including Mitts's asserted intoxication, as well as his counsel's argument that intoxication was a mitigating factor. The jury was not precluded from considering any evidence as mitigating. In *State v. Landrum* (1990), 53 Ohio St.3d 107, 122, 559 N.E.2d 710, 727-728, we held that a trial judge did not err by simply following the statutory language and declining to instruct that particular evidence was a possible

46

specific mitigating factor. We find that Mitts's eighth proposition of law
lacks merit.

*Mitts*, 690 N.E.2d at 531.

In the ninth proposition of law, Mitts argued that the aggravating factors did not outweigh the

mitigating factors, summarized the mitigating evidence, and outlined various mitigating factors he drew

from that evidence.  The Ohio Supreme Court considered these arguments in its independent review of

the death sentence:

Pursuant to R.C. 2929.05, we independently weigh the
aggravating circumstances against the mitigating factors and determine
whether Mitts's sentence is disproportionate to sentences in similar
cases.

Sgt. Glivar's murder has two aggravating circumstances: (1) that
the victim was a peace officer in the line of duty (R.C. 2929.04[A][6])
and (2) that the murder was part of a course of conduct involving the
purposeful killing or attempt to kill two or more persons (R.C.
2929.04[A][5]). Bryant's murder carries only the course-of-conduct
aggravating circumstance. The evidence proves these aggravating
circumstances beyond a reasonable doubt.

We find that the nature and circumstances of these offenses do
not offer the slightest mitigating value. In contrast, Mitts's history,
character, and background are entitled to some mitigating weight. As
several witnesses testified, Mitts was respected and loved by his family
and was a devoted father. See *State v. Fox,* 69 Ohio St.3d at 194,
631 N.E.2d at 133. Mitts's brother testified that Mitts was the oldest
child in the family and that while growing up Mitts looked after the
younger children. Mitts's sister described Mitts as "laid-back" and a
"gentle giant," who was very protective of his brothers and sisters. Mitts
served honorably for four years in the Coast Guard, and he was
gainfully employed all of his life. See *State v. Lundgren* (1995), 73
Ohio St.3d 474, 495, 653 N.E.2d 304, 324-325; *State v. Fox, supra;
State v. Simko* (1994), 71 Ohio St.3d 483, 496, 644 N.E.2d 345,
350;*State v. Brewer* (1990), 48 Ohio St.3d 50, 64, 549 N.E.2d 491,
505. We accord all of these factors some mitigating weight.

47

R.C. 2929.04(B)(1) through (4) and (6) are not applicable in this case. The victims did not "induce or facilitate" the offenses and Mitts did not act under "duress, coercion or strong provocation." (R.C. 2929.04[B][1] and [2].) The expert opinion testimony confirmed that Mitts did not suffer from any "mental disease or defect." (R.C. 2929.04[B][3].) Mitts was forty-two years old at the time of the offenses and was the principal offender. (R.C. 2929.04 [B][4] and [6].)

Mitts had no criminal record, and this "noteworthy" mitigating factor in R.C. 2929.04(B)(5) is entitled to significant mitigating weight. See *State v. Fox*, 69 Ohio St.3d at 195, 631 N.E.2d at 133-134.

As to "other factors" (R.C. 2929.04[B][7] ), Mitts claims remorse for his actions as well as the influence of alcohol as mitigating factors. Mitts's expression of remorse in his unsworn statement is entitled to some weight. See *State v. Rojas* (1992), 64 Ohio St.3d 131, 143, 592 N.E.2d 1376, 1387. As to alcohol, Mitts presented no evidence that he was an alcoholic, and voluntary drunkenness is entitled to very little mitigating weight. See, *e.g., State v. Slagle,* 65 Ohio St.3d at 614, 605 N.E.2d at 931.

We now weigh these mitigating factors against the aggravating circumstance(s) in each murder. "When a capital defendant is convicted of more than one count of aggravated murder, * * * [o]nly the aggravating circumstances related to a given count may be considered in assessing the penalty for that count." *State v. Cooey* (1989), 46 Ohio St.3d 20, 544 N.E.2d 895, paragraph three of the syllabus. Based on the evidence, we find that the aggravating circumstances in the murder of Sgt. Glivar outweigh the mitigating factors. As to the murder of Bryant, we also find that the aggravating circumstance outweighs the mitigating factors.

We further conclude that the death penalty imposed for each aggravated murder is appropriate and proportionate when compared with similar capital cases. As to "course of conduct" murders, see *State v. Allard* (1996), 75 Ohio St.3d 482, 663 N.E.2d 1277; *State v. Williams* (1996), 74 Ohio St.3d 569, 660 N.E.2d 724; *State v. Dunlap* (1995), 73 Ohio St.3d 308, 652 N.E.2d 988; *State v. Loza* (1994), 71 Ohio St.3d 61, 641 N.E.2d 1082; *State v. Grant* (1993), 67 Ohio St.3d 465, 620 N.E.2d 50; *State v. Lorraine* (1993), 66 Ohio St.3d 414, 613 N.E.2d 212; *State v. Hawkins* (1993), 66 Ohio

48

> St.3d 339, 612 N.E.2d 1227; *State v. Montgomery* (1991), 61 Ohio
> St.3d 410, 575 N.E.2d 167; and *State v. Combs* (1991), 62 Ohio
> St.3d 278, 581 N.E.2d 1071. When compared with prior cases
> involving the murder of a peace officer, the death penalty is also
> appropriate and proportionate. See, *e.g., State v. Zuern* (1987), 32
> Ohio St.3d 56, 512 N.E.2d 585; *State v. Glenn* (1986), 28 Ohio
> St.3d 451, 28 OBR 501, 504 N.E.2d 701.

*State v. Mitts*, 690 N.E.2d 522, 532-34 (Ohio 1998).

In the tenth proposition of law, Mitts contended that the trial court improperly weighed the

relevant sentencing factors in imposing the death sentence.  Specifically, Mitts claimed that the court did

not consider the mitigating evidence, weigh each individual conviction separately, list the aggravating

factors, or consider Mitts's lack of criminal history as mitigating in violation of R.C. § 2929.04(B)(5).

The supreme court ruled as follows:

> In imposing a sentence, "the assessment and weight to be given
> mitigating evidence are matters for the trial court's determination." *State
> v. Lott* (1990), 51 Ohio St.3d 160, 171, 555 N.E.2d 293, 305. The
> fact that mitigation evidence is admissible "does not automatically mean
> that it must be given any weight." *State v. Steffen* (1987), 31 Ohio
> St.3d 111, 31 OBR 273, 509 N.E.2d 383, paragraph two of the
> syllabus. See, also, *State v. Stumpf* (1987), 32 Ohio St.3d 95, 512
> N.E.2d 598, paragraph two of the syllabus. R.C. 2929.03(F) does
> require, however, that the trial court state in its separate opinion its
> specific findings as to the existence of the mitigating factors, the
> aggravating circumstances the offender was found guilty of committing,
> and the reasons why the aggravating circumstances were sufficient to
> outweigh the mitigating factors. R.C. 2929.03(F); *State v. Maurer*
> (1984), 15 Ohio St.3d 239, 15 OBR 379, 473 N.E.2d 768, paragraph
> three of the syllabus.

> We agree with Mitts that the trial court erred by not separately
> weighing the aggravating circumstances in each count of aggravated
> murder. *State v. Cooey* (1989), 46 Ohio St.3d 20, 544 N.E.2d 895,
> paragraph three of the syllabus. The trial court also incorrectly stated
> that no evidence of any statutory mitigating factors existed; in fact, the

49

> evidence showed that Mitts had no criminal record. See R.C.
> 2929.04(B)(5). Although the trial court correctly identified the
> aggravating circumstances, the trial court did not merge the
> specifications as it should have done. (See discussion on Proposition of
> Law III.) Nor does the trial court's opinion explain why the aggravating
> circumstances outweighed the mitigating factors. See *State v. Fox*
> (1994), 69 Ohio St.3d 183, 190-191, 631 N.E.2d 124, 130-131.
>
> Despite these deficiencies in the trial court's opinion, we find that
> reversal is not required. The court of appeals already noted these
> defects and determined, after an independent sentence review, that the
> death penalty was appropriate. Further, our "independent review of a
> sentence will cure any flaws in the trial court's opinion." *State v. Fox,*
> 69 Ohio St.3d at 191, 631 N.E.2d at 131. Accord *State v. Hill*
> (1996), 75 Ohio St.3d 195, 210, 661 N.E.2d 1068, 1082; *State v.*
> *Lott,* 51 Ohio St.3d at 170-173, 555 N.E.2d at 304-307. Accordingly,
> we overrule the tenth proposition of law.

*Mitts,* 690 N.E.2d at 532.

In the eleventh proposition of law, Mitts made a number of arguments challenging Ohio's death

penalty provisions, and argued that the imposition of the death penalty violates the Sixth, Eighth and

Fourteenth Amendments to the United States Constitution and Article I, §§ 2, 9, 10 and 16 of the Ohio

Constitution.  The supreme court ruled as follows:

> We have previously held that R.C. 2929.05 does not require
> this court to address and discuss, in opinion form, each proposition of
> law raised in a capital case. See, *e.g., State v. Keith* (1997), 79 Ohio
> St.3d 514, 517, 684 N.E.2d 47, 54; *State v. Allen* (1995), 73 Ohio
> St.3d 626, 628, 653 N.E.2d 675, 680. Accordingly, we reject the
> eleventh proposition of law, a familiar attack on the    constitutionality of
> Ohio's death-penalty statutes, for reasons we have often stated before.

*ECF No. 16, Appendix, Volume III, Merit Brief of Appellant,* at 44-59; Mitts, 690 N.E.2d at 526.

The Ohio Supreme Court thus affirmed the convictions and death penalty.  *Mitts,* 690 N.E.2d at 534.

On March 19, 1998, Mitts filed a motion for rehearing in the Ohio Supreme Court, asking  the court to

50

rehear the first proposition of law.  *ECF No. 16, Appendix, Volume III,* at 275-76.  The motion was

denied, without opinion, on June 17, 1998.  *State v. Mitts*, 695 N.E.2d 266 (Ohio 1998).  Mitts did

not file a petition for writ of certiorari to the U.S. Supreme Court.  *ECF No. 12, Motion to Dismiss*,

at 3.

### B.   State Post-Conviction Proceedings

#### 1.   Trial Court

Represented again by Attorneys Doughten and Parker, Mitts next sought state post-conviction

relief, pursuant to Ohio Revised Code § 2953.21, in the Cuyahoga County Court of Common Pleas.

On January 31, 1997, Mitts filed a motion for appropriation of funds to hire an expert to assist in the

preparation of his post-conviction proceedings.  *State v. Mitts,* No. 76963, 2000 WL 1433952, at *2

(Ohio Ct. App. Sept. 28, 2000).  Mitts argued that the appointment was necessary to support the

ineffective assistance claim.  *ECF No. 17, Appendix, Volume IV,* at 145.  In the motion, Mitts also

requested funds to appoint Dr. Eisenberg to assist in the preparation of his defense.  *Id.*  On March 23,

1999, Mitts filed an amended petition for post-conviction relief, which contained certain exhibits and

raised the following six causes of action:

> 1.   Mitts was denied the effective assistance of counsel in both phases of trial as
>      guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments of the United
>      States Constitution and Article I, §§ 10 and 16 of the Ohio Constitution.
>
> 2.   Mitts was denied the effective assistance of counsel in the mitigation phase of
>      trial as guaranteed by the Fifth, Sixth and Fourteenth Amendments to the United
>      States Constitution and Article I, §§ 10 and 16 of the Ohio Constitution when
>      trial counsel failed to investigate and present relevant mitigating evidence.

3.   Mitts's sentence is void or voidable under the Fifth, Eighth and Fourteenth Amendments of the United States Constitution because Ohio courts do not engage in an effective, meaningful proportionality review as required by statute.

4.   Mitts's convictions and sentence violate the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution because Ohio's post-conviction procedure does not provide meaningful review of prisoners' claims.

5.   Mitts's convictions and sentence are void and/or voidable under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and Article I, §§ 2, 9, 10 and 16 of the Ohio Constitution, because there was insufficient evidence to support his convictions of aggravated murder.

6.   Mitts's convictions and sentence are void and/or voidable under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution; Article I, §§ 1, 2, 5, 9, 10, 16 and 20, and Article II, § 39 of the Ohio Constitution; and Ohio Revised Code § 2929.024 because defense counsel did not request, and the trial court did not appoint, an expert to assist counsel during trial.

*See ECF No. 17, Appendix, Volume IV,* at 150, *First Amended Petition, etc.* ("Amended Post-

Conviction Petition").  On June 9, 1999, the State filed a motion to dismiss the post-conviction petition.

*ECF No. 17, Appendix, Volume IV,* at 283.

On August 16, 1999, the trial court issued a decision denying Mitts's petition and request for

expert assistance.  *Id.* at 306, *Findings of Fact and Conclusions of Law* (hereinafter "Findings and

Conclusions").

In the first cause of action, Mitts argued that he was denied effective assistance of counsel in the

guilt-innocence and mitigation phases of trial.  *Amended Post-Conviction Petition* ¶¶ 23-24.

Specifically, Mitts argued that his counsel did not provide adequate representation at trial, was in a hurry

to try the case, did not properly conduct voir dire (specifically, by failing to question potential jurors

about race), insisted on a "blackout defense" even though Mitts told his attorney that he was not

52

blacked out during the incident, and did not request an expert.  *Id*. ¶¶ 25-28.  Mitts also requested

discovery in order to fully develop this claim, and the appointment of an investigator and funding to hire

an expert.  *Id*. ¶¶ 29-30.  The court reviewed Mitts's evidence, i.e. an affidavit from Mitts (Exhibit K),

and  held that "Petitioner's allegations in his First Claim for Relief, that his constitutional rights were

violated, are barred under res judicata and are therefore, denied."  *Findings and Conclusions*, at 308,

311.  Specifically, the court held:

> Under Ohio law, the doctrine of res judicata is that an existing, final judgment or decree, rendered upon the merits without fraud or collusion, by a court of competent jurisdiction, is conclusive of rights, questions and facts in issue, as to the parties or their privies, in all other actions in the same or any other judicial tribunal of concurrent jurisdiction (numerous citations omitted).  63 Ohio Jr. 3d, Judgments, Sec. 401, pages 178-181.  Furthermore, expression of the rule in the following manner has been approved:

>> The judgment of a court of concurrent jurisdiction directly upon the point is, as a plea in bar or as evidence, conclusive between the same parties, on the same matter, directly in question in another court. But neither the judgment of a court of concurrent or exclusive jurisdiction is evidence of any matter incidently cognizable, nor of any matter to be inferred by argument from the judgment ... The doctrine of res judicata is a principle of universal jurisdiction forming a part of the legal systems of all civilized nations, and has been characterized as a fundamental concept in the organization of civil society ... The doctrine is an obvious rule of expediency, public policy, public tranquility, and natural justice.  It is founded on the conclusiveness accorded to judgments.  It is based on the principle that parties might not to [*sic*] be permitted to litigate the same issues more than once, that litigation must not be interminable, the the [*sic*] judgment ought to be the end of the litigation, that circuity of actions should yield to the repose of litigation, and that a multiplicity of

actions is not favored. Without this fundamental doctrine, the proper enforcement of law would be quite impossible, as it could unsettle all the determination of law and open an endless avenue to contention and vexation.

63 Ohio Jur. 3d, Sec. 401, pages 178-181.

The doctrine of res judicata, which most often is raised in the context of civil cases, is equally applicable to post-conviction relief proceedings. State v. Nichols (1984), 11 Ohio St.3d 40.

In the case at bar, the petitioner's jury conviction and and [sic] Trial Court's sentence were affirmed by the Court of Appeals, Eighth District, Cuyahoga County, see State v. Mitts (Dec. 19, 1996), Cuy. App. No. 68612, unreported. The Ohio Supreme Court affirmed the Appellate Court's decision in State v. Mitts (1998), 81 Ohio St.3d 223. Clearly, the petitioner's claims have been reviewed and ruled on by the State courts which are Courts of competent jurisdiction in this action.

In Hicks v. De La Cruz (1977), 52 Ohio St.2d 71, the Ohio Supreme Court held:

The modern view of res judicata enhances the doctrine of collateral estoppel, which basically states that if an issue of fact of [sic] law actually is litigated and determined by a valid and final judgment, such determination being essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on a same or different claim.

Id. at 74.

Applying res judicata to the case at bar, it is clear that petitioner's incorporation of his claims in paragraphs 1-21 as represented in paragraph 22 are barred because the Courts (the Appellate Court and the Ohio Supreme Court) have previously ruled on these very same issues.

54

Furthermore, res judicata bars the assertion of any issue which was raised or could have been raised at trial or on appeal. State v. Perry (1967), 10 Ohio St.2d 175.  Moreover, where the alleged errors occurred on the record and the petitioner was represented by different counsel on appeal, ineffective assistance of counsel may not be raised in a post-conviction relief petition. State v. Cole (1982), 2 Ohio St.3d 112; State v. Woodward (Jan. 22, 1998) Cuy. App. No. 71912, unreported.  Thus petitioner's claims of ineffective assistance of counsel in paragraphs 23, 24, 25, 26, 27 and 28 are barred under res judicata in keeping with the Cole decision.

In addition, in order to overcome the doctrine of res judicata, petitioner must present competent, relevant and material evidence dehors the record.  State v. Combs (1994) 100 Ohio App.3d 90. Evidence dehors the record is evidence "outside" the record that was not in existence and available to the petitioner in time to support the direct appeal.  State v. Smith (1975), 17 Ohio St.3d 98.  The trial court has authority to weigh credibility of affidavit(s); this court in State v. Apanovitch (1996), 113 Ohio App.3d 591, held that "[w]here the evidence presented is specious, a hearing is not required" and stated that the evidence must be "of a weight and quality to demonstrate substantive grounds for relief to warrant an evidentiary hearing[.]" Id. at 597. See also State v. Saylor (1998), 125 Ohio App.3d 636; State v. Murawski (Apr. 29, 1999) Cuy. App. No. 74035, unreported.

As stated in R.C. 2953.21(A)(1), courts require some documentary support, affidavits, and/or trial transciprts [sic], to substantiate the claims of the petitioner.  In presenting grounds for relief, a petition for post-conviction relief must allege specific detailed facts. Sanders v. United States (1963), 373 U.S. 1. Broad assertions without further demonstration of prejudice do not warrant a hearing for a post conviction petition.  General conclusory allegations are inadequate as a matter of law to impose an evidentiary hearing.  State v. Jackson (1980), 64 Ohio St.2d 107, 111.  The statute requires "substantive grounds for relief."  R.C. 2953.21(C).

Petitioner's First Claim for Relief neither alleges specific detailed facts nor has petitioner submitted evidence to support his claims in paragraphs 23, 24, 25, 26 or 27.  In paragraph 28, petitioner does cites [sic] to Exhibit K, but this exhibit is his own affidavit regarding his childhood.  Therefore, these claims are denied.

55

In addition, petitioner relies on <u>Turner v. Murray</u> (1986), 476 U.S. 28, for the proposition that trial counsel did not properly conduct voir dire of the jury by failing to question the jury as to race. <u>Turner</u> does not mandate such questions of a jury where victim and defendant are of different race. <u>Turner</u> only requires the court to permit such questions if presented by trial counsel. Therefore, "a defendant cannot complain of a trial judge's failure to question prosective [*sic*] jurors on racial prejudice unless the defendant has specifically requested such an inquiry." <u>Id.</u> at 31, Headnotes.

*Findings and Conclusions*, at 308-311.

The court then addressed Mitts's request for discovery:

The Ohio Supreme court has held that post-conviction petitions are proceedings and, as such, the limit to discovery in post-conviction proceedings is the limitation imposed by Crim. R. 16. <u>State, ex. rel. Steckman v. Jackson</u> (1994), 70 Ohio St.3d 420. Criminal Rule 16 provides for discovery of evidence favorable (and/or exculpatory) to the petitioner by the prosecuting attorney. However, the Rule makes no provision allowing for complete disclosure of the prosecutors' or police investigators' files.

In a very similar case, the Eighth District Court of Appeals affirmed a lower court's decision to deny further discovery to support a petitioner's post-conviction relief petition. See <u>State v. Lott</u> (Nov. 3, 1994), Cuy. App. Nos. 66388, 66389, and 66390, unreported. In <u>Lott</u>, the Court of Appeals held that:

[A]lthough a post-conviction relief proceeding under R.C. 2953.21 is civil in nature, the extent of the trial court's jurisdiction is set forth by the statute, and the power to conduct and compel discovery under the civil rules is not included within the trial court's statutorily defined authority.***We agree and conclude that appellant was not entitled to conduct discovery under the civil procedure in a post-conviction relief proceeding. It must be emphasized that a post-conviction relief proceeding under R.C. 2953.21 does not grant power to the trial court to authorize discovery under the Rules of Civil Procedure.

56

> A post-convicition [*sic*] relief proceeding is not
> a civil re-trial of appellant's conviction.
>
> Id. at 12.  Citations omitted.
>
> Applying Ohio law to the case at bar, it is clear that petitioner is
> not entitled to further discovery in support of his post-conviction relief
> petition under the Code, the case law, or Criminal Rule 16.  Petitioner
> received all discovery available, pre-trial.  Nor does he now make a
> particularized requested [*sic*] which might be addressed.

*Findings and Conclusions*, at 311-312.

As for Mitts's request for the appointment of an investigator and funding for expert witnesses,

the trial court ruled as follows:

> The Ohio Supreme Court has held that to prevail on a request
> for appointment of an expert at the states' [*sic*] expense in capital cases,
> a defendant must show that the appointment is "reasonably necessary
> for the proper representation" of the defendant.  State v. Jenkins
> (1984), 15 Ohio St.3d 164, 173.  To determine what is "reasonably
> necessary," the Court noted that "the factors to consider are: 1) the
> value of the expert assistance to the defendant's proper representation
> ***; and 2) the availability of alternative devices that would fulfill the
> same functions as the expert assistance sought."  Id.
>
> The initial burden of establishing the reasonableness of the
> request belongs to the indigent defendant, who must "at a minimum***
> present the trial judge with sufficient facts upon which the court can base
> a decision."  State v. Scott (1987), 41 Ohio App.3d 313.  Because "the
> appointment of [an expert] represents a substantial expense to the State,
> the defendant's burden is likewise substantial."  State v. Braden (Nov.
> 16, 1992), Montgomery App. No. 12918, unreported.
>
> The appointment of investigators or expert assistance in a capital
> proceeding is governed by R.C. 2929.024 and has been construed to
> place the appointment of investigators or expert assistance within the
> sound discretion of the trial court.  State v. Broom (1988), 40 Ohio
> St.3d 277. Furthermore, in Caldwell v. Mississippi (1985), 472 U.S.
> 320, the Supreme Court found no  denial of due process when the state

57

court refused to fund the hiring of various experts in a capital case.  The
Court noted that the "petitioner offered little more than undeveloped
assertions that the requested assistance would be beneficial . . ."  <u>Id.</u> at
323-324.

Petitioner does not present facts which establish that an expert is
"reasonably necessary."  Furthermore, petitioner may obtain the sought-
after information through other means, namely legal research.  Petitioner
does not provide evidence sufficient to show that expert testimony
is warranted for his proper representation.  As such, petitioner's request
for expert assistance is denied.

*Findings and Conclusions*, at 312-313.

In the second cause of action, Mitts argued that he was denied effective assistance of counsel

during the mitigation phase of trial.  *Amended Post-Conviction Petition* ¶ 32.  Mitts argues that his

counsel failed to adequately investigate various mitigating factors, and failed to prepare and present

mitigating evidence at trial.  Mitts also requested discovery to fully develop this cause of action.  *Id*. ¶

52.

Again, the trial court dismissed Mitts's claim under the doctrine of *res judicata.  Findings and*

*Conclusions*, at 313.  The court held:

[T]he Eighth District Court of Appeals in <u>State v. Woodard</u>
(Jan. 22, 1998), Cuy. App. No. 71912, unreported, has determined
that:

the failure to investigate and present evidence at
the mitigation phase could have been raised on direct
appeal and is barred by <u>res judicata</u>.  See <u>State v. Cole</u>
(9182), 2 Ohio St.3d 112. "Under the doctrine of <u>res
judicata</u>, a final judgment of conviction bars a convicted
defendant who was represented by counsel from raising
and litigating in any proceeding expect [*sic*] an appeal
from that judgment, any defense or any claimed lack of
due process that was raised or could have been raised

58

> by the defendant at the trial, which resulted in that
> judgment of conviction, or on appeal from that
> judgment." State v. Szefcyk (1996), 77 Ohio St.3d 93,
> 95 [quoting State v. Perry (1967), 10 Ohio St.2d 175,
> at paragraph nine of the syllabus.]

Woodard, at 5-6.

Petitioner also asserts that his defense attorneys were ineffective because they did not call certain expert witnesses during both the evidentiary and mitigation phases of the trial. However, "decisions regarding the calling of witnesses are within the purview of defense counsel's trial tactics."  O'Malley v. U.S. (1961), 285 F.2d 733, quoted in State v. Hunt (1984), 20 Ohio App.3d 310.  It has been held that an attorney's trial strategy will not be the subject of second-guessing by courts which are reviewing claims of ineffective assistance of counsel.  State v. Hester (1976), 45 Ohio St.2d 71; State v. Peoples (1971), 28 Ohio App.2d 162.  In this case, trial counsel did call witnesses in the mitigation phase: four witnesses who were close to the defendant, knew him and could speak to his normal behavior and habits; and one expert witness, psychologist James Eisenberg, who testified about how alcohol can effect an individual's behavior.  The expert also testified regarding defendant's social history and actions on the day in question.  Therefore, mitigating evidence was definately [sic] presented.  Defendant's claims that trial counse [sic] did not investigate possible mitigating factors including a thorough review of his background, is erroneous.

Defendant's Second Claim for Relief cites additional things that trial counsel might have done towards the mitigation phase, but does not establish ineffective assistance of counsel. Defense exhibits are cumulative information, hypothetical questions which might have been asked, lists of additional people who might have been called to testify. For instance, defendant faults trial counsel for not calling Thomas Harrigan as a witness in the mitigation phase to testify that defendant was a good employee and that the events of August 14th were not consistent with defendant's normal way of handling frustration.  This testimony would have been cumulative as both George Fontana, defendant's ex-father-in-law and Christine Fontana, defendant's ex-mother-in-law said basically the same thing.

59

It is clear from the record that trial counsel made strategic
choices about which witnesses to call and which testimony to elicit,
which is within his discretion pursuant to O'Malley; Hunt; and Hester.
Petitioner now wants to retry the case using a different game plan.  His
suggestions for an alternative presentation do not support his allegations
of ineffective assistance of counsel nor do they demonstrate that a
different outcome would result.  Thus, this claim is denied.

Petitioner's Second Claim for Relief again reqests [*sic*]
discovery in paragraph 52.  As discussed supra, this request is denied.

*Findings and Conclusions*, at 313-315.

In his third cause of action, Mitts argued that Ohio courts do not engage in an effective,

meaningful proportionality review as required by statute.  *Amended Post-Conviction Petition*

¶¶ 54, 60.  Specifically, Mitts argued that the Ohio courts limit comparison to cases where the death

sentence was imposed, and ignore those cases with similar facts where the death penalty was not

imposed.  *Id*. ¶¶ 60-63.  The petition stated:

A primary example of the lack of meaningful proportionality
review is the majority opinion in State v. Richey, 64 Ohio St.3d 353,
595 N.E.2d 915 (1992).  In Richey, the court merely concluded that
the death penalty was appropriate and proportionate.  This conclusion
was followed by citations to nine (9) cases and their aggravating
circumstances.  There was no further comment on the similarity among
the cases.  In contrast, the dissenting opinion engaged in a thorough
comparison of the cases cited by the majority.  In doing so, Justice
Brown noted that "if one reads those cases (which are merely listed and
not analyzed by the majority), it is obvious that not one is remotely
similar to this one."  Id. at 376, 595 N.E.2d at 993.  He concluded by
stating, "[s]uch a review deserves more than lip service and a listing of
cases which are in no sense comparable to this one."  Id. at 377-78,
595 N.E.2d at 934.

In more than eleven (11) years of capital litigation concerning
the present death penalty statute, Ohio's appellate courts have not
followed adequate standards for the exercise of their statutorily-

60

mandated proportionality review.  The courts appear to rely only on the base language defining aggravating circumstances as the sole criterion for comparing one death penalty case to another.  It may be appropriate for a court to begin proportionality analysis with the statutory language defining the aggravating circumstances.  However, detailing the aggravating circumstance[s], finding other cases with the same circumstances, and concluding that the death penalty is proportionate or appropriate does not meet the statute's mandates nor the mandates of the United States Supreme Court.

*ition*, ¶¶ 64-65.

Mitts requested a hearing to develop the record on the proportionality of similarly charged defendants throughout the State.  *Id.* ¶ 55.  Mitts also requested discovery in order to fully develop and pursue this cause of action.  *Id.* ¶ 66.  The court ruled as follows:

Petitioner's Third Claim for Relief requests a proportionality review of the petitioner's sentence of death using cases which are fact specific to petitioner's facts, in paragraphs 54-67.  This claim is also barred by res judicata as petitioner has already raised this issue in his appeal to the Ohio Supreme Court.  See State v. Mitts (1998), 81 Ohio St.3d 223.  There are no substantive grounds for relief on this issue.  Petitioner further challenges the proportionality review conducted by the Ohio Supreme Court in death penalty cases.   His challenge is also barred by res judicata.

In State v. Steffen (1987), 31 Ohio St.3d 111, 123, the court, citing State v. Rogers (1985), 17 Ohio St.3d 174 at 186, held that "proportionality review is not constitutionally mandated, this court is relatively free, within the confines of [2929.05] to determine the pool of cases to be used for comparison."  The Steffen court further held that the proportionality review should be limited to cases in which the death penalty was imposed stating that "only convictions of a capital crime are relevant for comparison purposes, since such cases are necessarily so qualitatively different from all others that comparison with non-capital offenses would be a profitless exercise," Steffen at 123.  The court held that the "proportionality review required by 2929.05(A) is satisfied by a review of those cases already decided by the reviewing court in which the death penalty has been imposed."  Id., at 123-124.  The Steffen

61

court also states that "no reviewing court need consider any case where the death penalty was sought but not obtained or where the death sentence could have been sought but was not." Id., at 124.

There is no evidence that defendant's sentence is disproportionate to other similar cases.

*Findings and Conclusions,* at 315-16.

The court denied Mitts's discovery request, holding that "other alternatives are available to petitioner, such as legal research, in order to evidence disparity of sentence." *Id.* at 316.

In the fourth cause of action, Mitts attacked the doctrine of *res judicata* and argued that Ohio's post-conviction procedure has been rendered meaningless and does not provide adequate review of prisoners' claims. *Amended Post-Conviction Petition* at ¶¶ 75-76. The common pleas court disagreed:

Petitioner's Fourth Claim for Relief attacks the doctrine of res judicata and presupposes the denial of this petition for post-conviction relief. The Eighth District Court of Appeals held that attempting to re-litigate issues barred by res judicata could amount to misconduct and even suggested the possibility of sanctions. The Court stated:

In fact, the attempt by the applicant's present counsel to re-litigate the claim of ineffective assistance of appellate counsel amounts to frivolous behavior and is tantamount to misconduct. Applicant's present counsel is forewarned that such future conduct shall not be tolerated by this court. Counsel, through the present application for reopening, has not served the best interest of the applicant and in effect has blatantly abused the limited resources of this court. Again, present counsel is forewarned to cease and desist from such behavior or face the inherent authority of this court which allows the imposition of sanctions. (Numerous citations omitted).

62

> State v. Spisak (Nov. 29, 1994) Cuy. App. No. 49873,
> unreported, emphasis added.

> Applying this dictate to the case at hand, it is clear that
> petitioner's present attempt to revisit issues barred by res judicata could
> be seen as an abuse of the system under the Spisak decision.
> Anticipating this Court's ruling of res judicata does not preclude that
> determination if the Court finds that it is appropriate.  The Defense team
> must not be allowed to continue raising issues long  since decided.

*Findings and Conclusions*, at 316.

In the fifth cause of action, Mitts argued that there was insufficient evidence to support his

convictions of aggravated murder.  *Amended Post-Conviction Petition* ¶ 79.  Specifically, Mitts

alleged that he was unable to form the specific intent necessary to support his aggravated murder

convictions because of his intoxication.  *Id*. ¶ 81.  Mitts also requested funding for the appointment of

experts to establish his inability to form the specific intent required by law, and requested discovery to

fully develop this claim.  *Id*. ¶¶ 82, 86.  The trial court ruled as follows:

> [B]oth the Eighth District Court of Appeals and the Supreme
> Court of Ohio found sufficient evidence to support affirming petitioner's
> convictions on each level of appeal. Therefore, this claim is also barred
> by res judicata.

> Paragraph 82 again requests appointment of experts.  As
> discussed above, this request is denied.

> Paragraphs 83 and 84 broadly assert that petitioner's
> constitutional rights were violated.  No supporting evidence is submitted
> for these assertions. Paragraph 85 asserts that petitioner is innocent.
> These assertion [*sic*] are unfounded and unsupported.  As stated in
> R.C. 2953.21(A)(1), courts require some documentary support,
> affidavits, and/or trial transciprts [*sic*], to substantiate the claims of the
> petitioner.  In presenting grounds for relief, a petition for post-conviction
> relief must allege specific detailed facts.  Sanders v. United States
> (1963), 373 U.S. 1. Broad assertions without further demonstration of

prejudice do not warrant a hearing for a post conviction petition. General conclusory allegations are inadequate as a matter of law to impose an evidentiary hearing. <u>State v. Jackson</u> (1980), 64 Ohio St.2d 107, 111. The statute requires "substantive grounds for relief." R.C. 2953.21(C). As petitioner has not presented sufficient facts and/or evidence to support his claims, this claim for relief is denied.

Paragraph 86 of petitioner's Fifth Claim for Relief is yet another request for discovery to explore this claim. Again, as discussed above, this request is denied.

*Findings and Conclusions*, at 317.

In the sixth claim for relief, Mitts argued that his convictions and death sentence were void and/or voidable because defense counsel did not request, and the trial court did not appoint, an independent pharmacologist and/or toxicologist or similarly qualified expert to assist counsel in both phases of trial, in light of evidence that Mitts had abused alcohol and was under the influence at the time of the offenses. *Id*. ¶¶ 89-90. Mitts argued that the failure to appoint such an expert precluded him from "completely and efficiently" presenting evidence of relevant mitigating evidence under R.C. § 2929.04. *Id*. ¶ 91. Mitts also requested discovery to fully pursue this claim. *Id*. ¶ 93. The court responded:

Petitioner's Sixth Claim for Relief asserts that petitioner was denied expert assistance at trial and that he was prejudiced by this denial. As previously discussed, this issue could have, and should have been raised on appeal, not in a petitioner [*sic*] for post-conviction relief. Most importantly, petitioner has made no showing that he is entitled to expert assistance. The United States Supreme Court in <u>Ake v. Oklahoma</u> (1985), 470 U.S. 68, held that in a capital case where the defense is one of sanity [*sic*], the State must provide expert psychiatric help in order to provide the indigent defendant with the basic tools for a defense. However, in <u>Caldwell v. Mississippi</u> (1985), 472 U.S. 320, the Supreme Court found no denial of due process when the state court refused to fund the hiring of various experts in a capital case. In the

64

case at bar, the defense is not insanity, therefore, there is no mandate to
hire experts to support petitioner's theories.

Lastly, in paragraph 93, petitioner again requests discovery to
fully develop and pursue this claim. For the reasons stated before,
petitioner's request is denied. (citation omitted).

*Findings and Conclusions*, at 317-18. With this, the trial court denied the amended post-conviction

petition without a hearing.

## 2. Court of Appeals

On September 17, 1999, Mitts, under the continued representation of Attorneys Doughten and

Parker, appealed the trial court's denial of his post-conviction petition to the Ohio Court of Appeals,

Eighth District, asserting the following assignments of error:

1. The trial court erred in summarily dismissing Mitts's post-conviction petition
   without an evidentiary hearing.

2. Ohio's post-conviction system does not comply with the requirements of due
   process as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments
   to the United States Constitution.

3. The trial court erred to the substantial prejudice of the appellant by dismissing
   his claim of ineffective assistance of counsel during the mitigation phase of trial.

4. The state courts have failed to engage in a meaningful proportionality review as
   is required by R.C. § 2929.05(A).

5. The trial court erred to the substantial prejudice of the appellant by denying
   relief of the claims relating to the need for discovery, investigators and expert
   assistance.

6. Mitts's convictions and sentences are void and/or voidable because there was
   insufficient evidence to support his convictions of aggravated murder.

7. Mitts was denied the effective assistance of counsel in the guilt-innocence
   determination phase as guaranteed by the Fifth, Sixth, Eighth and Fourteenth

65

Amendments of the United States Constitution and Article I, §§ 10 and 16 of the Ohio Constitution.

8.     The trial court erred by finding claims I, II, III, IV, V and VI barred by the doctrine of *res judicata.*

*ECF No. 18, Appendix, Volume V,* at 65,  *Appellant's Brief and Assignments of Error* ("Appellant's Br."), at v.  On January 10, 2000, the State filed a brief in response.  *ECF No. 18, Appendix, Volume V,* at 129, *Brief of Appellee.*

On September 28, 2000, the Court of Appeals issued an opinion affirming the judgment of the trial court.  *State v. Mitts*, No. 76963, 2000 WL 1433952, at *1 (Ohio Ct. App. Sept. 28, 2000).

In the first assignment of error, Mitts argued that the trial court erred when it summarily dismissed his post-conviction petition without an evidentiary hearing.  Mitts claims that he supported his petition with sufficient evidence to warrant a hearing.  The court of appeals disagreed:

> A post-conviction relief proceeding is a collateral civil attack on a criminal conviction. As such, a defendant's right to post-conviction relief is not a constitutional right but is a right created by statute. Therefore, a petitioner receives no more rights than those granted by the statute. *State v. Calhoun* (1999), 86 Ohio St.3d 279, 714 N.E.2d 905.

> R.C. 2953.21(A) provides:

> Any person convicted of a criminal offense or adjudged delinquent claiming that there was such a denial or infringement of his rights as to render the judgment void or voidable under the Ohio Constitution or the Constitution of the United States, may file a petition at any time in the court which imposed sentence, stating the grounds for relief upon, and asking the court to vacate or set aside the judgment or sentence or to grant other appropriate relief. The petitioner may file such supporting affidavit and other documentary

66

evidence as will support his claim for relief.

A trial court may dismiss a petition for post-conviction relief without first holding an evidentiary hearing. *State ex rel. Jackson v. McMonagle* (1993), 67 Ohio St.3d 450, 619 N.E.2d 1017. The trial court may do so where it determines the petition, supporting affidavits, documentary evidence, files, and the record do not demonstrate the petitioner set forth sufficient operative facts to establish substantive grounds for relief. *Calhoun, supra,* at paragraph two of the syllabus.

A petition for post-conviction relief will be granted only where the denial or infringement of constitutional rights is so substantial as to render the judgment void or voidable. Relief is not available when the issue has been litigated by appeal or upon a motion for a new trial. *State v. Walden* (1984), 19 Ohio App.3d 141, 146, 483 N.E.2d 859. The claim must depend on factual allegations which cannot be determined by an examination of the files and records of the case. *State v. Milanovich* (1975), 42 Ohio St.2d 46, 325 N.E.2d 540, paragraph one of the syllabus. Constitutional issues which could have been raised on appeal but were not will be barred by res judicata. *State v. Perry* (1967), 10 Ohio St.2d 175, 226 N.E.2d 104.

Appellant inexplicably argues he entered a plea of guilty to aggravated murder. In fact, a jury convicted appellant of two counts of aggravated murder and two counts of attempted murder. Appellant's grasp of the record below seems tenuous at best. Either that, or appellant's attorney needs to exercise more care when pirating from another brief.

In support of his petition, appellant attached what appears to be possible questions and answers for various defense witnesses who were his family members. No context is offered as to when these exhibits were created or by whom. The trial court did not abuse it discretion by discounting this evidence.

Appellant also attached notes allegedly given to his attorney about his background to be used in mitigation. The Supreme Court considered appellant's background, including his childhood, Coast Guard service, and that he was gainfully employed all of his life when conducting its independent sentence assessment. Although appellant

67

argues the jury only was to consider intoxication as a defense, the record reflects the jury was aware of evidence challenging the idea he exhibited racial hatred and showing his prior history with drinking alcohol. During the penalty phase of the trial, appellant's former in-laws testified about his personality and history. Appellant's siblings testified about their family history. Nearly all of the evidence appellant now points to as mitigation was offered at trial or would be merely cumulative of what was admitted.

The trial court correctly afforded little weight to the evidence submitted in support of appellant's petition for post-conviction relief. The trial court did not abuse its discretion by denying the petition without first holding an evidentiary hearing.

Appellant's first assignment of error is overruled.

*Mitts*, No. 76963, at *2-4.

In the second assignment of error, Mitts argued that Ohio's post-conviction relief system (under Ohio Revised Code § 2953.21) was unconstitutional because it failed to provide any meaningful opportunity for a petitioner to challenge his conviction. The court of appeals overruled this claim, stating as follows:

This court upheld the constitutionality of Ohio's post-conviction proceedings in *State v. Slagle* (Aug. 10, 2000), Cuyahoga App. No. 76834, unreported. In *State v. Wiles* (1998), 126 Ohio App.3d 71, 709 N.E.2d 898, the Eleventh District Court of Appeals held that such a challenge is not cognizable in a petition for post-conviction relief but is to be made in an original action for habeas corpus. The court further rejected arguments that the post-conviction system is a sham but stated a petitioner's chance of success depended more on the merit of his claim than on the procedural obstacles of statutory post-conviction relief.

Appellant's second assignment of error lacks merit.

*Mitts*, No. 76963, at *4.

68

In the third assignment of error, Mitts contended that the trial court abused its discretion by dismissing his ineffective assistance of counsel claim.  Mitts asserted that his counsel did not adequately prepare and present mitigation evidence, and listed a number of mitigating factors in support of his claim of ineffective assistance of counsel.  Mitts also claimed that he wished to testify under oath but was prevented from doing so by his attorney.  The court of appeals ruled as follows:

> The doctrine of res judicata bars a claim of ineffective assistance of counsel when a defendant is represented by new counsel on direct appeal and the issue could have been determined without resort to evidence de hors the record. *State v. Cole* (1982), 2 Ohio St.3d 112, 443 N.E.2d 169, syllabus. Competent, relevant, and material evidence de hors the record may defeat the application of res judicata. This evidence must demonstrate that the petitioner could not have appealed the constitutional claim by use of information found in the original record. *State v. Lawson* (1995), 103 Ohio App.3d 307, 659 N.E.2d 362. The petitioner must submit evidentiary documents which contain sufficient operative facts to demonstrate that counsel was not competent and that the defense was prejudiced by the ineffectiveness. *State v. Jackson* (1980), 64 Ohio St.2d 107, 413 N.E.2d 819. If the petitioner fails to meet this burden, the trial court may dismiss the petition for post-conviction relief without a hearing. *Id.*

> The claim of ineffective assistance of counsel requires proof that counsel's performance is proved to have fallen below an objective standard of reasonable representation and, in addition, prejudice arises from counsel's performance. *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus. The establishment of prejudice requires proof that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different. *Id.* at paragraph three of the syllabus. The burden is on the defendant to prove ineffectiveness of counsel. *State v. Smith* (1985), 17 Ohio St.3d 98. Trial counsel is strongly presumed to have rendered adequate assistance. *Id.*

> Much of appellant's assertions claiming ineffective assistance of counsel involve trial tactics. Debatable trial tactics and strategies do not constitute a denial of effective assistance of counsel. *State v. Clayton*

(1980), 62 Ohio St.2d 45, 49, 402 N.E.2d 1189. An attorney's selection of which witnesses to call at trial falls within the purview of trial tactics and generally will not constitute ineffective assistance of counsel. *State v. Coulter* (1992), 75 Ohio App.3d 219, 598 N.E.2d 1324. Asking specific questions of a witness, even an expert witness, also falls under the realm of trial tactics.

The witnesses appellant wished to call to testify about his behavior at his place of employment were cumulative of other evidence admitted at the trial. Appellant's claims about evidence regarding his mother and the failure to request a continuance are barred by res judicata. The information appellant asserts he wished to convey under oath also was cumulative to legal arguments presented at trial. *State v. Lawson* (1995), 103 Ohio App.3d 307, 659 N.E.2d 362. This court will not second guess every aspect of the defense attorney's presentation at the penalty phase of appellant's trial. The existence of alternative or additional mitigation theories does not establish ineffective assistance of counsel. *State v. Combs* (1994), 100 Ohio App.3d 90, 105, 652 N.E.2d 205.

Appellant's third assignment of error is overruled.

*Mitts*, No. 76963, at *4-5.

In the fourth assignment of error, Mitts challenged the constitutionality of the proportionality review set forth in R.C. 2929.05(A).  Specifically, Mitts argued that Ohio appellate courts do not engage in a meaningful proportionality review, because, among other things, the courts limit comparison to cases where the death sentence was imposed, and ignore those cases with similar facts where the death penalty was not imposed.  The court of appeals disagreed:

In essence, appellant is asking this court to declare unconstitutional the method used by a superior court in deciding proportionality in capital cases. This claim is not cognizable in a petition for post-conviction relief because it does not affect the trial court's judgment of conviction or sentence. See *State v. Murnahan* (1992), 63 Ohio St.3d 60, 584 N.E.2d 1204. The Supreme Court consistently has rejected this same challenge to the constitutionality of Ohio's

70

> proportionality review of capital cases. *State v. Stallings* (2000), 89
> Ohio St.3d 280, 731 N.E.2d 159; *State v. Getsy* (1998), 84 Ohio
> St.3d 180, 702 N.E.2d 866.
>
>          Appellant's fourth assignment of error is overruled.

*Mitts*, No. 76963, at *5.

     In the fifth assignment of error, Mitts argued that the trial court erred by not allowing him to

engage in discovery, appoint investigators, or provide funds for expert assistance, all of which,

according to Mitts, were necessary for the preparation of his petition.  The court of appeals ruled as

follows:

>          As appellant notes, in *Calhoun, supra,* the court held a
> petitioner for post-conviction relief receives no more rights than are
> granted by R.C. 2953.21. This statute does not provide for discovery.
> *State v. Williams* (Nov. 17, 1999), Summit App. No. 19437,
> unreported. A petitioner is not entitled to discovery to assist him in
> establishing substantive grounds for relief. See *State v. La Mar* (Mar.
> 17, 2000), Lawrence App. No. 98 CA 23, unreported. Discovery may
> be allowed after it is determined an evidentiary hearing is warranted.
> *State v. Smith* (1986), 30 Ohio App.3d 138, 506 N.E.2d 1205. The
> trial court did not abuse its discretion by denying appellant's request for
> discovery or for the appointment of investigators and expert witnesses.
>          Appellant's fifth assignment of error is overruled.

*Mitts*, No. 76963, at *6.

     In the sixth assignment of error, Mitts argued that his conviction was void or voidable because

insufficient evidence was admitted at trial to support the element of specific intent.  Mitts argued that his

intoxicated state prevented him from being able to form the specific intent to kill necessary to be death

eligible under Ohio law.  The appeals court held:

>          Claims challenging the sufficiency or weight of the evidence
> admitted at trial are to be determined in the underlying criminal

proceeding and are not cognizable in post-conviction proceedings. *State v. Gillespie* (Mar. 9, 2000), Cuyahoga App. No. 75918, unreported. Post-conviction proceedings are to address constitutional errors which may have occurred during the trial. See *State v. Powell* (1993), 90 Ohio App.3d 260, 629 N.E.2d 13. A post-conviction relief proceeding is not a civil re-trial of a criminal conviction. *State v. Lott* (Nov. 3, 1994), Cuyahoga App. Nos. 66388, 66389, and 66390, unreported. The issue of intoxication was presented at trial and considered by the reviewing courts on appeal. This claim is barred by res judicata.

> Appellant's sixth assignment of error is not well-taken.

*Mitts*, No. 76963, at *6.

In the seventh assignment of error, Mitts contended that his counsel was ineffective during the guilt phase of the trial.  The court of appeals rejected this claim:

> In his seventh assignment of error, appellant argues his attorney was ineffective during the guilt phase of the trial. Appellant's claims [that] his attorney did not adequately prepare for trial, conduct voir dire properly, and insisted on presenting a black-out defense are barred by res judicata.

> Appellant's seventh assignment of error is meritless.

*Mitts,* No. 76963, at *6.

In the eighth assignment of error, Mitts challenged the dismissal on *res judicata* grounds of all the claims set forth in his post-conviction petition.  The court of appeals ruled as follows:

> Appellant presents a rather nebulous argument in support of this assignment of error which seems to reiterate points raised in the previous assignments of errors. Appellant has not presented  any cogent arguments with citations to the record as required by App.R. 16.

> Appellant's eighth assignment of error is overruled.

*Mitts*, No. 76963, at *6.

72

Accordingly, the Court of Appeals affirmed the judgment of the trial court dismissing the post-conviction petition without a hearing.  *Id*. at *1-2.  On October 2, 2000, Mitts filed a motion for reconsideration with the Eighth District Court of Appeals.  *ECF No. 18, Appendix, Volume V,* at 291.  The motion was denied.  *Id.* at 299.

### 3.     Ohio Supreme Court

On November 8, 2000, Mitts appealed the Court of Appeals decision to the Ohio Supreme Court.  *ECF No. 19, Appendix, Volume VI,* at 3.  Represented by Attorney Doughten, Mitts filed a memorandum in support of jurisdiction wherein he raised the following eight propositions of law:

1.     An evidentiary hearing must be granted pursuant to R.C. § 2953.21 where the petition includes credible documentary evidence which, if true, create a reasonable probability that the decision of the earlier hearing would have been otherwise.

2.     Ohio's post-conviction system does not comply with the requirements of due process as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

3.     The trial court erred to the substantial prejudice of the appellant by dismissing his claim of assistance of counsel during the mitigation phase of trial.

4.     The state courts have failed to engage in a meaningful proportionality review as required by R.C. § 2929.05(A).

5.     Because indigent defendants do not possess the tools to develop issues that are ripe for decision through a petition for post-conviction relief, a trial court must grant requests for assistance where the record reflects that such issue is not frivolous.

6.     If a defendant is intoxicated to the extent that he is unable to form the specific intent to kill another with prior calculation and design, the evidence is insufficient to support a conviction of aggravated murder in violation of R.C. § 2903.01(A).

73

7.  The failure to properly prepare the culpability phase of a capital trial results in a denial of an accused's right to effective assistance of counsel as required by the Sixth and Fourteenth Amendments to the United States Constitution.

8.  *Res judicata* is not applicable even where the issue was raised on direct appeal if additional evidence not present in the original record is necessary to fully develop the issues.

*ECF No. 19, Appendix, Volume VI,* at 6-7, *Appellant's Mem. in Support of Jurisdiction*, at i-ii.  On

December 14, 2000, the State filed a response memorandum.  *ECF No. 19, Appendix, Volume VI,* at

62, *Mem. in Response to Jurisdiction*.  On February 14, 2001, the Ohio Supreme Court issued a *sua*

*sponte* dismissal of Mitts's appeal on the grounds that it presented no substantial constitutional question.

*State v. Mitts*, 742 N.E.2d 144 (Ohio 2001).

### C.    *Murnahan* Proceedings

#### 1.    Court of Appeals

On April 9, 2001, Mitts filed a motion for appointment of counsel to file a *Murnahan*

application.  *ECF No. 20, Appendix, Volume VII,* at 7.  The motion was granted and attorney Robert

Dixon was appointed as counsel for the appeal.  On January 14, 2002, Mitts filed an application to

reopen direct appeal pursuant to Ohio Rule of Appellate Procedure 26(B).  *ECF No. 20, Appendix,*

*Volume VII,* at 27, *Defendant-Appellant's Application to Reopen Appeal etc.* ("*Murnahan*

Application").  Mitts raised the following six assignments of error:

1.  The cumulative effect of prosecutorial misconduct during the mitigation phase deprived Mitts of his right to a fair trial as guaranteed by the Fifth, Eighth and Fourteenth Amendments to the United States Constitution.

2.  The trial court's instructions at the mitigation phase allowing the jury to determine what evidence could be considered concerning the aggravating

74

circumstances resulted in violation of Mitts's rights under the Eighth and Fourteenth Amendments to the United States Constitution.

3.      The trial court's erroneous instructions to the jury during the culpability phase regarding the burden of proof and the subject of punishment violated Mitts's rights under the Fifth, Eighth and Fourteenth Amendments to the United States Constitution.

4.      Mitts was denied the effective assistance of counsel in violation of his rights under the Sixth and Fourteenth Amendments to the United States Constitution.

5.      The death penalty violates international law.

6.      Mitts was denied effective assistance of counsel on appeal.

*Murnahan Application*, at 2-8.  On February 8, 2002, the State filed a memorandum in opposition to Mitts's application.  *ECF No. 23, Appendix, Volume X,* at 180.  On May 10, 2002, the Ohio Court of Appeals denied Mitts's *Murnahan* application.  *State v. Mitts*, No. 68612, 2002 WL 1335629, at *7 (Ohio Ct. App. May 10, 2002).  The appeals court first addressed whether the application was timely filed:

{¶ 13} As mandated by App.R. 26(B)(2)(b), an application for reopening must be filed within ninety days of journalization of the appellate judgment which the applicant seeks to reopen. The    applicant must establish "good cause" if the application for reopening is filed more than ninety days after journalization of the appellate judgment. *State v. Cooey,* 73 Ohio St.3d 411, 1995-Ohio-328, 653 N.E.2d 252; *State v. Reddick,* 72 Ohio St.3d 88, 1995-Ohio-249, 647 N.E.2d 784.

{¶ 14} Herein, Mitts is attempting to reopen the appellate judgment that was journalized on December 30, 1996. He did not file his application for reopening until January 14, 2002, more than six years after journalization of the appellate judgement in *State v. Mitts* (Dec. 19, 1996), Cuyahoga App. No. 68612. Mitts' counsel, however, asserts the "application is timely in that (Mitts) is entitled to the appointment of counsel and that any applicable deadlines for filing cannot begin to run until counsel is appointed." Counsel further states

that this court granted him an extension until January 14, 2001 to file the application to reopen.

{¶ 15} However, counsel's argument that Mitts is entitled to the appointment of counsel is based upon an incorrect premise.

{¶ 16} An application to reopen pursuant to App.R. 26(B) is a post-conviction petition. The Supreme Court of Ohio recognized this classification in Supreme Court Practice Rule II, Section 2(A)(4)(b): The provision for delayed appeal applies to appeals on the merits and does not apply to appeals involving post-conviction relief, including appeals brought pursuant to *State v. Murnahan* (1992), 63 Ohio St.3d 60, 584 N.E.2d 1204 and App.R. 26(B). Thus an applicant has no right to counsel in filing the application.

{¶ 17} *State v. Dozier* (Jan. 17, 1980), Cuyahoga App. Nos. 40186 and 40187, reopening disallowed (Jan. 3, 2002), Motion No. 33149. See, also, *State v. Bragg* (July 15, 1991), Cuyahoga App. No. 58859, reopening disallowed (Nov. 26, 2001), Motion No. 27560; *State v. Darrington* (Oct. 2, 1995), Cuyahoga App. No. 65588, reopening disallowed (Oct. 27, 2000), Motion No. 17770; *State v. Walker* (May 31, 1994), Cuyahoga App. No. 47616, reopening disallowed (Aug. 3, 2001), Motion No. 27447; *State v. Creasey* (Nov. 23, 1994), Cuyahoga App. Nos. 65717 and 65718, reopening disallowed (Aug. 29, 2001), Motion No. 24781. Moreover, counsel fails to cite any authority in support of this proposition. Therefore, because an applicant does not have a right to counsel, counsel's assertion that the time period to file does not begin to run until counsel is appointed does not have merit.

{¶ 18} Nor do we find that this court's extension waived the applicable time requirements. In the matter sub judice, Mitts' application should have been filed on or before March 31, 1997 to have been considered timely.  Accordingly, we find that the application is untimely on its face.

{¶ 19} In an attempt to establish "a showing of good cause," Mitts, through counsel, asserts that "the failure to appoint counsel as constitutionally required precludes the imposition of a filing deadline upon an indigent and incarcerated individual who has neither the resources or expertise to file such action." Furthermore, "the State has

an obligation to advise Appellant of his right to pursue relief with counsel at State expense." However, the absence or denial of counsel does not show good cause for untimely filing. *Walker,* supra; *Creasey,* supra.

{¶ 20} Additionally, this court and the Supreme Court of Ohio have firmly established that a lack of legal training is not a viable ground for establishing "good cause" for the untimely filing of an application for reopening. *State v. Klein* (Apr. 8, 1991), Cuyahoga App. No. 58389, reopening disallowed (Mar. 15, 1994), Motion No. 49260, affirmed (1994), 69 Ohio St.3d 1481, 634 N.E.2d 1027; *State v. Trammel* (July 24, 1995), Cuyahoga App. No. 67834, reopening disallowed (Apr. 22, 1996), Motion No. 70493; *State v. Travis* (Apr. 5, 1990), Cuyahoga App. No. 56825, reopening disallowed (Nov. 2, 1994), Motion No. 51073, affirmed (1995), 72 Ohio St.3d 317, 649 N.E.2d 1226. Nor does ignorance of the law constitute good cause for failing to timely file an application for reopening. *State v. Turner* (Nov. 16, 1989), Cuyahoga App. No. 55960, reopening disallowed (Aug. 20, 2001), Motion No. 23221; *State v. Railing* (Oct. 20, 1994), Cuyahoga App. No. 67137, reopening disallowed (Aug. 30, 1996), Motion No. 72596, at 2.

{¶ 21} Furthermore, limited access to legal materials does not establish good cause. *State v. Stearns* (July 24, 2000), Cuyahoga App. No. 76513, reopening disallowed (Feb. 14, 2002), Motion No. 27761; *State v. Kaszas* (Sept. 21, 1998), Cuyahoga App. Nos. 72546 and 72547, reopening disallowed (Aug. 14, 2000), Motion No. 16752; *State v. Hickman* (Apr. 30, 1998), Cuyahoga App. No. 72341, reopening disallowed (Dec. 13, 2000), Motion No. 20830; and *Turner,* supra.

{¶ 22} Counsel also argues that because Mitts was represented by the same counsel throughout his direct appeals, counsel could not be expected to raise his own ineffectiveness. This argument is also unpersuasive and establishes an independent ground for denying the application to reopen. *Walker,* supra. Accordingly, Mitts' application is fatally defective and must be denied.

{¶ 23} Notwithstanding the above, Mitts fails to establish that his appellate counsel was ineffective. In regard to claims of ineffective assistance of appellate counsel, the United States Supreme Court has upheld an appellate attorney's discretion to decide which issues he or

77

she believes are the most fruitful arguments. "Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue, if possible, or at most on a few key issues." *Jones v. Barnes* (1983), 463 U.S. 745, 103 S.Ct. 3308, 77 L.Ed.2d 987. Additionally, appellate counsel is not required to argue assignments of error which are meritless. *Barnes,* supra.

{¶ 24} Thus, in order for the court to grant the application for reopening, Mitts must establish that "there is a genuine issue as to whether the applicant was deprived of the effective assistance of counsel on appeal." App.R. 26(B)(5).

{¶ 25} In *State v. Reed* (1996), 74 Ohio St.3d 534, 535, 660 N.E.2d 456, 458, we held that the two prong analysis found in *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674, is the appropriate standard to assess a defense request for reopening under App.R. 26(B)(5). [Applicant] must prove that his counsel were deficient for failing to raise the issue he now presents, as well as showing that had he presented those claims on appeal, there was a "reasonable probability" that he would have been successful. Thus, [applicant] bears the burden of establishing that there was a "genuine issue" as to whether there was a "colorable claim" of ineffective assistance of counsel on appeal.

{¶ 26} *State v. Spivey,* 84 Ohio St.3d 24, 25, 1998-Ohio-704, 701 N.E.2d 696. To establish such claim, applicant must demonstrate that counsel's performance was deficient and that deficiency prejudiced the defense. *Strickland v. Washington* (1984), 466 U.S. 688, 104 S.Ct. 2052, 80 L.Ed.2d 674; *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, certiorari denied (1990), 497 U.S. 1011, 110 S.Ct. 3258, 111 L.Ed.2d 768. Mitts failed to demonstrate any such deficiency.

{¶ 27} Furthermore, a substantive review of the application to reopen fails to demonstrate that there exists any genuine issue as to whether Mitts was deprived of the effective assistance of appellate counsel.

*State v. Mitts*, No. 68612, 2002 WL 1335629, at *2-4 (Ohio Ct. App. May 10, 2002) (internal

footnote omitted).

In the first assignment of error, Mitts argued that appellate counsel failed to argue that the effect

of prosecutorial misconduct during the mitigation phase deprived Mitts of his right to a fair trial.  Mitts

asserted that the prosecutor repeatedly misled the jury about what facts should be considered as

aggravating circumstances; improperly argued what standard should be applied in weighing the

aggravating circumstances against the mitigating factors; and improperly told the jury that they must

acquit Mitts of the death penalty before they could consider life imprisonment.  The court of appeals

ruled as follows:

> {¶ 28} In his first assignment of error, Mitts states that his
> appellate counsel should have argued that the effect of prosecutorial
> misconduct during the mitigation phase deprived the appellant of his
> right to a fair trial as guaranteed by the Fifth, Eighth and Fourteenth
> Amendments to the United States Constitution. In support of this
> argument, Mitts asserts that the prosecutor repeatedly misled the jury
> regarding what facts should be considered as aggravating
> circumstances; that the prosecutor improperly argued what standard
> should be applied in weighing the aggravating circumstances; and that he
> improperly told the jury that they must acquit the appellant of the death
> penalty before they could consider an alternative punishment.

> {¶ 29} As Mitts notes in his application, no objection to the
> comments were made at trial. Accordingly, Mitts waived all but plain
> error. Plain error does not exist unless, but for the error, the outcome of
> trial would have been different. *State v. Joseph,* 73 Ohio St.3d 450,
> 1995-Ohio-288, 653 N.E.2d 285.

> {¶ 30} In the matter sub judice, we do not find plain error.
> While the prosecutor did argue the nature and circumstances of the
> offense, he never suggested that they were to be considered by the jury
> as aggravating circumstances. *State v. Nields,* 93 Ohio St.3d 6, 2001-
> Ohio-1291, 752 N.E.2d 859. See, also, *State v. Wagenstahl* (1996),

79

75 Ohio St.3d 344, 662 N.E.2d 311.

{¶ 31} We also do not find any error with the remaining
contentions of prosecutorial misconduct. The test for prosecutorial
misconduct is whether the remarks were improper and, if so, whether
they prejudicially affected the substantial rights of the accused. *State v.*
*Smith* (1984), 14 Ohio St.3d 13, 470 N.E.2d 883. Assuming
*arguendo* that the remarks were improper, we do not find that Mitts
was prejudiced. Our review of the record indicates that the judge
corrected any alleged errors with his jury instructions. The judge
correctly instructed the jury what the aggravating circumstances were,
that the state of Ohio had the burden of proving beyond a reasonable
doubt that the aggravating circumstances were sufficient to outweigh any
mitigating factors, and corrected any "acquit first" argument made by the
prosecutor.

*Mitts*, No. 68612, at *4-5 (footnote omitted).

In the second assignment of error, Mitts argued that the trial court's instructions at the mitigation

phase allowed the jury to determine what evidence could be considered concerning the aggravating

circumstances which resulted in the violation of Mitts's rights under the Eighth and Fourteenth

Amendments to the United States Constitution.  Mitts also argued that the trial court improperly defined

mitigation.  After noting that Mitts waived all but plain error by failing to object to the instructions, the

court of appeals ruled as follows:

{¶ 33} After reviewing the entire record, we do not find plain
error. It should also be noted that this court performed its constitutional
duty of conducting an independent review of the sentence and found that
the aggravating circumstances outweighed the mitigating factors.

*Mitts*, No. 68612, at *5.

In the third assignment of error, Mitts argued that the trial court's instructions to the jury during

the culpability phase regarding the burden of proof and the subject of punishment violated Mitts's rights

80

under the Fifth, Eighth and Fourteenth Amendments.  Mitts argued that the trial court improperly shifted

the burden of proof by instructing the jury to determine whether Mitts was innocent rather than whether

the State proved him guilty beyond a reasonable doubt, and diminished the jury's sense of responsibility

by instructing the jury that the duty to impose punishment was in the sole discretion of the court.  The

court of appeals ruled:

> {¶ 35} Once again, the failure to object to this instruction limits
> our review to plain error. *Joseph,* supra. "A jury instruction * * * must
> be viewed in the context of the overall charge, * * *  rather than in
> isolation." *State v. Thompson* (1987), 33 Ohio St.3d 1, 514 N.E.2d
> 407, quoting *State v. Price* (1979), 60 Ohio St.2d 136, 398 N.E.2d
> 772. After reviewing the entire charge, we do not find plain error. The
> court clearly instructed the jury that the defendant is presumed innocent,
> that the burden of proof was on the state of Ohio, and that the
> defendant must be acquitted of any crime charged unless the state
> proved each and every element of the crime beyond a reasonable
> doubt.
>
> {¶ 36} We further find that Mitts was not prejudiced by the
> court's instruction regarding the subject of punishment. The record
> establishes that, after a defense objection to the charge, the court
> corrected itself and told the jury to disregard the prior instruction and
> that they may or may not discuss or consider the subject of punishment.
> The court also reminded the jury that there were two parts to the trial as
> was explained to them during voir dire.

*Mitts*, No. 68612, at *5.

In the fourth assignment of error, Mitts argued that he was denied effective assistance of trial

counsel because counsel failed to object to numerous instances of prosecutorial misconduct (as set forth

in the first assignment of error) and to erroneous and prejudicial jury instructions (as set forth in the

second and third assignments of error).  Mitts also argues that trial counsel failed to present a reasonable

defense theory during both phases of trial.  First, counsel failed to investigate, prepare and adequately

81

present mitigation evidence e.g., he failed to make reasonable use of a psychology/mitigation expert.

Second, counsel called Dr. McKee as a defense witness.  Mitts argues that Dr. McKee's testimony

undermined the defense theory and resulted in defense counsel attempting to impeach her.  The court of

appeals held as follows:

> {¶ 37} . . . . [B]ecause we have previously determined that there was no underlying error, we do not find that counsel was ineffective.  *State v. Henderson* (1989), 39 Ohio St.3d 24, 528 N.E.2d 1237.

> {¶ 38} Mitts also argues that he was denied the effective assistance of counsel because counsel failed to present a reasonable theory of defense at both the culpability and mitigation phases by failing to properly prepare for the testimony of a defense witness, Dr. Sandra McKee, and by failing to use a mitigation expert.

> {¶ 39} In *Strickland,* the United States Supreme Court stated that a court's scrutiny of an attorney's work must be highly deferential. The court further stated that it is too tempting for a defendant to second-guess his attorney after conviction and that it would be all too easy for a court to conclude that a specific act or omission was deficient, especially when examining the matter in hindsight. Accordingly, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland,* 104 S.Ct. at 2065. Debatable trial tactics and strategies do not constitute a denial of effective assistance of counsel. *State v. Clayton* (1980), 62 Ohio St.2d 45, 402 N.E.2d 1189.

> {¶ 40} As this court stated in *State v. Mitts* (Sept. 28, 2000), Cuyahoga App. No. 76963,

> {¶ 41} An attorney's selection of which witnesses to call at trial falls within the purview of trial tactics and generally will not constitute ineffective assistance of counsel. *State v. Coulter* (1992), 75 Ohio App.3d 219, 598 N.E.2d 1324. Asking specific questions of a witness, even an expert witness, also falls under the realm of trial tactics.

82

{¶ 42} Furthermore, the existence of alternative or additional mitigation theories does not establish ineffective assistance of trial counsel. *State v. Combs* (1994), 100 Ohio App.3d 90, 652 N.E.2d 205.

{¶ 43} In the matter sub judice, counsel's presentation of evidence during both the culpability phase and mitigation phase were debatable trial tactics which this court will not second-guess. We also find that Mitts failed to establish prejudice.

*Mitts*, No. 68612, at *6.

In the fifth assignment of error, Mitts argued that the death penalty violates international law and Article VI of the U.S. Constitution. The court of appeals found this argument to lack merit, citing *State v. Keene*, 693 N.E.2d 246 (Ohio 1998), and *State v. Phillips*, 656 N.E.2d 643 (Ohio 1995). *Mitts*, No. 68612, at *6.

In the sixth assignment of error, Mitts argued that he was denied the effective assistance of counsel on appeal for all the reasons set forth in his 26(B) application. The court of appeals stated: "In light of the above review, we do not find that Mitts was denied the effective assistance of counsel on appeal." *Id*. Accordingly, the court of appeals denied Mitts's application to reopen his direct appeal. *Id*. at *7.

### 2.      Ohio Supreme Court

On June 17, 2002, Mitts appealed the court of appeals' denial of his *Murnahan* application to the Ohio Supreme Court. *ECF No. 24, Appendix, Volume XI,* at 46. On July 22, 2002, Mitts filed a motion for appointment of counsel to appeal the denial of his 26(B) application. *Id.* at 12. On September 25, 2002, the motion was denied. *Id*. at 17. On November 13, 2002, Mitts filed a *pro se* brief, asserting seven assignments of error. *Id*. at 24. The first six assignments of error repeated the

very errors raised in the court of appeals.[4]  The seventh assignment of error stated as follows: "The

failure of this court to grant Mitts's request for appointment of counsel for this appeal is a denial of equal

protection and due process of law in violation of the Fifth, Sixth, and Fourteenth Amendments to the

United States Constitution [and calls into question the constitutionality of Ohio's procedure for

reopening direct appeal]."  *ECF No. 24, Appendix, Volume XI,* at 25, *Appellant's Br.*, at i, 15.

On December 9, 2002, the State filed a brief in opposition.  *ECF No. 24, Appendix, Volume*

*XI,* at 70, *Merit Brief of Appellee*.  On March 19, 2003, the Ohio Supreme Court affirmed the

judgment of the Court of Appeals denying Mitts's application to reopen his direct appeal.  *State v.*

*Mitts*, 784 N.E.2d 698 (Ohio 2003).  The Ohio Supreme Court held as follows:

> {¶ 4} The two-prong analysis found in *Strickland v.*
> *Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d
> 674, is the appropriate standard by which to determine whether a
> defendant has received ineffective assistance of appellate counsel. See
> *State v. Sheppard* (2001), 91 Ohio St.3d 329, 330, 744 N.E.2d 770;
> *State v. Spivey* (1998), 84 Ohio St.3d 24, 25, 701 N.E.2d 696; *State*
> *v. Reed* (1996), 74 Ohio St.3d 534, 534-535, 660 N.E.2d 456.
>
> {¶ 5} In order to show ineffective assistance, Mitts "must prove
> that his counsel were deficient for failing to raise the issues he now
> presents and that there was a reasonable probability of success had he
> presented those claims on appeal." *Sheppard,* 91 Ohio St.3d at 330,
> 744 N.E.2d 770, citing *State v. Bradley* (1989), 42 Ohio St.3d 136,
> 538 N.E.2d 373, paragraph three of the syllabus. Moreover, to justify
> reopening his appeal, Mitts "bears the burden of establishing that there
> was a 'genuine issue' as to whether he has a 'colorable claim' of
> ineffective assistance of counsel on appeal." *Spivey,* 84 Ohio St.3d at
> 25, 701 N.E.2d 696.

---

[4]The claim regarding victim-impact evidence, however, was not raised before the Ohio
Supreme Court.

{¶ 6} We have reviewed Mitts's assertions of deficient performance by appellate counsel and find that Mitts has failed to raise "a genuine issue as to whether [he] was deprived of the effective assistance of counsel on appeal" before the court of appeals, as required by App.R. 26(B)(5).

{¶ 7} Accordingly, the judgment of the court of appeals is affirmed.

*Mitts*, 784 N.E.2d at 699-700.

### D.     **Federal Habeas Petition**

Mitts thereafter filed in this Court a notice of intent to file a petition for writ of habeas corpus and a motion for appointment of counsel.  *ECF Nos. 1, 4.*  The Court granted the motion and appointed Robert A. Dixon and an Assistant Public Defender with capital habeas experience from the Death Penalty Division of the Office of the Ohio Public Defender to represent Mitts.  *ECF No. 7*, at 1-2.  On October 16, 2003, Mitts filed a petition for writ of habeas corpus under 28 U.S.C. § 2254, alleging the following grounds for relief:

1.    Petitioner was denied the effective assistance of counsel in the mitigation phase as guaranteed by the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Article I, §§ 10 and 16 of the Ohio Constitution.

2.    Petitioner was denied the effective assistance of counsel in the guilt-innocence determination phase as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution and Article I, §§ 10 and 16 of the Ohio Constitution.

3.    Petitioner's right to due process of law was violated because his conviction was based on insufficient evidence.

4.    The Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution; § 39, Article II of the Ohio Constitution and Ohio Revised Code § 2929.024 guarantee an accused in capital cases the use of experts.

85

5.      In a capital murder trial, the court must instruct the jury that it may recommend consecutive life sentences where the defendant has been convicted of two separate and distinct counts of aggravated murder.  The failure to instruct properly is violative of the Fifth, Eighth and Fourteenth Amendments to the United States Constitution.

6.      The trial court must charge the jury on the defense of voluntary intoxication where a reasonable jury could find that the defendant could not form the requisite intent due to his or her inebriation.  The failure to provide the instruction is a violation of the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Article I, §§ 9 and 16 of the Ohio Constitution.

7.      The trial court's instruction that a death verdict is only a recommendation is a violation of Petitioner's right to due process of law and to his right to be free from cruel and unusual punishments.

8.      Inaccurate penalty phase instructions that misguide the jury as to their duties under the law render the resultant sentence unreliable and violative of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and §§ 9, 10 and 16, Article I, of the Ohio Constitution.

9.      Petitioner received the ineffective assistance of counsel when defense counsel failed to object to erroneous jury instructions and improper comments of the prosecutor.

10.     The trial court may not refuse to provide relevant mitigating instructions to the penalty phase jury.  The refusal to instruct is in contravention of the Fifth, Eighth and Fourteenth Amendments to the United States Constitution.

11.     The cumulative effect of prosecutorial misconduct during the mitigation phase deprived Petitioner of his right to a fair trial as guaranteed by the Fifth, Eighth and Fourteenth Amendments to the Constitution.

12.     Petitioner was deprived of the effective assistance of counsel during his direct appeal.

*ECF No. 27, Petition for Writ of Habeas Corpus* ("Petition"), at i-ii.

86

III.    **INITIAL CONSIDERATIONS**

    A.    **STANDARD OF REVIEW**

       A federal court's review of a petition for a writ of habeas corpus, filed by a prisoner incarcerated pursuant to the judgment of a state court, is governed by 28 U.S.C. § 2254.  Section 2254(a) permits a state prisoner to challenge his incarceration "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  Federal habeas corpus relief "does not lie for errors of state law."  *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990).   Thus, "it is not the province of a federal habeas court to re-examine state-court determinations of state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).

       The Antiterrorism and Effective Death Penalty Act of 1996, Pub.1.No. 104-132, 110 Stat. 1214 (1996) ("AEDPA"), signed into law on April 24, 1996, amended Title 28 of the United States Code and applies to all habeas petitions filed on or after its effective date of April 24, 1996.  *Barker v. Yukins*, 199 F.3d 867, 871 (6th Cir. 1999), *cert. denied*, 120 S.Ct. 2658 (2000) (citations omitted); *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998).  The AEDPA made significant changes in habeas law, including increased restrictions on which issues can be appealed and a heightened respect for state court factual and legal determinations.

       Under 28 U.S.C. § 2254(d) (enacted as a part of the AEDPA), a petition for writ of habeas corpus:

> shall not be granted with respect to any claim that was adjudicated on
> the merits in State court proceedings unless the adjudication of the claim
> –

> (1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

> (2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

*Id.*; *Staley v. Jones*, 239 F.3d 769, 775 (6th Cir. 2001).

The United States Supreme Court recently had occasion to interpret § 2254(d) in *Terry Williams v. Taylor*, 529 U.S. 362 (2000).[5]  With respect to the first clause of § 2254(d), the Court explained that the phrases "contrary to" and "unreasonable application of" must be given independent meanings.

> First, a state-court decision is contrary to this Court's precedent if the state court arrives at a conclusion opposite to that reached by this Court on a question of law.  Second, a state-court decision is also contrary to this Court's precedent if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to ours.

*Terry Williams*, 529 U.S. at 405 (citing *Green v. French*, 143 F.3d 865, 869-70 (4th Cir. 1998), *cert. denied*, 525 U.S. 1090 (1999)).  The Supreme Court construed the second clause of § 2254(d) as follows:

> First, a state-court decision involves an unreasonable application of this Court's precedent if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case.  Second, a state-court decision also involves an unreasonable application of this Court's precedent if the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or

---

[5]On the very same day, the Supreme Court decided two cases captioned *Williams v. Taylor*, leading the undersigned to use the petitioner's full name.

88

> unreasonably refuses to extend that principle to a new context where it
> should apply.

*Terry Williams*, 529 U.S. at 407 (citing *Green v. French*, 143 F.3d at 869-70).

The Court pointed out that, in determining the reasonableness of the state court's

decision, the federal court must employ an objective test, not a subjective one.[6]  When viewing the

objective reasonableness of the state court decision, however, a federal court may not find an

application to be unreasonable merely because it finds that the state court decision was erroneous or

incorrect.  *Terry Williams*, 529 U.S. at 410-412;  *Maranian v. Jackson*, No. 99-2017, 2001 WL

700856 (6th Cir. Jun. 11, 2001), *cert. denied*, 534 U.S. 1138 (2002).

The *Terry Williams* Court also clarified that "clearly established Federal law, as determined by

the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the

Supreme] Court's decision as of the time of the relevant state-court decision."  529 U.S. at 412.  The

Sixth Circuit has subsequently held that this holding "prevents the district court from looking to lower

federal court decisions in determining whether the state court decision is contrary to, or an unreasonable

application of, clearly established federal law."  *Harris v. Stovall*, 212 F.3d 940, 944 (6th Cir. 2000)

(quoting *Herbert v. Billy*, 160 F.3d 1131, 1135 (6th Cir. 1998)), *cert. denied*, 532 U.S. 947 (2001).

A habeas court may only rely on that class of Supreme Court precedent that would qualify as an

"old rule" under *Teague v. Lane*, 489 U.S. 288 (1989).  *Terry Williams*, 529 U.S. at 412.  Under

*Teague*, a case announces a new rule if the result was not dictated by precedent existing at the time the

---

[6]Based on this determination, the Supreme Court rejected the Fourth Circuit's
interpretation that a state court's application of federal law was only unreasonable "if the state
court has applied federal law in a manner that reasonable jurists would all agree is unreasonable."
*Terry Williams*, 529 U.S. at 409.

defendant's conviction became final.  489 U.S. at 301.  The rule the petitioner relies upon must be

"dictated or compelled" by the cited Supreme Court decision.  *Harris*, 212 F.3d at 944.  The Supreme

Court has articulated two exceptions to the general rule of non-retroactive application for new rules of

criminal procedure.  "An exception that allows for retroactive application of a new rule applies only if

the new rule: (1) 'places certain kinds of primary private individual conduct beyond the power of the

criminal law-making authority to proscribe,' or (2) 'requires the observance of those procedures that . .

. are implicit in the concept of ordered liberty.' "  *Goode v. U.S.*, 305 F.3d 378, 383 (6th Cir. 2002)

(parallel citations omitted), *cert. denied,* 537 U.S. 1096 (2002).

Under the AEDPA, determinations of factual issues by a state court shall be presumed to be

correct.  28 U.S.C. § 2254(e)(1).  This presumption of correctness is rebuttable only by clear and

convincing evidence to the contrary.  *Id.*

When a state court decides a constitutional issue by form order or without explaining its

reasoning, a habeas court should focus on the result of the state court's decision and apply AEDPA

deference because the habeas court cannot grant relief unless the state court's <u>result</u> is not in keeping

with the strictures of the AEDPA.  *Harris*, 212 F.3d at 943 & n.1.  However, when a federal claim was

not "adjudicated on the merits" in state court (e.g., the state court did not address the constitutional

claim on the merits and the claim has not been procedurally defaulted), the habeas court reviews the

claim *de novo.  See Maldonado v. Wilson,* 416 F.3d 470, 476 (6th Cir. 2005); *McKenzie v. Smith,*

326 F.3d 721, 726-27 (6th Cir. 2003) (applying *de novo* review to a claim that was not addressed at

all in state court because there were no state court "results," let alone reasoning, to which the habeas

court could defer); *Hill v. Mitchell,* 400 F.3d 308, 313 (6th Cir. 2005) (stating that claims that were

not adjudicated on the merits in state court and have not been procedurally defaulted are reviewed *de novo*); *Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003).

The Court must now determine, as an initial matter, whether the asserted grounds for relief are properly before the Court.

## B.    EXHAUSTION

A state prisoner must exhaust his state remedies before bringing his claim in a federal habeas corpus proceeding. 28 U.S.C. § 2254(b), (c); *Rose v. Lundy*, 455 U.S. 509 (1982).  A habeas petitioner satisfies the exhaustion requirement when the highest court in the state in which the petitioner has been convicted has had a full and fair opportunity to rule on the claims. *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994); *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990). If under state law there remains a remedy that petitioner has not yet pursued, exhaustion has not occurred and the federal habeas court cannot entertain the merits of the claim. *Rust*, 17 F.3d at 160.

Claims that were never raised at any juncture of the state-court proceedings are both unexhausted and procedurally defaulted because the Ohio Supreme Court has not had an opportunity to decide them.   If a habeas petitioner sought to return to state court and attempted to present new claims to the Ohio Supreme Court, that court would refuse to hear such claims because "[t]he Ohio Supreme Court has stated that it will not consider constitutional claims not raised and preserved in the Ohio Court of Appeals." *Fornash v. Marshall*, 686 F.2d 1179, 1185 n.7 (6th Cir. 1982), *cert. denied*, 460 U.S. 1042 (1983) (citing *State v. Phillips*, 27 Ohio St.2d 294, 302 (1971)).  Thus, the Petitioner's failure to raise a claim to the Ohio Court of Appeals would preclude Ohio Supreme Court review.  This preclusion, in turn, would prevent the Petitioner from satisfying the exhaustion requirement as the Ohio

91

Supreme Court has not had a "fair and full opportunity" to review these claims as *Rust* requires.

A petitioner "cannot obtain federal habeas relief under 28 U.S.C. § 2254 unless he has completely exhausted his available state court remedies to the state's highest court." *Buell v. Mitchell*, 274 F.3d 337, 349 (6th Cir. 2001) (quoting *Coleman v. Mitchell*, 244 F.3d 533, 538 (6th Cir. 2001)) (emphasis omitted). Rather than dismiss certain claims the Court deems unexhausted, however, a habeas court need not wait for exhaustion if it determines that a return to state court would be futile. *Lott v. Coyle*, 261 F.3d 594, 608 (6th Cir. 2001). In circumstances where the petitioner has failed to present a claim in state court, a habeas court may deem that claim procedurally defaulted because the Ohio state courts would no longer entertain the claim. *Buell*, 274 F.3d at 349.

The Petitioner failed to raise sub-claims 9(c), (d), (e) and (f), and claim 11 at any juncture of his state court proceedings. Thus, the Court finds that these claims are unexhausted yet procedurally defaulted because no Ohio court would review them on the merits. The Court will review these claims in Section C, Subpart 2(h) and (i), *infra*.

## C.     PROCEDURAL DEFAULT

### 1.     Law

Federal courts "will not review questions of federal law decided by a state court if the decision of that court rests upon a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman v. Thompson*, 501 U.S. 722, 729 (1991). Applied to the habeas context, the doctrine of procedural default acts to bar federal review of federal claims that a state court has declined to address because of the petitioner's noncompliance with a state procedural requirement. *See Wainwright v. Sykes*, 433 U.S. 72, 87 (1977). "In these cases, the state judgment rests on

92

independent and adequate state procedural grounds." *Coleman*, 501 U.S. at 730.

If the district court concludes that the State prisoner has procedurally defaulted his federal claims in state court, federal review is barred unless the prisoner can demonstrate "cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 749; *Bousley v. U.S.*, 523 U.S. 614 (1998).

Demonstrating "cause" requires showing that an objective factor external to the defense impeded counsel's efforts to comply with the state procedural rule. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Demonstrating "prejudice" requires showing a wrong "infecting" the trial with constitutional error. *United States v. Frady*, 456 U.S. 152, 168 (1982).

In the absence of cause and prejudice, federal courts are prohibited from reviewing issues that are procedurally defaulted unless the petitioner shows that his conviction is the result of a fundamental miscarriage of justice. A fundamental miscarriage of justice is a conviction of one who is "actually innocent." *See Coleman*, 501 U.S. at 750; *Murray*, 477 U.S. at 496. The Supreme Court requires the petitioner to demonstrate not merely a reasonable doubt in light of new evidence, but rather that "it is more likely than not that no reasonable juror would have convicted [the petitioner] in light of the new evidence." *Schlup v. Delo*, 513 U.S. 298, 327 (1995). The petitioner fails to meet his burden if "at least one juror, acting reasonably and properly instructed would have found" him guilty. *Fairchild v. Norris*, 51 F.3d 129, 130-31 (8th Cir.), *cert. denied*, 515 U.S. 1182 (1995); *Schlup*, 513 U.S. at 329.

In ascertaining whether a state court has addressed the merits of a petitioner's constitutional claim, federal courts must rely on the presumption that there is no independent and adequate state ground for the state court decision absent a clear statement to the contrary. *Morales v. Coyle*, 98 F.Supp.2d 849, 862 (N.D. Ohio 2000) (citing *Coleman*, 501 U.S. at 735).  Applying this presumption, the Sixth Circuit has established a four-step analysis to determine whether a claim has in fact been procedurally defaulted. *See Maupin v. Smith*, 785 F.2d 135 (6th Cir. 1986).  The Court must determine (1) whether the petitioner failed to comply with an applicable state procedural rule;  (2) whether the state courts actually enforced the state procedural sanction;  (3) whether the state procedural bar is an "adequate and independent" state ground on which the State can foreclose federal review;  and if the above are met, (4) whether the petitioner has demonstrated cause and prejudice, or a fundamental miscarriage of justice. *Id.*  In determining whether a state court rested its holding on procedural default so as to bar federal habeas review, the Court must look to "the last explained state-court judgment." *Combs v. Coyle*, 205 F.3d 269, 275 (6th Cir. 2000);  *Couch v. Jabe*, 951 F.2d 94, 96 (6th Cir. 1991) (quoting *Ylst v. Nunnemaker*, 501 U.S. 797, 805 (1991)).

In sum, if the Court applies the *Maupin* test and determines that the petitioner has in fact procedurally defaulted a claim, federal habeas review of the claim is prohibited unless the petitioner can show cause and prejudice for the default, or a fundamental miscarriage of justice.[7] Two common examples of procedural default are discussed below.

_____

[7]For an in-depth discussion of the policy concerns underlying the limited discretion that federal courts may exercise in reviewing habeas claims, see *Calderon v. Thompson*, 523 U.S. 538, 554-56 (1998).

94

a.    "Plain-Error" Review by State Courts for Manifest Injustice Does Not
Constitute a Waiver of Procedural Default.

Under Ohio law, the failure to raise a contemporaneous objection to a perceived error in the

trial court constitutes a procedural bar to review of the error on direct appeal.  *Scott v. Mitchell*, 209

F.3d 854, 866 (6th Cir. 2000) (citing Ohio R. Crim. P. 52; *State v. Williams*, 51 Ohio St.2d 112

(1977) (citations omitted)), *cert denied*, 531 U.S. 1021 (2000).  However, the procedural default does

not foreclose all consideration of the alleged error by the Ohio courts.  Rather, the state courts may

conduct a limited review of the record to ensure that the perceived error does not constitute a plain

error affecting a substantial right.  Crim. R. 52.(B); *State v. Ballew*, 76 Ohio St.3d 244, 254 (1996).

The basic inquiry in the plain-error analysis is whether the defendant has been denied a fair trial.

*Ballew*, 76 Ohio St.3d at 254.

The Sixth Circuit Court of Appeals has long held that plain-error review by the state courts does

not constitute a waiver of state procedural default rules.  *Seymour v. Weaver*, 224 F.3d 542, 557

(2000), *cert. denied,* 532 U.S. 989 (2001) (citing *Paprocki v. Foltz*, 869 F.2d 281, 284-85 (6th Cir.

1989)).  The Sixth Circuit has also recognized that a state waiver doctrine, which permits state appeals

courts to undertake a limited examination of otherwise waived issues for manifest injustice, furthers

important interests.  *Loza v. Mitchell*, No. C-1-98-287, 2002 WL 1580520, at *28 (June 11, 2002).

More to the point, the Sixth Circuit has held that a procedural default based on the failure to

make a contemporaneous objection constitutes an "adequate and independent state ground" under

*Maupin*.  *Loza*, 2002 WL 1580520, at *28 (summarizing *Scott v. Mitchell*, 209 F.3d 854).  Thus, if

the record shows that the state courts actually enforced the waiver doctrine and undertook only plain-

95

error review of an issue, the habeas petitioner must show cause and prejudice for the procedural default

or a fundamental miscarriage of justice in order to merit federal review.

> **b.  The *Perry* Rule  – *Res Judicata* is a Procedural Bar to Federal Habeas Review of Claims that Should Have Been Raised on Direct Appeal and Were Not.**

As another example of procedural default, under Ohio law, all claims that were known or should

have been known by the defendant at the time of trial or direct appeal must be raised on direct appeal

from the judgment of conviction.  Ohio provides an avenue of relief, namely post-conviction review, for

those claims that were unknown, or could not reasonably have been known, to the defendant until after

the judgment of conviction.  Ohio's post-conviction relief statute, O.R.C. § 2953.21, provides in

pertinent part:

> Any person who has been convicted of a criminal offense or adjudicated a delinquent child and who claims that there was such a denial or infringement of the person's rights as to render the judgment void or voidable under the Ohio Constitution or the Constitution of the United States . . . may file a petition in the court that imposed sentence, stating the grounds for relief relied upon, and asking the court to vacate or set aside the judgment or sentence or to grant other appropriate relief. The petitioner may file a supporting affidavit and other documentary evidence in support of the claim for relief.

*Id.*

This statute has long been interpreted to bar post-conviction consideration of any issue that was

fully litigated before the judgment of conviction or on direct appeal from that judgment, or of any issue

that could have been fully litigated before judgment of conviction or on direct appeal <u>but was not</u>.  *See*

*State v. Perry,* 10 Ohio St.2d 175 (1967), syllabus para. 7; *State v. Combs*, 100 Ohio App.3d 90,

98 (1994).  The *Perry* Court stated:

> Under the doctrine of *res judicata*, a final judgment of conviction bars a convicted defendant who was represented by counsel from raising and litigating in any proceeding except an appeal from that judgment, any defense or any claimed lack of due process that was raised or could have been raised by the defendant at the trial, which resulted in that judgment of conviction, or on an appeal from that judgment.

*Perry* at syllabus para. 9.

Under *Perry*, the doctrine of *res judicata* has been consistently applied by Ohio state courts to bar consideration of federal claims that were not timely asserted in state court proceedings. *Morales v. Coyle*, 98 F.Supp.2d 849, 860-61 (N.D. Ohio 2000). *See, e.g., State v. McGuire*, No. CA2000-10-011, 2001 WL 409424 at * 10 (Ohio App. 12 Dist. April 23, 2001); *State v. Twyford*, No. 98-JE-56, 2001 WL 301411 at *4 (Ohio App. 7 Dist. Mar. 19, 2001) (noting that the Ohio Supreme Court recently reaffirmed *Perry* in *State v. Szefcyk*, 77 Ohio St.3d 93 (1996)). Further, this state procedural bar has routinely been observed by federal courts reviewing habeas petitions and is roundly deemed an independent and adequate state ground foreclosing federal habeas review. *See, e.g., Byrd v. Collins*, 209 F.3d 486, 521 (6th Cir. 2000); *Williams v. Bagley,* 380 F.3d 932, 967 (6th Cir. 2004).[8] Consequently, if the record shows that the state courts actually enforced the *Perry* rule, the

---

[8]The Supreme Court of Ohio recognized an exception to the *Perry* rule in *State v. Hester*, 45 Ohio St.2d 71 (1976). The *Hester* Court concluded that, where the record does not disclose that the issue of competent trial counsel has been adjudicated, *res judicata* is an improper basis upon which to dismiss an Ohio post-conviction petition. *Id*. at syllabus para. 2. The Ohio Supreme Court subsequently modified the *Hester* exception to the *Perry* rule in *State v. Cole*, 2 Ohio St.3d 112 (1982), finding that:

> Where the defendant, represented by new counsel upon direct appeal fails to raise therein the issue of competent trial counsel, and said issue could fairly have been determined without resort to evidence outside the record, res judicata is a proper basis for dismissing defendant's petition for post-conviction relief.

97

habeas petitioner must show cause and prejudice for the procedural default, or a fundamental

miscarriage of justice, in order for this Court to review the issue on the merits.

> ### 2.    Analysis

> #### a.    First Ground for Relief

In the first ground for relief, Mitts argues that he was denied the effective assistance of counsel

during the penalty phase because counsel did not conduct a thorough investigation into possible

mitigating evidence.  *Petition,* at 5.  He argues that counsel failed to investigate, prepare and adequately

present the defense mitigation case.  *Id.* at 9.

The last reasoned state court judgment on this claim was rendered by the Ohio Court of

Appeals on post-conviction review.  That court held as follows:

> The doctrine of res judicata bars a claim of ineffective assistance
> of counsel when a defendant is represented by new counsel on direct
> appeal and the issue could have been determined without resort to
> evidence de hors the record. *State v. Cole* (1982), 2 Ohio St.3d 112,
> 443 N.E.2d 169, syllabus. Competent, relevant, and material evidence
> de hors the record may defeat the application of res judicata. This
> evidence must demonstrate that the petitioner could not have appealed
> the constitutional claim by use of information found in the original
> record. *State v. Lawson* (1995), 103 Ohio App.3d 307, 659 N.E.2d
> 362. The petitioner must submit evidentiary documents which contain
> sufficient operative facts to demonstrate that counsel was not competent
> and that the defense was prejudiced by the ineffectiveness. *State v.
> Jackson* (1980), 64 Ohio St.2d 107, 413 N.E.2d 819. If the petitioner
> fails to meet this burden, the trial court may dismiss the petition for post-
> conviction relief without a hearing. *Id.*

---

*Id.* at syllabus.  These modifications to the *Perry* rule have led federal habeas courts to
conclude that Ohio's post-conviction statute, upon which *Perry* rests, satisfies due process.
*Morales*, 98 F. Supp. 2d at 861.  *See also Smith v. Anderson*, 104 F. Supp. 2d 773 (S.D. Ohio
2000).

The claim of ineffective assistance of counsel requires proof that counsel's performance is proved to have fallen below an objective standard of reasonable representation and, in addition, prejudice arises from counsel's performance. *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus. The establishment of prejudice requires proof that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different. *Id.* at paragraph three of the syllabus. The burden is on the defendant to prove ineffectiveness of counsel. *State v. Smith* (1985), 17 Ohio St.3d 98. Trial counsel is strongly presumed to have rendered adequate assistance. *Id.*

Much of appellant's assertions claiming ineffective assistance of counsel involve trial tactics. Debatable trial tactics and strategies do not constitute a denial of effective assistance of counsel. *State v. Clayton* (1980), 62 Ohio St.2d 45, 49, 402 N.E.2d 1189. An attorney's selection of which witnesses to call at trial falls within the purview of trial tactics and generally will not constitute ineffective assistance of counsel. *State v. Coulter* (1992), 75 Ohio App.3d 219, 598 N.E.2d 1324. Asking specific questions of a witness, even an expert witness, also falls under the realm of trial tactics.

The witnesses appellant wished to call to testify about his behavior at his place of employment were cumulative of other evidence admitted at the trial. Appellant's claims about evidence regarding his mother and the failure to request a continuance are barred by res judicata. The information appellant asserts he wished to convey under oath also was cumulative to legal arguments presented at trial. *State v. Lawson* (1995), 103 Ohio App.3d 307, 659 N.E.2d 362. This court will not second guess every aspect of the defense attorney's presentation at the penalty phase of appellant's trial. The existence of alternative or additional mitigation theories does not establish ineffective assistance of counsel. *State v. Combs* (1994), 100 Ohio App.3d 90, 105, 652 N.E.2d 205.

Appellant's third assignment of error is overruled.

*State v. Mitts,* No. 76963, 2000 WL 1433952, *4-5 (Ohio Ct. App. Sept. 28, 2000).

99

Respondent argues that Mitts's sub-claims that counsel failed to request a continuance and failed to introduce evidence about his mother are procedurally defaulted because the state court dismissed these claims on *res judicata* grounds. *Return of Writ,* at 19-20. Respondent concedes that the remaining claims are not defaulted. *Id.* at 20. Mitts argues that the possible existence of mental illness in his family was not in the record and therefore could not be raised on direct appeal. *Traverse,* at 22. He states that he filed a motion for appropriation of funds to hire a psychologist but the state post-conviction court denied the motion. *Id.* Mitts claims that a psychologist could have explained how his mother's history affected his mental health. *Id.* He also argues that a determination of whether he was prejudiced by counsel's failure to request a continuance requires evidence *dehors* the record. *Id*. at 21. Mitts also states that the Ohio Court of Appeals did not directly cite to the controlling authority on this issue, *Strickland v. Washington,* 466 U.S. 668 (1984). *Id*. at 19.

The Court of Appeals held that Mitts's claim that his attorney failed to request a continuance and his claim regarding his mother were barred by *res judicata.* The trial court considered and rejected the rest of the arguments on the merits. Although the state court did not expressly cite to *Strickland,* it cited to a state court case, *State v. Bradley,* which clearly employed the *Strickland* standard to address claims of ineffective assistance of counsel.

Ineffective assistance claims are not barred by *res judicata* under Ohio law where the petitioner presents evidence outside the direct appeal record. *Hill v. Mitchell,* 400 F.3d 308, 314 (6th Cir. 2005). Mitts attaches various exhibits to his post-conviction petition that are *dehors* the record. Furthermore, the arguments advanced in Mitts's post-conviction petition regarding trial counsel's ineffectiveness require supplementation of the trial court record. *Greer v. Mitchell,* 264 F.3d 663, 675

100

(6th Cir. 2001); *United States v. Rahal,* 191 F.3d 642, 645 (6th Cir. 1999)   (holding that ineffective

assistance claims are not generally cognizable on direct appeal unless the record is adequate to assess

the merits of the claims).  Because the trial record was not adequate to assess the merits of this claim,

Mitts was not required to raise the instant claim on direct appeal.  "[W]hen the record reveals that the

state court's reliance upon its own rule of procedural default is misplaced, we are reluctant to conclude

categorically that federal habeas review of the purportedly defaulted claim is precluded."  *Id*.

Accordingly, the Court finds that Mitts's claims that counsel failed to request a continuance and his claim

regarding his mother are not procedurally defaulted.  The Court will address the entire claim on the

merits in Section IV.

### b.      Second Ground for Relief

In the second ground for relief, Mitts contends that he was denied the effective assistance of

counsel in the guilt-innocence phase of the trial which resulted in a death sentence that does not comply

with the minimum constitutional standards of reliability required for the imposition of the death penalty.

*Petition,* at 9-10.  Mitts argues that trial counsel: (a) was in a hurry to try the case, and therefore, did

not adequately investigate alternative defenses or strategies; (b) did not properly conduct *voir dire*

(specifically, by failing to question the jurors about race); (c) insisted on a blackout defense even though

Mitts informed counsel, the mitigation specialist Susan Evanson, and the psychologist Dr. Eisenberg, that

he was not blacked out during the incident; and (d) did not request an expert to support this defense.

*Id.*; *Traverse,* at 25.

101

The last reasoned state court judgment on this claim was rendered by the Court of Appeals on

post-conviction review.  The court held as follows:

> In his seventh assignment of error, appellant argues his attorney
> was ineffective during the guilt phase of the trial. Appellant's claims
> [that] his attorney did not adequately prepare for trial, conduct voir dire
> properly, and insisted on presenting a black-out defense are barred by
> res judicata.
>
> Appellant's seventh assignment of error is meritless.

*State v. Mitts*, No. 76963, 2000 WL 1433952, at *6 (Ohio Ct. App. Sept. 28, 2000).

Mitts argues that the Ohio Court of Appeals did not explain its reasoning when it found this

claim to be barred by *res judicata. Traverse*, at 26.  Although the court of appeals denied this claim in

a brief statement, its judgment was not unexplained.  *See Ylst v. Nunnemaker,* 501 U.S. 797, 802

(1991) (describing an "unexplained order" as one whose text or accompanying opinion does not

disclose the reason for the judgment).  Here, the state court opinion disclosed the reason for its

judgment.  The court expressly stated that the claim was barred by *res judicata.*  The state court's

failure to explain why it utilized *res judicata* does not alter this Court's finding.  Accordingly, the court

of appeals' ruling is the last reasoned state court judgment on this claim.  *See Simpson v. Jones,* 238

F.3d 399, 407-08 (6th Cir. 2000) (rejecting petitioner's claim that the state supreme court's judgment

was not adequately explained).  *See also Abela v. Martin,* 380 F.3d 915, 923 (6th Cir. 2004)

(discussing *Simpson*).  Even if the Court of Appeals' decision does not represent the last explained state

court judgment on this claim, the trial court on post-conviction review also denied the claim on *res*

*judicata* grounds.  Although the trial court briefly addressed and rejected Mitts's voir dire sub-claim on

the merits, it clearly and expressly relied on a state procedural bar to dismiss the entire claim.  *Harris v.*

102

*Reed,* 489 U.S. 255, 263 (1989); *Simpson,* 238 F.3d at 407-08; *Coe v. Bell,* 161 F.3d 320, 329-30 (6th Cir. 1998).

Mitts argues that the evidence supporting his claim that counsel breached the duty to investigate alternative defenses was presented outside the record (in the form of affidavits from Susan Evanson and Dr. Eisenberg), and thus, the claim could not have been raised on direct appeal.  *Id*. at 26-27. Accordingly, argues Mitts, the court of appeals erroneously applied *res judicata* and his claim is not procedurally defaulted.

The affidavits cited by Mitts present information relevant to the instant claim.  In her affidavit, Evanson states that Mitts informed her that he was not in a blackout at the time of the offense but was told by his attorney not to disclose this to anyone.  In Eisenberg's affidavit, Eisenberg states that he did not believe Mitts was in a blackout and that Mitts informed him about counsel's attempt to conceive the blackout theory.  *See ECF No. 17, Appendix, Volume IV, Exhs. L-M,* at 139-144.  As discussed *supra*, ineffective assistance claims are not barred by *res judicata* under Ohio law where the petitioner presents evidence outside the direct appeal record.  *Hill v. Mitchell,* 400 F.3d 308, 314 (6th Cir. 2005).  For the reasons set forth in the first ground for relief, the Court finds that the claim that counsel breached his duty to investigate alternative defenses is not procedurally defaulted.  Mitts, however, does not allege that his voir dire sub-claim could not have been raised on direct appeal.  The trial record was adequate to assess the merits of this claim, and Mitts does not present any evidence outside the direct appeal record to support this claim.  Accordingly, Mitts's voir dire sub-claim is procedurally defaulted.

103

The Court finds that Mitts failed to comply with the applicable state procedural rule requiring perceived errors to be raised at the earliest possible occasion, *Perry*, 10 Ohio St.2d 175, 180; the state courts actually enforced the procedural bar, *Williams v. Bagley,* 380 F.3d 932, 967 (6th Cir. 2004); and application of *res judicata* under Ohio law is an "adequate and independent" state ground upon which federal habeas review is foreclosed.  *Coleman v. Mitchell,* 268 F.3d 417, 429 (6th Cir. 2001). Mitts does not allege cause and prejudice, or a fundamental miscarriage of justice, to excuse the default.[9]

---

[9]Even were this Court to address this claim on the merits, it would not be well-taken.  In sub-claim (b) Mitts argues that counsel was ineffective because he did not question the jurors about race in a case that involved racial overtones.  Claims of ineffective assistance of counsel are analyzed under the standard enunciated in *Strickland v. Washington*, 466 U.S. 668 (1984).  To prevail on a claim of ineffective assistance of counsel, Mitts must establish two elements: (1) counsel's performance fell below an objective standard of reasonableness, and (2) there is a reasonable probability that, but for counsel's deficiency, the outcome of the proceedings would have been different.  *Griffin v. United States*, 330 F.3d 733, 736 (6th Cir. 2003) (citing *Strickland*, 466 U.S. at 694).  A review of counsel's performance must be highly deferential and requires the Court to "indulge a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance."  *Monzo v. Edwards*, 281 F.3d 568, 579 (6th Cir. 2002) (quoting *Strickland*, 466 U.S. at 689).  As to the second "prejudice" prong, the Supreme Court has stated that "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id*. (quoting *Strickland*, 466 U.S. at 694).

Sub-claim (b) fails under both prongs.  In *Turner v. Murray*, 476 U.S. 28, 36-37 (1986), the Supreme Court held that a capital defendant accused of an interracial crime is entitled to have potential jurors informed of the race of the victim and questioned about racial bias if the defendant specifically requests such an inquiry.  Mitts has failed to overcome the strong presumption that counsel's decision not to question the jurors about racial prejudice was reasonable trial strategy.  Counsel could have reasonably believed that questioning jurors about their racial attitudes might have unduly emphasized Mitts's use of racial epithets during the shootings.  In fact, in his dissent in *Turner,* Justice Powell expressed a concern that inquiry into racial prejudice, in the absence of circumstances that demonstrate a clear need for such questioning, might have the negative effect of suggesting to jurors that race is somehow relevant to the case.  *Turner*, 476 U.S. at 48 n.5 (Powell, J., dissenting).  In response, the majority stated:  "[w]hether such a concern is purely chimerical or not is a decision we leave up to a capital defendant's counsel."  *Id*. at 37 n.10.

Furthermore, Mitts fails to demonstrate a reasonable probability that, but for counsel's failure to question the venire on racial prejudice, the outcome of his trial would have been different.  Although the record suggests that John Bryant's murder was in fact racially motivated, witnesses

104

The remaining sub-claims set forth in the second ground for relief will be addressed on the merits in Section IV.

### c.      Third Ground for Relief

In the third ground for relief, Mitts contends that there was insufficient evidence to show that he formed the specific intent to kill John Bryant and Dennis Glivar.  Because Mitts withdrew this ground for relief, *see Traverse*, at 28, we do not reach this claim.

### d.      Fourth Ground for Relief

In the fourth ground for relief, Mitts argues that he was denied the effective assistance of counsel and the assistance of experts when trial counsel failed to request, or the trial court refused to appoint, an independent pharmacologist, toxicologist or similarly qualified expert to assist counsel during trial, where the evidence (and other information known or readily available to counsel) indicated that Mitts abused alcohol and was under the influence at the time of the offense. *Petition*, at 11.  Mitts contends that the absence of an expert in both phases of his trial caused him prejudice because he was unable to completely and efficiently present mitigating evidence under Ohio Revised Code § 2929.04.  *Id.*

---

testified that Mitts did not display a hatred of African-Americans.  *See Tr.,* at 990, 992 (Testimony of Norman Koplin) (testifying that Mitts brought a black friend to the shooting range a couple of times); *id.* at 1208 (Testimony of Dr. Sonia McKee) (indicating that there was no evidence in Mitts's background that he hated black people).  Moreover, Mitts does not claim that racial bias tainted the impaneled jury, and there is no evidence that any juror exhibited racial bias.  *See Clark v. Collins,* 19 F.3d 959, 965 (5th Cir. 1994).

The last reasoned state court judgment on this claim was rendered by the Court of

Common Pleas on post-conviction review.  In dismissing this claim, the trial court stated:

> As previously discussed, this issue could have, and should
> have been raised on appeal, not in a petitioner [*sic*] for post-
> conviction relief.  Most importantly, petitioner has made no
> showing that he is entitled to expert assistance.  The United States
> Supreme Court in <u>Ake v. Oklahoma</u> (1985), 470 U.S. 68, held
> that in a capital case where the defense is one of sanity, [*sic*] the
> State must provide expert psychiatric help in order to provide the
> indigent defendant with the basic tools for a defense.  However, in
> <u>Caldwell v. Mississippi</u> (1985), 472 U.S. 320, the Supreme
> Court found no denial of due process when the state court refused
> to fund the hiring of various experts in a capital case.  In the case
> at bar, the defense is not insanity, therefore, there is no mandate to
> hire experts to support petitioner's theories.

*See ECF No. 17, Appendix, Volume IV, Findings of Fact and Conclusions of Law*, at 317-

18.

Although the state court did not use the term "*res judicata*," the Court finds that the state

court intended to apply that doctrine to deny Mitts's expert assistance claim.  Perhaps the state

court did not find it necessary to reiterate the title of the procedural doctrine that it "previously

discussed" and employed to deny Mitts's first, second, third and fifth claims.  *ECF No. 17,*

*Appendix, Volume IV,* at 308-17.  The court then went on to consider and reject Mitts's expert

assistance claim on the merits and expressly identified its merits holding as the "[m]ost

important[  ]" basis for denying the claim.

The Court finds that the post-conviction court clearly and expressly relied on *res judicata*

as a ground for rejecting Mitts's claim.  *See Coe v. Bell*, 161 F.3d 320, 329-331 (6th Cir. 1998)

106

(finding that state-court statement of procedural bar was "clear and express"); *Scott v. Mitchell,* 209 F.3d 854, 865 (6th Cir. 2000) (finding that the state court's "[m]ore importantly" sentence did not represent a ruling on the merits but was merely a supplement to the state court's enforcement of the procedural bar). *Cf. Harris,* 489 U.S. at 266 n.13 (finding that the reference to state law in the state-court opinion was insufficient to clearly demonstrate whether the court intended to invoke *res judicata* as an alternative ground for denying the claim especially in the context of clear reliance on federal law). Accordingly, this claim is procedurally defaulted.

The Court finds that Mitts failed to comply with the applicable state procedural rule requiring perceived errors to be raised at the earliest possible occasion, *Perry,* 10 Ohio St.2d 175, 180; the state courts actually enforced the procedural bar, *Williams v. Bagley,* 380 F.3d 932, 967 (6th Cir. 2004); and application of *res judicata* under Ohio law is an "adequate and independent" state ground upon which federal habeas review is foreclosed. *Coleman v. Mitchell,* 268 F.3d 417, 429 (6th Cir. 2001). Mitts does not allege cause and prejudice, or a fundamental miscarriage of justice, to excuse the default.[10]

---

[10]Even were this claim not defaulted, it would not be well-taken. Mitts does not show that the state court's decision was contrary to, or involved an unreasonable application of, clearly established Supreme Court law. Mitts does not establish that he is entitled to expert assistance, and makes no showing that expert assistance would have been beneficial to him at trial. He merely asserts that the failure to request or appoint an expert was prejudicial where the evidence established that he was intoxicated at the time of the offense. In *Caldwell v. Mississippi*, 472 U.S. 320, 323 n.1 (1985), the petitioner challenged the trial court's denial of his request for expert assistance. The U.S. Supreme Court found no due process violation in the trial court's refusal to appoint experts given that the petitioner "offered little more than undeveloped assertions that the requested assistance would be beneficial." *Id.*

Mitts also makes a generalized allegation that the absence of an expert during both phases of trial was prejudicial because he was unable to completely and efficiently present relevant mitigating evidence in violation of Ohio Revised Code § 2929.04. However, evidence of Mitts's

---

intoxication was elicited at trial from Dr. McKee and Dr. Eisenberg.  During the guilt phase of the trial, Dr. McKee discussed Mitts's history of alcohol consumption, testified that Mitts was intoxicated on the date of the offense and stated that the intoxication caused some impairment to his memory.  *Tr.,* at 1183, 1188.  Dr. McKee stated that as a psychiatrist she specializes in the evaluation and treatment of disorders of mental illness as well as alcohol and substance abuse.  *Id*. at 1167.  During the mitigation phase, Dr. Eisenberg also testified to the effects of alcohol consumption on Mitts's behavior on the date of the offense.  He testified that, in his opinion, the alcohol consumption led directly to Mitts's conduct and that, but for the alcohol, it is unlikely that the offense would have occurred.  *Id.* at 1468-69.  Furthermore, Dr. Eisenberg's testimony on Mitts's intoxication was more favorable to the defense than Dr. McKee's.  *Compare Tr.,* at 1201-02 *with id.* at 1481.  Accordingly, Mitts was not denied the opportunity to present mitigating evidence under R.C. § 2929.04.  In short, Mitts does not show that the state court's judgment was contrary to, or involved an unreasonable application of, clearly established Supreme Court law.

Mitts also claims that the denial of expert assistance infringed upon his right to effective assistance of counsel.  The state court held that Mitts's claim could have and should have been raised on direct appeal.  As previously discussed in this Opinion, ineffective assistance claims are generally not cognizable on direct appeal unless the record is adequate to assess the merits of the claim.  Mitts does not allege that this claim could not have been presented on direct appeal.  There is, however, evidence outside the trial record that Mitts abused alcohol (specifically Dr. McKee's sanity report includes a notation of alcohol abuse and Dr. Eisenberg testified in his deposition that Mitts abused alcohol).

Despite this evidence, the instant claim lacks merit.  Mitts does not once allege that counsel's decision not to request another expert fell below an objective standard of reasonableness.  He has also fails to demonstrate resulting prejudice.  Even if one of the requested experts informed the guilt-phase jury about the extent and effects of Mitts's alcohol abuse, Mitts does not show that the expert would have testified that Mitts was unable to form specific intent on the night of August 14, 1994.  Moreover, there was overwhelming evidence of Mitts's guilt.  *See Hicks v. Collins,* 384 F.3d 204, 212, 215 (6th Cir. 2004) (finding that petitioner was not denied the effective assistance of trial counsel during the guilt phase of trial where counsel failed to consult with or obtain an expert on the effects of cocaine on the body).

Furthermore, Mitts predicates error on counsel's failure to request an *additional* expert.  Drs. McKee and Eisenberg had sufficient information to testify to Mitts's history of alcohol use.  Although Dr. Eisenberg stated in his deposition that he is not an expert in alcoholism, *ECF No. 63, Deposition of James R. Eisenberg, Ph.D.,* at 7, Dr. McKee testified at trial that she specialized in alcohol and substance abuse, *Tr.,* at 1167.  *See also ECF No. 17, Appendix, Volume IV,* at 143, *Petition for Post-Conviction Relief, Exh. M-2* (stating that he is not an expert on the physiological effects of alcohol intoxication).  In light of the expert witnesses available to him, Mitts does not show why the additional expense of hiring another expert was warranted in this situation.  Counsel's decision not to present mitigating evidence on alcohol abuse (as opposed to voluntary intoxication) through the testimony of the two experts available to him is discussed in the first ground for relief in Section IV.

### e.  Seventh Ground for Relief

In the seventh ground for relief, Mitts contends that the trial court's instruction to the jury that a death verdict is only a recommendation and is not binding on the court, but that a life sentence was binding on the court, violated his due process rights and his right to be free from cruel and unusual punishment.  *Petition*, at 17; *Traverse,* at 38.  He argues that the instruction placed the ultimate responsibility for imposing the death sentence on the court, and minimized the jury's sense of responsibility.  *Traverse,* at 38-40.  Mitts argues that the instructions essentially told the jury that if it wished to avoid the responsibility of deciding whether Mitts should live or die, it had to recommend a death sentence, because only then would the trial court be forced to render the ultimate decision.  *Petition,* at 17-18.  He contends that under federal law, "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere."  *Id.* at 17 (quoting *Caldwell v. Mississippi*, 472 U.S. 320, 328-29 (1985)).

In the last reasoned state court judgment on this issue, the Ohio Supreme Court on direct appeal found that Mitts failed to object to the instruction at trial, and waived all but plain-error review:

> Mitts's counsel failed to object at trial and waived all but plain error. *State v. Slagle* (1992), 65 Ohio St.3d 597, 605, 605 N.E.2d 916, 925. Plain error is an obvious error or defect in the trial proceedings that affects a substantial right. Crim.R. 52(B). Under this standard, reversal is warranted only when the outcome of the trial would have been different without the error. *State v.*

> *Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d
> 804, paragraph two of the syllabus.
>
> This court has previously held that the trial court does not
> err by referring to the jury's verdict as a recommendation or by
> recognizing that the trial court would make the final decision on the
> death penalty. See, *e.g., State v. Woodard* (1993), 68 Ohio
> St.3d 70, 77, 623 N.E.2d 75, 80-81; *State v. DePew* (1988),
> 38 Ohio St.3d 275, 280, 528 N.E.2d 542, 550; *State v.
> Jenkins,* 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, at
> paragraph six of the syllabus. Accordingly, we overrule Mitts's
> fifth proposition of law.

*State v. Mitts*, 690 N.E.2d 522, 530 (Ohio 1998).

Mitts argues that the Ohio Supreme Court excused the procedural default by addressing

the claim on the merits. *Traverse,* at 40. The Court disagrees. By holding that the trial court did

not err in providing the instruction, the Ohio Supreme Court was merely conducting plain-error

analysis and thus enforcing the state procedural rule. Whether the second paragraph of the state-

court judgment represents a review for plain error or an alternative holding on the merits is

ambiguous at first glance. However, construed logically, the second paragraph represents an

application of the plain-error rule set forth in the first paragraph. The state court found no error in

the trial court's instruction, let alone one that created a manifest injustice or seriously affected the

outcome of the trial. *State v. Mills,* 582 N.E.2d 972, 987 (Ohio 1992); *State v. Crump,* No. 8-

04-24, 2005 WL 579169, at *6 (Ohio Ct. App. Mar. 14, 2005). Accordingly, the Ohio

Supreme Court's conclusion that the instruction did not constitute error represents state-court

enforcement of the state procedural rule. *See Gulertekin v. Tinnelman-Cooper*, 340 F.3d 415,

110

423-24 (6th Cir. 2003) (finding claim procedurally defaulted where the state court identified

defense counsel's failure to object and conducted plain-error analysis); *Hinkle v. Randle*, 271

F.3d 239, 244 (6th Cir. 2001) (holding that a state appellate court's plain-error review represents

enforcement of a procedural default); *Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir. 2000)

("Controlling precedent in our circuit indicates that plain error review does not constitute a waiver

of state procedural default rules").  *See also Paprocki v. Foltz,* 869 F.2d 281, 284-85 (6th Cir.

1989).  Importantly, the court never relied on, or even mentioned, federal law in dismissing this

claim.  *See Simpson v. Jones,* 238 F.3d 399, 407-408 (6th Cir. 2000) (finding that the

requirement that the state court "clearly and expressly" state that its judgment is based on a state

procedure rule applies only when a state court judgment rests primarily on federal law or is

interwoven with federal law); *Coleman v. Thompson,* 501 U.S. 722, 740 (1991) (finding *Harris*

presumption inapplicable where the state court judgment "fairly appear[ed]" to rest primarily on

state law and did not mention federal law).

Accordingly, the Court finds that Mitts failed to comply with the state procedural rule

requiring contemporaneous objections to perceived trial errors, the state courts actually enforced

the rule by reviewing this issue for plain error only, and Ohio's contemporaneous-objection rule is

an "adequate and independent" state ground upon which federal habeas review is foreclosed.

*Scott v. Mitchell*, 209 F.3d 854, 864-71 (6th Cir. 2000).  Again, Mitts fails to argue cause and

prejudice, or a fundamental miscarriage of justice, to excuse this default.

According to Mitts, because the state court did not cite in its analysis *Caldwell v. Mississippi*, the controlling authority on this issue, this Court does not owe any deference to the state court judgment and may independently determine whether the state court's decision was an unreasonable application of federal law.  *Traverse,* at 40.  The Court disagrees.  As previously discussed, the state court relied on a state procedural rule to dismiss the claim and did not even mention federal law in its ruling; accordingly, Mitts's argument that the state court applied federal law in an unreasonable manner lacks merit.[11]  *See Lancaster v. Adams,* 324 F.3d 423, 436 (6th Cir. 2003) (holding that claims that are procedurally defaulted cannot be considered by federal courts on habeas review absent showing of cause and prejudice or miscarriage of justice).

### f.        Eighth Ground for Relief

In the eighth ground for relief, Mitts asserts that the trial court violated his due process rights and his constitutional right to a reliable verdict when it gave the jury an improper acquittal-first instruction during the penalty phase.  *Traverse,* at 41, 44; *Petition,* at 18.  Mitts argues that the trial court erroneously instructed the jury that it could consider a life option only after first

---

[11]Even were this Court to address the merits of this claim, it would not be well-taken.  The U.S. Supreme Court has explained that there is no basis for a *Caldwell* claim if the challenged instructions accurately described the role of the jury under state law.  *Dugger v. Adams*, 489 U.S. 401, 407 (1989).  In order to establish a *Caldwell* violation, a petitioner must show that the remarks to the jury improperly described the role assigned to the jury by state law.  *Id*. at 407.  According to the Ohio Supreme Court, a trial court accurately states Ohio law when it instructs the jury that any recommendation of death is only a recommendation and is not binding on the court, that a life verdict is binding on the court, and that the final decision to impose the death sentence rests with the court.  *See State v. Loza,* 641 N.E.2d 1082, 1099 (Ohio 1994); *State v. Hicks*, 538 N.E.2d 1030, 1038-39 (Ohio 1989); *State v. Hutton,* 559 N.E.2d 432, 447 (Ohio 1990).  Furthermore, because a habeas court must accept the interpretation of state law by the highest state court on a petitioner's direct appeal, *Gall v. Parker*, 231 F.3d 265, 303 (6th Cir. 2000), this Court must defer to the Ohio Supreme Court's ruling on this claim.

112

rejecting the death penalty. *Petition,* at 18. Mitts contends that the instruction misled the jury on

its role and prevented the jurors from considering the mitigating evidence and life options in their

proper context. *Id.*; *Traverse, at 44.* "In order to give any effect to mitigation, a jury must be

free to consider life options before acquitting the defendant of death." *Traverse,* at 44. Mitts also

states that "[t]he instructions in this case undermined confidence in the outcome[,] . . . created an

unacceptable risk that a death sentence rested upon improper grounds . . . . [and] violated [his]

due process right to be sentenced according to procedures established by state law." *Id*. The

relevant instructions read as follows:

> When all 12 members of the jury find by proof beyond a
> reasonable doubt that the aggravating circumstances in each
> separate count with which Harry D. Mitts, Jr., has been found
> guilty of committing outweigh the mitigating factors, if any, then
> you must return such finding to the Court.

> I instruct you as a matter of law that if you make such a
> finding, then you must recommend to the Court that the sentence
> of death be imposed on the defendant Harry D. Mitts, Jr.

>     . . . .

> On the other hand, after considering all the relevant
> evidence raised at trial, the evidence and testimony received at
> this hearing and the arguments of counsel, you find that the state
> of Ohio failed to prove beyond a reasonable doubt that the
> aggravating circumstances with which the defendant Harry D.
> Mitts, Jr., was found guilty of committing outweigh the mitigating
> factors, you will then proceed to determine which of two possible
> life imprisonment sentences to recommend to the Court.

*Tr.,* at 1568-1570.

Shortly after reciting these instructions, the trial court read the verdict forms:

I will now read to you the verdict forms which will apply in this case.  No inference is to be drawn from the order in which I read these forms to you.

Verdict, Count one, state of Ohio versus Harry D. Mitts, Jr., sentencing procedure, we the jury in this case, being duly impaneled and sworn, do find that the state of Ohio has proved beyond a reasonable doubt the aggravating circumstances which the defendant, Harry D. Mitts, Jr., was found guilty of committing in count one outweighs [*sic*] the mitigating factors presented in this case.

We the jury recommended [*sic*] that the sentence of death be imposed on the defendant, Harry D. Mitts, Jr.  There are 12 signature bars.  The top one to be signed by the foreman.

The second verdict for count one reads as follows:  We the jury in this case, being duly impaneled and sworn, do find the aggravating circumstances with which the defendant, Harry D. Mitts, Jr., was found guilty of committing in count one are not sufficient to outweigh the mitigating factors presented in this count.

We the jury recommend that the defendant, Harry D. Mitts, Jr., be sentenced to life imprisonment with parole eligibility after serving 30 full years of imprisonment.  Once again there are 12 signature bars.  The top one to be signed by the foreman.

If you find that 30 full years is not the appropriate sentence or if you are unable unanimously to agree, then you will proceed to consider the third verdict.

The third verdict on count one reads as follows:  We the jury in this case, being duly impaneled and sworn, do find the

114

> aggravating circumstances with which the defendant, Harry D.
> Mitts, Jr., was found guilty of committing in count one are not
> sufficient to outweigh the mitigating factors presented in this count.
>
> We the jury recommend that the defendant, Harry D.
> Mitts, Jr., be sentenced to life imprisonment with parole eligibility
> after serving 20 full years of imprisonment.  And once, again, there
> are 12 signature bars, the top to be signed by the foreman.

*Id.* at 1570-72.

Mitts argues that the language "unable unanimously to agree" (mentioned in the third to last

paragraph quoted above) further confused the jury.  *Traverse,* at 44.  By including this language

only in reference to one of the life options, argues Mitts, the trial court by omission effectively

informed the jury "that such procedure did not apply to the death consideration."  *Id*.

Presumably, Mitts is arguing that this language led the jury to believe that it could *not* move on to

consider a life option if it was unable to reach a unanimous agreement regarding the death penalty,

in violation of Ohio Revised Code § 2929.03(D)(2).  *Id.* at 42.

In the last reasoned state court judgment addressing this claim, the Ohio Supreme Court

on direct review found that Mitts failed to object to this instruction, and waived all but plain-error

review.

> In his sixth proposition of law, Mitts raises three additional
> penalty-phase issues, but Mitts's counsel failed to object or
> request additional instructions and again waived all but plain error.

*State v. Mitts*, 690 N.E.2d 522, 530-531 (Ohio 1998).

115

Immediately after addressing Mitts's first argument, the Ohio Supreme Court addressed

the jury charge:

> Second, Mitts argues that the trial court gave an improper
> "acquittal-first" instruction on its sentencing deliberations in
> violation of *State v. Thomas* (1988), 40 Ohio St.3d 213, 533
> N.E.2d 286. The court did *not* instruct the jury that it could
> consider lesser penalties only if it first unanimously rejected the
> death penalty. Instead, the court instructed that if all twelve
> members of the jury found that the state had not proved that the
> aggravating circumstances outweighed mitigating factors, then it
> must choose between the possible life sentences. That instruction
> is consistent with R.C. 2929.03(D)(2) and does not constitute
> error.[12]  *State v. Taylor,* 78 Ohio St.3d at 28-29, 676 N.E.2d at
> 95; *State v. Davis* (1996), 76 Ohio St.3d 107, 116- 118, 666
> N.E.2d 1099, 1108-1109.

*Id.* at 531.  The state court employed plain-error analysis to dispose of the instant claim.  After

noting that the instruction was not in fact an "acquittal-first" instruction, the Ohio Supreme Court

concluded that the instruction was consistent with Ohio Revised Code § 2929.03(D)(2) and did

not constitute error.  Mitts argues that the claim is not procedurally defaulted because the Ohio

Supreme Court did not rely on a procedural bar to deny this claim, but instead, ruled on the

merits.  *Traverse,* at 46.  The State, while arguing that the claim is defaulted, notes that the state

court also denied the claim on the merits.  *Return of Writ,* at 57.  The Court disagrees with Mitts

---

[12]It is noteworthy that the trial court did not actually instruct the jury that "if all *twelve*
members" found that the State had not proved that the aggravating circumstances outweighed the
mitigating factors, then the jury must choose between the possible life sentences.  Nonetheless, in
the last two cases cited by the Ohio Supreme Court above (*State v. Taylor* and *State v. Davis*),
the state court upheld instructions similar to those at issue in Mitts's case.  Furthermore, a habeas
court must accept the interpretation of state law by the highest state court on a petitioner's direct
appeal.  *Gall v. Parker*, 231 F.3d 265, 303 (6th Cir. 2000).

116

and with the State to the extent it argues that the state court rendered an alternative ruling on the

merits.  *See Sur-Reply*, at 13.  As previously discussed, the state court's plain-error review

represents enforcement of a procedural default.  For the reasons set forth in the seventh ground

for relief, *supra*, the state court relied on Ohio's contemporaneous-objection rule and

concomitant plain-error analysis to deny this claim.

Mitts also argues that he raised this claim on direct appeal under federal constitutional

grounds, but the state court resolved the claim on state law grounds.  As a result, argues Mitts, the

state court did not "adjudicate the merits" of his federal claim within the meaning of AEDPA.

*Traverse,* at 41.  Accordingly, Mitts argues that the Court should conduct an independent review

of this claim to determine whether the state court's decision resulted in an unreasonable

application of federal law.  *Id*. (citing *Harris v. Stovall,* 212 F.3d 940, 943 (6th Cir. 2000)).

Contrary to Mitts's assertions, the principle announced in *Harris v. Stovall* does not

govern the instant claim.  In that case, the Sixth Circuit held that where a state court fails to

articulate its reasoning for its decision, a federal habeas court must conduct "an independent

review of the record and applicable law to determine whether the state court decision is contrary

to federal law, unreasonably applies clearly established law, or is based on an unreasonable

determination of the facts in light of the evidence presented."  *Harris*, 212 F.3d at 943.

However, where a claim is procedurally defaulted, as it is here, it may not be considered by a

federal court on habeas review:

> "When a habeas petitioner fails to obtain consideration of
> a claim by a state court, either due to the petitioner's failure to

117

> raise that claim before the state courts while state-court remedies
> are still available or due to a state procedural rule that prevents the
> state courts from reaching the merits of the petitioner's claim, that
> claim is procedurally defaulted and may not be considered by the
> federal court on habeas review.  'A petitioner may avoid this
> procedural default only by showing that there was cause for the
> default and prejudice resulting from the default, or that a
> miscarriage of justice will result from enforcing the procedural
> default in the petitioner's case.'"

*Lancaster v. Adams,* 324 F.3d 423, 436 (6th Cir. 2003) (citation and internal citations

omitted).  The Court finds that Mitts failed to comply with the state procedural rule requiring

contemporaneous objections to perceived trial errors, the state courts actually enforced the rule

by reviewing this issue for plain error only, and Ohio's contemporaneous-objection rule is an

"adequate and independent" state ground upon which federal habeas review is foreclosed.  *Scott

v. Mitchell*, 209 F.3d 854, 864-71 (6th Cir. 2000).

In the alternative, Mitts argues that his counsel's ineffectiveness in failing to object to the

instruction constitutes "cause" to excuse the procedural default.  *Traverse,* at 46.  Mitts argues

that "the failure to properly charge the jury resulted in an inability of the jury to properly consider

mitigation and life sentence options and undermined the reliability of the entire process."  *Id*. at 49.

Ineffective assistance of counsel can constitute cause for procedural default.  *Munson v.

Kapture,* 384 F.3d 310, 316 (6th Cir. 2004).  To establish ineffective assistance, Mitts must

show that counsel's performance fell below an objective standard of reasonableness and that

there is a reasonable probability that, but for counsel's deficiency, the outcome of the proceedings

would have been different.  *Griffin v. United States*, 330 F.3d 733, 736 (6th Cir. 2003) (citing

118

*Strickland v. Washington*, 466 U.S. 668, 694 (1984)).

For the reasons set forth in the ninth ground for relief, *see infra* Section IV, Subpart E,

the Court finds that Mitts has not demonstrated ineffective assistance of counsel in failing to object

to the "acquittal-first" instruction.  Accordingly, Mitts fails to establish cause to excuse the

procedural default.[13]

_____

[13]Were this Court to address the merits of Mitts's claim, the Court would be faced with contradictory rulings by the Sixth Circuit regarding the constitutionality of unanimity and acquittal-first instructions in a capital case.  *Compare Coe v. Bell,* 161 F.3d 320 (6th Cir. 1998), *Scott v. Mitchell*, 209 F.3d 854 (6th Cir. 2000), *and Roe v. Baker,* 316 F.3d 557 (6th Cir. 2002), *with Davis v. Mitchell*, 318 F.3d 682 (6th Cir. 2003).  *See also Mapes v. Coyle,* 171 F.3d 408 (6th Cir. 1999).

Although it is unclear whether Mitts is making a pure "acquittal-first" argument or a combination "acquittal-first" and unanimity argument on habeas review, a review of the state court proceedings reveals that Mitts simply presented an acquittal-first argument in state court.  In his appellate brief to the Ohio Supreme Court, Mitts argued as follows:

> The judge instructed the jury that it could consider the lesser penalties after finding that the state failed to prove the aggravating factor present did not [*sic*] outweigh the mitigating factors.  (T. 1569).  It is not necessary for the jury to reject the death option before considering the life option.  State v. Thomas (1988), 40 Ohio St.3d 213, cert. denied (1989) 443 U.S. 826.

*ECF No. 16, Appendix, Volume III,* at 55, *Merit Brief of Appellant,* at 31.  An identical argument was presented before the Court of Appeals.  *ECF No. 15, Appendix, Volume II,* at 94, *Appellant's Brief and Assignments of Error*, at 31.

In *Mills v. Maryland,* 486 U.S. 367, 384 (1988), the U.S. Supreme Court reversed a death sentence imposed under Maryland's capital punishment scheme because the jury instructions and verdict form created a substantial probability that reasonable jurors may have thought they were precluded from considering mitigating evidence unless all jurors unanimously agreed on the presence of a particular circumstance.  *See also McCoy v. North Carolina,* 494 U.S. 433, 438 (1990).

In *Mapes,* a panel of the Sixth Circuit stated that the trial court erroneously gave the jury an acquittal-first instruction by requiring the jury to unanimously reject the death penalty before considering a life sentence.  *Id*. at 416-17.  However, this statement was *dicta* because the panel held that the claim was procedurally defaulted.  *Id*. at 419.  In *Coe,* a panel of the Sixth Circuit held that the unanimity instructions did not violate *Mills* because the instructions required unanimity as to the results of the weighing process and not as to the presence of a mitigating factor.  *Id*. at 338.

_____

The panel also rejected the petitioner's argument that the jury should have been informed of the consequences of a failure to reach unanimity.  *Id*. at 339.  In *Roe,* a panel of the Sixth Circuit found no constitutional violation where the sentencing court failed to instruct the jury that unanimity was not required for a life sentence.  *Id*. at 563-64.  The panel stated:

> In essence, Roe contends that the failure of the court to instruct the jury regarding the result of any deadlock as to the imposition of a death sentence may have resulted in the impression on the jury that it must unanimously reject death, rather than a single juror's being capable of preventing a death sentence by creating a deadlock.

*Id*. at 563.

The instant instructions are most similar to the instructions at issue in *Scott* and *Davis*.  In *Scott,* a panel of the Sixth Circuit stated that the unanimity instruction at issue did not violate *Mills*. *Id*. at 877.  The panel stated that the instruction required unanimity only as to the weighing process and not to the existence of individual mitigating factors.  *Id*. at 875-76.  The panel stated:

> Whether or not the district court was correct that the instruction violated Ohio law by not conforming with the Ohio Supreme Court's subsequent decision in *Brooks* (which we find doubtful, given that court's approval of Scott's sentence), it does not violate Scott's federal constitutional rights under *Mills* and therefore cannot justify habeas relief.

*Id*. at 876.  The court also stated that the district court was incorrect in finding error in the trial court's failure to instruct the jury as to the consequences of deadlock.  *Id*. at 877.  However, because the *Scott* panel determined that the claim regarding the unanimity instruction was procedurally defaulted, *id*. at 873, its determination that the instruction was constitutionally sound was merely *dicta.*

In *Davis,* a panel of the Sixth Circuit held that the trial court's jury instructions, which are virtually identical to the instructions at issue in this case, were constitutionally infirm.  The *Davis* court, which decided the claim on the merits, characterized the petitioner's claim as follows:

> The habeas petitioner argues that these two interconnected instructions-the unanimity instruction and the acquittal-first instruction-constitute constitutional error under the Eighth Amendment because there was a reasonable likelihood that jurors would understand the instruction to mean that juror unanimity was required to mitigate the punishment from death to life.

*Id*. at 685.  The panel held as follows:

120

Furthermore, Mitts does not allege prejudice or a fundamental miscarriage of justice to excuse the default.

### g.        Tenth Ground for Relief

In the tenth ground for relief, Mitts argues that the trial court violated his constitutional rights when it refused to instruct the jury during the penalty phase that it could consider his intoxication as mitigating evidence.  *Petition,* at 20-21.  Because Mitts withdrew this ground for relief, *see Traverse*, at 58, we do not reach this claim.

---

> [T]here is a reasonable likelihood that the jury believed that it could not render a verdict in favor of life imprisonment rather than death unless the jury was unanimous with respect to its reasoning on the presence of mitigating factors and unless the jury was unanimous in rejecting the death penalty.  Instructions that leave a jury with the impression that juror unanimity was required to mitigate the punishment from death to life imprisonment clearly violate the Eighth Amendment, and therefore the writ of habeas corpus must issue setting aside the death sentence.

*Id*.  Specifically, the panel found the instruction unconstitutional on three grounds: (1) the silence on the lack of unanimity required for mitigating factors; (2) the "acquittal-first" instruction; and (3) the unanimity instruction ("Now, as you know, since this is a criminal case, the law requires that in order for you to reach a decision all 12 of you must be in agreement.").  *Id*. at 684, 690.  The panel held that an instruction requiring that a jury must first unanimously reject the death penalty before considering a life option precludes the individual juror from giving effect to mitigating evidence in violation of *Mills.  Id.* at 689.  The court also concluded that the jury was led to believe that mitigating factors must be found unanimously, in violation of *Mills.  Id.* at 688, 690-91.

The panel in *Davis* did not even cite *Coe, Scott* or *Roe*.  While *Davis* discussed the constitutionality of an "acquittal-first" instruction, which is the issue in the instant claim, *Scott* did not.  Nonetheless, the instructions in *Scott* and *Davis* are virtually identical to those in the instant case.  Furthermore, Mitts did not make the same argument before the Ohio Supreme Court that the petitioner allegedly made in *Davis.  See also Davis,* 318 F.3d at 692 (Boggs, J., dissenting) (disagreeing with the majority's description of petitioner's argument).

The Court declines to reconcile the contradictory rulings of the Sixth Circuit, and refrains from addressing the merits of this claim, in the wake of finding the claim procedurally defaulted.  *See Williams v. Mitchell, Case No. 1:99 CV 2399, ECF No. 45, Memorandum & Order of Judge Kathleen M. O'Malley, March 28, 2003*, at 88-93 (refraining from addressing the merits of a claim challenging a unanimity instruction in light of finding the claim procedurally defaulted).

121

### h.        Eleventh Ground for Relief

In the eleventh ground for relief, Mitts argues that the cumulative effect of prosecutorial

misconduct during the mitigation phase of the trial deprived him of his constitutional right to a fair

trial.  *Petition*, at 21.  Specifically, Mitts argues that prosecutorial misconduct rendered his trial

fundamentally unfair for the following reasons:  (a) the prosecutor improperly argued that the jury

should consider the nature and circumstances of the offense (e.g., racial motives for the shootings)

as an aggravating circumstance; (b) the prosecutor improperly argued that the manner and means

of the killings should be considered an aggravating circumstance, and improperly asked the jury to

consider "any other factors relative to whether the defendant should be put to death"; (c) the

prosecutor improperly argued that the jury should consider victim impact evidence as an

aggravating circumstance; and (d) the prosecutor improperly argued that the jury must first reject

the death penalty before considering a life option, thus decreasing the possibility that the jury

would recommend a life sentence.  *Id*. at 21-22; *Traverse*, at 59-62.

The State argues that Mitts has not previously presented this claim to any Ohio court,

*Return of Writ,* at 64, and Mitts contends that the issue was presented to the state courts during

his *Murnahan* proceedings, *Traverse,* at 59.  Although Mitts raised the aforementioned instances

of prosecutorial misconduct in his application to reopen direct appeal, they were only presented as

part of an ineffective assistance of appellate counsel claim.  *See Wong v. Money,* 142 F.3d 313,

322 (6th Cir. 1998) ("[A] claim [must] be presented to the state courts under the same theory in

which it is later presented in federal court").  The Sixth Circuit has drawn a distinction between

habeas claims that are based on a different legal theory (unexhausted) and claims that represent a variation in legal theory (exhausted). *Prather v. Rees,* 822 F.2d 1418, 1421 (6th Cir. 1987). "Defendant exhausts his claim if he has fairly presented the substance of his claim to the highest court in the state." *Id*. at 1420 (citation omitted); *Williams v. Bagley,* 380 F.3d 932, 969 (6th Cir. 2004) (finding claims procedurally defaulted because the defendant failed to raise the claims under the same theory presented in state court).  The Court finds that the instant claim is both unexhausted and procedurally defaulted.  *See supra,* Section III, Subpart B.

A cursory reading of the first assignment of error in Mitts's 26(B) application would suggest that the instant claim was properly presented to the state court.  However, the last line of argument in support of this claim states that "[t]he foregoing instances of prosecutorial misconduct should have been raised on direct appeal . . . ."  *See ECF No. 20, Appendix, Volume VII,* at 33, *Defendant-Appellant's Application to Reopen Appeal etc.,* at 5.  Furthermore, both the Ohio Court of Appeals (in reviewing Mitts's 26(B) application) and the Ohio Supreme Court (in reviewing the denial of that application) construed the misconduct claim as a claim of ineffective assistance of appellate counsel.  In summarizing Mitts's claim, the Ohio Court of Appeals stated as follows:

> In his first assignment of error, Mitts states that his appellate counsel should have argued that the effect of prosecutorial misconduct during the mitigation phase deprived the appellant of his right to a fair trial as guaranteed by the Fifth, Eighth and Fourteenth Amendments to the United States Constitution.

123

*State v. Mitts*, No. 68612, 2002 WL 1335629, at *2-4 (Ohio Ct. App. May 10, 2002) (internal

footnote omitted).  The Ohio Supreme Court also "reviewed Mitts's assertions of deficient

performance by appellate counsel . . . ."  *State v. Mitts,* 784 N.E.2d 698, 700 (Ohio 2003).

Most importantly, an application for reopening pursuant to Ohio Rule of Appellate Procedure

26(B) must be based on a claim of ineffective assistance of appellate counsel.  *State v. Steimle,*

Nos. 77005, 77006, 77302, 77303, 2005 WL 1581260 (Ohio Ct. App. June 30, 2005).

It is important to draw a distinction between the instant case and *Williams, Wong* and

*Prather.*  In *Williams,* the petitioner presented a prosecutorial misconduct claim in state court

based solely on the allegation that the prosecutor improperly vouched for the credibility of

witnesses, 380 F.3d at 969; on habeas review, he presented the same claim as well as ten other

instances of prosecutorial misconduct, *id.* at 969 n.20.  The Sixth Circuit found these ten claims

procedurally defaulted.  *Id*. at 969.  In *Wong,* the petitioner argued in state court that her counsel

was ineffective for failing to present an insanity defense, 142 F.3d at 317; on habeas review, she

made this claim and in addition argued that her counsel was ineffective for failing to pursue

additional investigation to determine whether a third expert might have concluded that she was

insane or that the expert's findings did in fact support an insanity defense, *id.* at 319-22.  The

Sixth Circuit found this second ineffective assistance claim procedurally defaulted.  *Id*. at 322.

Finally, in *Prather,* the petitioner argued at trial that a jury instruction on a lesser-included offense

was necessary because the jury could find that he was not armed with a *deadly* weapon because

the weapon was inoperable, 822 F.2d at 1420, 1421; on habeas review he argued that the

instruction was necessary because "the jury could find he was not *armed* with a deadly weapon

124

because he never armed himself with the shotgun the morning he attempted the crime." *Id.* at 1421.  The Sixth Circuit found that this argument was not properly before the habeas court.  *Id.* at 1424.

In the instant case, however, Mitts did present the "substance of [the] claim" in question in his *Murnahan* proceedings (i.e., the alleged misconduct).  This fact standing alone might suggest that the instant claim is not procedurally defaulted.  However, the fact that Mitts raises the instant claim of prosecutorial misconduct in addition to a claim that appellate counsel was ineffective in failing to raise these very instances of misconduct (*see infra* twelfth ground for relief) persuades the Court that the instant claim is separate and distinct from the one raised during Mitts's *Murnahan* proceedings.  Mitts cannot now raise a prosecutorial misconduct claim as well as a claim that appellate counsel was ineffective for failing to raise that misconduct on appeal when only one of these claims was raised in state court.

Accordingly, the instant claim is unexhausted yet procedurally defaulted for the reasons previously set forth in Section III, Subpart B.  The claim "rests on a theory which is separate and distinct from the one previously considered and rejected in state court."  *Wong,* 142 F.3d at 322.  Again, Mitts fails to argue cause and prejudice, or a fundamental miscarriage of justice, to excuse this default.[14]

---

[14]Even were this claim not procedurally defaulted, the Court would find this claim to lack merit.  *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").  Mitts argues that the instances of misconduct taken as a whole infected the trial with unfairness so as to make the resulting conviction a denial of due process.  *Traverse,* at 63.  However, a review of the record reveals that the prosecutor did not make any improper

_____

comments rising to this level.

A claim of prosecutorial misconduct is evaluated in light of the record as a whole.  *United States v. Dakota,* 197 F.3d 821, 828 (6th Cir. 1999).  The Sixth Circuit has set forth a two-pronged test for claims of prosecutorial misconduct.  *Id.*  The Court must first determine whether the prosecutor's remarks were improper.  *Id*.

> Improper conduct is then examined for flagrancy, considering four factors: (1) the degree to which the remarks would mislead the jury and prejudice the accused, including whether a cautionary instruction was given to the jury; (2) whether the remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally placed before the jury; and (4) the strength of the evidence against the accused. *See id.* at 1384, 1389. If the conduct is found not to be flagrant, reversal is appropriate only when (1) the proof against the defendant was not overwhelming, (2) opposing counsel objected to the conduct, and (3) the district court failed to give a curative instruction.

*Dakota,* 197 F.3d at 828.

Contrary to Mitts's assertions in sub-claim (a), the government did not state or suggest during closing argument that the nature and circumstances of the offense (specifically, race and/or any racial motive for the offense) should be considered an aggravating circumstance.  *Petition,* at 21; *Traverse,* at 60.

A prosecutor may not argue or suggest that the nature and circumstances of a crime are "aggravating circumstances."  *State v. Wogenstahl,* 662 N.E.2d 311, 321 (Ohio 1996).  The Ohio Supreme Court has held that the nature and circumstances of the crime may only enter into the statutory weighing process on the side of mitigation.  *Id.* at 322.  Although the nature and circumstances of the offense may not be weighed *against* the mitigating factors, *State v. Williams,* 794 N.E.2d 27, 51 (Ohio 2003), a prosecutor may refer to the nature and circumstances of the crime "both to refute any suggestion that they are mitigating and to explain why the specified aggravating circumstance outweighs the mitigating factors."  *State v. Smith,* 721 N.E.2d 93, 114 (Ohio 2000).

Importantly, the jury is required to consider the nature and circumstances of the aggravating circumstances, *State v. Myers,* 780 N.E.2d 186, 216 (Ohio 2002), and the State may introduce and comment upon any evidence raised at trial that is relevant to the aggravating circumstances, *State v. Gumm,* 653 N.E.2d 253, 263 (Ohio 1995).  The Ohio Supreme Court has also recognized that the nature and circumstances of an offense can be so horrendous that it would be difficult to imagine factors that might be mitigating.  *State v. Morales,* 513 N.E.2d 267, 277 (Ohio 1987). *State v. Steffen,* 509 N.E.2d 383, 398 (Ohio 1987) ("The nature and circumstances of this offense are so harrowing that no mitigating feature can possibly be imagined.").

In its closing argument during the penalty phase, the government did not indicate in any way that the jury should consider John Bryant's race as an aggravating circumstance.  In fact, at multiple times during its closing argument, the prosecution clearly informed the jury that it had

126

already found the aggravating circumstances to be present in this case.  *Tr.,* at 1503, 1504, 1509.
After stating for the second time that the jury had already found the aggravating circumstances, the
government told the jury that "one of the things you're allowed to consider besides the aggravated
circumstances is all the evidence in this case."  *Id.* at 1504.  The prosecutor characterized this
evidence as "the nature and circumstances of the crimes."  *Id.*  It is within this framework that the
government discussed John Bryant's race.  *Id.* at 1506-07.  Mitts argues that the Court should
consider the prosecutor's arguments in context, and states that the improper comments were
"carefully crafted" into the government's argument regarding how the jury should consider the
aggravating and mitigating circumstances.  *Traverse,* at 60.  The Court disagrees.  The prosecutor
never suggested that the nature and circumstances of the offense were aggravating circumstances.
In fact, he discussed both circumstances separately.

 After discussing the nature and circumstances of the crimes, the prosecutor told the jury
that it would have to decide what weight to give to any mitigating factors.  *Tr.,* at 1509.  He
specifically asked the following rhetorical question:  "What kind of mitigation is there that would
mitigate the shooting of a man just because of the color of his skin?"  *Id.*  He repeated this remark
at the end of closing argument.  *Id.* at 1513.  By posing this question, the prosecutor did not ask the
jury to weigh the mitigating factors against the nature and circumstances of the offense (i.e. the
racial bias of the shooting); he was merely advocating the State's position that it was difficult to
imagine any factor that might mitigate a racially-motivated shooting.  *See Morales,* 513 N.E.2d at
277; *Steffen,* 509 N.E.2d at 398.  *See also State v. Jackson,* 751 N.E.2d 946, 957 (Ohio 2001)
(noting that a prosecutor can freely argue that mitigation evidence is worthy of little or no weight).
Even if the prosecutor's statement might have improperly suggested that the jury should weigh the
mitigating factors against a non-statutory aggravating circumstance, the trial court correctly
instructed the jury on the weighing process and the relevant aggravating circumstances.  *Tr.,* at
1563-65, 1568-69.  *See State v. O'Neal,* 721 N.E.2d 73, 86 (Ohio 2000).

 Furthermore, the State did not ask the jury to consider the manner and means of the killing
as an aggravating circumstance as alleged in sub-claim (b).  The prosecutor simply described the
manner of the killing during his discussion of the nature and circumstances of the crimes.  In fact,
immediately after arguing that Mitts "ambushed" the police officers, the prosecutor specifically
stated (for at least the third time) that the jury had already found the aggravating circumstances in
the case.  *Tr.,* at 1508-09.  Contrary to Mitts's assertions, *see Traverse,* at 61, the context in which
these comments were made does not alter this Court's ruling.

 Mitts's next argument similarly lacks merit.  During closing argument, the prosecutor
(when addressing the subject of mitigation) told the jury it could consider "any other factors relative
to whether the defendant should be put to death."  *Tr.,* at 1547.  This remark accurately states
Ohio law.  *See* Ohio Rev. Code § 2929.04(B)(7); *Powell v. Collins,* 332 F.3d 376, 395 (6th Cir.
2003).  Even if the jury was misled by this remark because of the context in which it was made, the
trial court properly instructed the jury about mitigation in its final charge.  *Tr.,* at 1565-66
(instructing the jury that it may consider mitigating factors, including any factors relative to the issue
of whether Mitts should be sentenced to death).

 Mitts's argument in sub-claim (c) is absolutely frivolous.  *See Petition,* at 22; *Traverse,* at
61-62.  There is no indication whatsoever that the prosecutor "urged" the jury to consider victim
impact evidence as an aggravating circumstance.  *See Tr.,* at 1548.

 In addition, Mitts argues that the prosecutor's argument injected improper victim impact

127

_____

evidence before the jury.  *Traverse,* at 56.  This claim also lacks merit.  In *Payne v. Tennessee,*
501 U.S. 808, 827 (1991), the U.S. Supreme Court held:

> [I]f the State chooses to permit the admission of victim
> impact evidence and prosecutorial argument on that subject, the
> Eighth Amendment erects no *per se* bar. A State may legitimately
> conclude that evidence about the victim and about the impact of
> the murder on the victim's family is relevant to the jury's decision
> as to whether or not the death penalty should be imposed. There is
> no reason to treat such evidence differently than other relevant
> evidence is treated.

The Supreme Court in *Payne* has left the decision of whether to admit victim-impact
evidence to the State.  Mitts cites to *Ohio v. Huertas,* 553 N.E.2d 1058, 1065 (Ohio 1990), to
support his claim.  *Huertas* is not on point.  In that case, the state court addressed a statement
made by a member of the victim's family as to the appropriateness of a particular sentence in a
capital case.  After Mitts was sentenced, the Ohio Supreme Court provided more guidance
regarding prosecutorial argument on the impact of the offense on the victim's family.  In *State v.
Fautenberry,* 650 N.E.2d 878, 882 (Ohio 1995), the Ohio Supreme Court explained its reasoning
for rejecting a challenge to a prosecutor's remarks in a prior case, *State v. Loza,* 641 N.E.2d 1082
(Ohio 1994).  In *Loza,* the appellant challenged a prosecutor's statements, made during the penalty
phase of a capital trial, on the grounds that the remarks represented impermissible victim-impact
evidence which denied him a fair sentencing determination.  The *Fautenberry* court stated as
follows:

> "[W]e find that evidence which depicts *both* the
> circumstances surrounding the commission of the murder and also
> the impact of the murder on the victim's family may be admissible
> during *both* the guilt and the sentencing phases. For that reason,
> we decided that the statements made by the prosecutor in *Loza*
> were properly admitted."

650 N.E.2d at 883.  Accordingly, in the present case, the prosecutor's statement about the victims'
families was not improper under Ohio law.

Finally, sub-claim (d) also lacks merit.  Mitts predicates error on the following statement by
the prosecutor made during closing argument:

> Now if you go back there and after your deliberations you
> find that the aggravating circumstances do not outweigh the
> mitigating factors, then you'll have two alternatives at that point.
> You can impose a sentence on the first count, the murder of
> Dennis Glivar, the aggravated murder of Dennis Glivar of a
> sentence of 20 full years to life or 30 full years to life.  So the
> alterna -- the discretional portion is only after you have found, if

128

### i.        Ninth Ground for Relief

In the ninth ground for relief, Mitts argues that he was denied the effective assistance of counsel because trial counsel failed to object to erroneous jury instructions and improper comments of the prosecutor. *Petition,* at 18.  First, Mitts argues that counsel failed to object to the "acquittal- first" instruction during the penalty phase of trial (sub-claim (a)). *Id.* at 19. Second, Mitts argues that counsel failed to object to the use of the term "recommendation" throughout the trial and in the jury instructions (sub-claim (b)). *Id.* Third, Mitts contends that counsel failed to object to improper argument by the prosecutor that the nature and circumstances of the offense (especially racial prejudice) should be considered aggravating circumstances (sub-claim (c)). *Id.* Fourth, Mitts alleges that counsel failed to object to the prosecutor's argument that the manner and means of the killings should be considered aggravating circumstances, and to the

---

you find, that the aggravating circumstances do not outweigh the mitigating factors, but you have to get to that point first.

*Tr.,* at 1502-03.  Mitts states that the prosecutor argued that the jury must reject the death penalty before considering a life option. *Traverse,* at 62 ("The prosecutor argued to the jury that they could not consider one of the life sentence options until after they have found that the aggravating circumstances do not outweigh the mitigating factors.").  He claims that this argument was particularly harmful because of the trial court's erroneous "acquittal-first" instruction. *Id.*  This argument is without merit.  To the extent Mitts argues that this type of comment violates *Mills v. Maryland,* 486 U.S. 367 (1988)*, Mapes v. Coyle,* 171 F.3d 408 (6th Cir. 1999), or any of the cases cited in his eighth ground for relief, *see Traverse,* at 62, none of these cases address the issue of a prosecutor's "acquittal-first" remarks.  Furthermore, Mitts does not demonstrate that this isolated remark deprived him of a fair trial.

In sum, Mitts has not shown that the prosecutor's comments, considered individually or cumulatively, "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Mason v. Mitchell,* 320 F.3d 604, 634-635 (6th Cir. 2003) (citation and internal quotation marks omitted).  He fails to show that the misconduct was "so pronounced and persistent that it permeates the entire atmosphere of the trial or so gross as probably to prejudice the defendant." *Id.* (citation omitted).

129

prosecutor's statement that the jury can consider any other factors relative to whether Mitts should receive the death penalty (sub-claim (d)).  *Id.*  Fifth, Mitts argues that counsel failed to object to the State's argument that the jury should consider victim impact evidence as an aggravating circumstance (sub-claim (e)).  *Petition,* at 20.  Sixth, Mitts argues that counsel failed to object to the prosecutor's argument that the jury must first reject the death penalty before considering a life option (sub-claim (f)).  He claims that this argument violates Ohio law and decreased the possibility that the jury would return a life verdict.  *Id*.  He also contends that the argument emphasized and heightened the impropriety of the court's acquittal-first instruction.  *Traverse,* at 56.  Mitts argues that the foregoing claims should be considered cumulatively if they are not individually sufficient to warrant relief.  *Id*. at 57.

Sub-claims (c), (d), (e) and (f) were not presented in state court.  Mitts concedes that he did not specifically describe on direct appeal the instances of misconduct to which trial counsel failed to object.  *Traverse,* at 57.  However, he argues that the instant claim was subsequently presented in his *Murnahan* application in which he specified the instances of misconduct.  *See ECF No. 20, Appendix, Volume VII,* at 30-33, *Defendant-Appellant's Application to Reopen Appeal etc.* at 2-5, 7.  The Court finds, as it did in the eleventh ground for relief, *supra,* that only claims of ineffective assistance of *appellate* counsel are cognizable in a *Murnahan* application.  Mitts himself states that he filed a *Murnahan* application "alleging that his appellate counsel was ineffective for failing to raise various issues." *Traverse,* at 57.  Importantly, where non-appellate counsel claims are raised in an application to reopen appeal, *Murnahan* courts have often construed such claims as ineffective assistance of appellate counsel claims.  For example, in *State*

130

*v. Warden,* No. WD-03-065, 2005 WL 791401, at *2 (Ohio Ct. App. Mar. 31, 2005), the

Ohio Court of Appeals on *Murnahan* review addressed an ineffective assistance of trial counsel

claim to the extent that the claimant intended to assert that appellate counsel was deficient in failing

to assert that trial counsel rendered ineffective assistance.  *See also Davie v. Mitchell,* 324

F.Supp.2d 862, 870 (N.D. Ohio 2004) (finding ineffective assistance of trial counsel claim

procedurally defaulted because the state court on *Murnahan* review construed the claim as one of

ineffective assistance of appellate counsel).  For the reasons previously discussed in this Opinion,

sub-claims 9(c), (d), (e) and (f) are both unexhausted and procedurally defaulted.[15]

Mitts makes a general allegation that "the ineffectiveness of appellate counsel is cause for

the procedural default of claims at the trial and appellate level."  *Traverse,* at 56.  To the extent

Mitts invokes appellate counsel's ineffectiveness as "cause" to excuse the default of these sub-

claims, he offers nothing more than a bare conclusory allegation to support this argument.

Furthermore, the Court finds that appellate counsel was not ineffective in failing to argue that trial

counsel was ineffective in failing to object to the aforementioned instances of prosecutorial

misconduct because there was no underlying misconduct.  *See supra* note 14.  Accordingly, Mitts

has not shown cause and prejudice, or a fundamental miscarriage of justice, to excuse this default.

---

[15]In any event, counsel was not ineffective in failing to object to the aforementioned comments of the prosecutor because there was no underlying misconduct.  *See supra note* 14; *Mason v. Mitchell,* 320 F.3d 604, 618 (6th Cir. 2003).  *See also* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").  Moreover, Mitts has not shown that the outcome of the trial would have been different had the objections been made. *Seymour v. Walker,* 224 F.3d 542, 556 (6th Cir. 2000).

131

Sub-claims (a) and (b), however, were properly presented in state court.  *See ECF No. 16, Appendix, Volume III*, at 58, *Merit Brief of Appellant,* at 34.  In the last reasoned state court judgment, the Ohio Supreme Court on direct appeal denied these claims on the merits.  *State v. Mitts*, 690 N.E.2d 522, 531-32 (Ohio 1998).  Accordingly, these claims will be addressed in Section IV.

## IV.    GROUNDS FOR RELIEF

The Court now turns to those claims that have survived the Court's preliminary review.  As previously explained, the Court's review is limited to a determination of whether the state court's decision was contrary to, or involved an unreasonable application of, clearly established Supreme Court law.

### A.    First Ground for Relief - Failure to Investigate, Prepare and Adequately Present Mitigation

In the first ground for relief, Mitts argues that he was denied the effective assistance of counsel during the penalty phase because counsel did not conduct a thorough investigation into possible mitigating evidence.  *Petition*, at 5.  He argues that counsel failed to investigate, prepare and adequately present the defense mitigation case.  *Id.* at 9.  Specifically, Mitts argues that trial counsel:

> a. Failed to adduce any evidence regarding the petitioner's mother or her condition.

> b. Failed to consult with a mitigation specialist who had accumulated significant information that should have been used to

132

develop a coherent theme of mitigation. Numerous factors that should have been considered by the jury were ignored by defense counsel.

c. Failed to properly interview the psychologist. In fact, when the psychologist refused to agree with defense counsel's assessment that the petitioner suffered from an alcoholic blackout, counsel became openly hostile to the psychologist. Counsel berated the psychologist on the witness stand and in closing argument.

d. Failed to request a continuance after the determination of guilt to allow adequate time to prepare mitigation.

e. Failed to adequately prepare the witnesses who did testify, which resulted in an inaccurate and incomplete depiction of Petitioner's background and the omission of relevant mitigation. The Fontana's [*sic*] both had additional insights and information that could have been used to buttress the mitigation. Questions were prepared for the testimony of the Fontana's [*sic*], but were ignored by defense counsel.  Exhibit B.

f. Failed to call Thomas Harrigan as a witness in the penalty phase. Mr. Harrigan was Petitioner's employer at Automated Packaging in Garfield Heights. Mr. Harrigan could have testified that Petitioner was a good employee. He could also have established have the incident was an anomaly with how Petitioner normally handled frustration and corroborated that the divorce had an adverse effect on Petitioner. Mr. Harrigan did not want to testify because of his friendship with the chief of police of Garfield Heights.

g. The defense also failed to called [*sic*] additional co-workers Gary Patterson and Stanley Schramek. Both men had matters relevant to the appropriateness of the death penalty in this case. Mr. Patterson could have added evidence about Petitioner's fascination with firearms and behavior at work during the months prior to the shootings.

133

*Petition,* at 5-6 (citations to record omitted).

Mitts argues that defense counsel did not believe in mitigation with the exception of

residual doubt, and disparaged the idea that mitigation should be based upon sociological or

psychological studies. *Id.* at 6.  Mitts asserts that counsel refused to allow him to testify under

oath, and if he had testified the jury would have been informed of the following:

> a. That he had always been a loner.

> b. That his father was not around during his youth, necessitating that Petitioner take responsibility for the family. His father was fired from a couple of jobs because of various scandals. His father started Petitioner's fascination with guns.

> c. That his first suicidal thoughts occurred at age sixteen because of a breakup with a girlfriend. Petitioner was encouraged to seek psychological help by his mother.

> d. That he joined the Coast Guard six months before he was eligible to do so.  The fact that he was in the Coast Guard was introduced at trial. However, it was not noted that this is where he began his alcohol problems.

> e. That he had a very difficult first marriage that ended in his wife leaving him for another man.

> f. That he had back surgery and, as a result, began to mix alcohol and narcotics.

> g. That he had engaged in excessive drinking in the time prior to the incident.

134

h. That he had great affection for his daughter, including taking her
fishing.

i. That his second marriage ended with his wife leaving him for
another man, who was a police officer.

j. That his frustration built as he continually battled for visitation
rights with his daughter.

k. That he became completely cut off from relations with his
mother because of his marriage to Janet.

l. His obsession with weapons and how it developed.

m. An accurate rendition of the events in the days and hours
preceding the shootings and the actual testimony of how it actually
occurred.

n. His remorse for the events and loss of life caused by the
petitioner.

*Petition,* at 6-7.

Mitts also argues that counsel failed to introduce as evidence Mitts's medical records after

the shootings.  Mitts argues that his statement to medical personnel that he wanted them to "just

kill me!  I killed a cop" is consistent with remorse and inconsistent with the intoxication defense.[16]

*Petition,* at 7.  Mitts contends that an outline of the above information was prepared by a

---

[16]It is noteworthy that petitioner's basis for arguing that his statement should have been
admitted is inconsistent with his position in the sixth ground for relief where he argues that the trial
court should have instructed the jury on the defense of voluntary intoxication.

135

mitigation assistant but ignored by defense counsel.  He also claims that counsel ignored additional

mitigating information that was available at trial, including information that Mitts was recommended

for re-enlistment by the Coast Guard and received a good conduct certificate and a medal for his

service.  *Id*. at 7-8.  Mitts argues that defense counsel failed to introduce into evidence a report

prepared by the court psychiatric clinic, which provided a detailed background and history of

Mitts, or to call as a witness Rita Haynes, the person who prepared the report. He states that the

report contained the following information:

> a. Petitioner's extreme remorse when evaluated for insanity. He
> told the Psychiatric Clinic that, "I can't believe this happened. I
> keep thinking that I'm going to wake up from this bad dream. I
> can't believe what people have told me that I have done." The
> report noted that at this point Petitioner became tearful. He
> continued "Can you imagine someone telling your kid that she is
> not going to see you again. How do you explain this to a kid." At
> this point Petitioner needed additional time to ventilate. This also
> was indicative of his sincere concern about his daughter.

> b. The report also revealed Petitioner's suicidal thoughts and his
> decision not to take the easy way out. "I am going to face this.
> Whatever it is."

*Petition,* at 7-8 (citation to record omitted).

Mitts also argues that counsel failed to prepare him for an unsworn statement and failed to

adequately consult with him about the preparation and presentation of mitigating evidence.  *Id.* at

8.  Counsel refused to discuss the evidence with the psychologist Dr. Eisenberg and refused to

talk to Susan Evanson, the mitigation specialist who assisted the psychologist in preparing

mitigation evidence.  *Id*.  Counsel met with Ms. Evanson only twice, refused to notify her as to

which courtroom the hearings were to be held, and refused to review the social history she

prepared.  *Id*.  Mitts argues that counsel failed to make reasonable use of a psychology/mitigation

expert.  *Id*. at 9.  He also contends that counsel did not interview the mitigation witnesses before

they testified, and failed to obtain an alcohol counselor who could explain the effects of alcohol on

the decision-making process.  *Id*. at 8.  Counsel told the jury during opening argument of the

penalty phase that the only evidence he thought could be considered as mitigating was Mitts's

intoxication:  "I have no explanation for you, I'm not going to offer you one.  Alcohol intoxication

is the only thing that may mitigate."  *Id*. at 9.  *See Tr.*, at 1387.  Counsel did not allow numerous

other factors to be considered as mitigating.  He would not discuss any possible mitigation other

than the blackout. *Petition,* at 8.  *See Traverse,* at 15 (stating that Dr. Eisenberg (had he been

asked) could have discussed Mitts's feelings of abandonment and rejection, his frustrations over

losing contact with his daughter, and his intermittent depression, all of which was aggravated by his

alcohol use).[17]

Mitts states that counsel told him to maintain that he had a blackout.  *Id*. at 6.  He states

that counsel maintained the theory that Mitts was in a blackout at the time of the offense even after

Mitts told counsel this was not true.  *Traverse,* at 14.  *See also ECF No. 67, Deposition of*

*Harry D. Mitts, Jr., May 4, 2004,* at 47-48, 52-53 (stating that defense counsel intimidated him

and told him to say he did not remember committing the crime).  Mitts told Ms. Evanson that he

---

[17]Mitts cites to Evanson's and Dr. Eisenberg's affidavits in support of this argument. However, Dr. McKee's sanity report states that Mitts indicated that he had never experienced any significant depressions.  *Amended Post-Conviction Petition, Exh. I-4.*

did not have a blackout but that counsel told him not to tell anyone.  *ECF No. 64, Deposition of Susan Evanson, August 24, 2004,* at 12-13 (stating that Mitts initially told her that he could not recall what happened at the time of the offense, but later told her that he did in fact remember, but counsel told him not to tell anyone).  Ms. Evanson relayed this information to Dr. Eisenberg.  *Id.* at 14.  *See also ECF No. 17, Appendix, Volume IV,* at 143, *Petition for Post-Conviction Relief, Exh. M-2* (Affidavit of James R. Eisenberg, Ph.D) (stating that Mitts told Dr. Eisenberg that his attorneys insisted that Mitts maintain he was in a blackout during the offense); *ECF No. 63, Deposition of James R. Eisenberg, Ph.D., August 24, 2004,* ("Eisenberg Dep."), at 18 (stating that Mitts told him that the blackout theory was counsel's idea).  Mitts argues that both Evanson and Eisenberg told counsel prior to trial that there was no basis for a blackout theory.  *Traverse,* at 13.  He claims that counsel pressed forward, disregarding mitigating evidence that did not fit with his plan.  *Id.*  Mitts contends that counsel's reliance on the fabrication that Mitts did not know what he was doing because he was in a blackout "tarnishe[d] the integrity of the information that did get considered."  *Id*. at 16.  Because Dr. McKee's testimony indicated that a blackout would not have affected Mitts's ability to make decisions at the time of the offense, counsel should have prepared and presented some other theory to the jury during the mitigation phase.  *Id*.

Mitts also argues that Dr. Sonia McKee, who was called as a witness by the defense, provided testimony that undermined the defense theory and, as a result, defense counsel attempted to impeach her.  *Id*. at 9.  In conclusion, Mitts argues that he was deprived of his rights

138

to effective assistance of counsel and to due process of law.  He also argues that he was deprived

of his constitutional rights against self-incrimination and cruel and unusual punishment.  *Id*.

The last reasoned state court judgment on this issue was rendered by the Ohio Court of

Appeals on post-conviction review.  That court held as follows:

> In his third assignment of error, appellant contends the trial
> court abused its discretion by dismissing his claim of ineffective
> assistance of counsel. Appellant asserts his attorney did not
> adequately prepare and present evidence of mitigation. Appellant
> points to evidence regarding his family history, personal
> background, expert testimony, and the failure to call certain
> witnesses as evidence in support of his claim of ineffective
> assistance of counsel. Appellant also avers he wished to testify
> under oath but was prevented from doing so by his attorney.

> Appellant raised a claim of ineffective assistance of
> counsel.  The doctrine of res judicata bars a claim of ineffective
> assistance of counsel when a defendant is represented by new
> counsel on direct appeal and the issue could have been
> determined without resort to evidence de hors the record. *State
> v. Cole* (1982), 2 Ohio St.3d 112, 443 N.E.2d 169, syllabus.
> Competent, relevant, and material evidence de hors the record
> may defeat the application of res judicata. This evidence must
> demonstrate that the petitioner could not have appealed the
> constitutional claim by use of information found in the original
> record. *State v. Lawson* (1995), 103 Ohio App.3d 307, 659
> N.E.2d 362. The petitioner must submit evidentiary documents
> which contain sufficient operative facts to demonstrate that
> counsel was not competent and that the defense was prejudiced
> by the ineffectiveness. *State v. Jackson* (1980), 64 Ohio St.2d
> 107, 413 N.E.2d 819. If the petitioner fails to meet this burden,
> the trial court may dismiss the petition for post-conviction relief
> without a hearing. *Id.*

> The claim of ineffective assistance of counsel requires
> proof that counsel's performance is proved to have fallen below

139

an objective standard of reasonable representation and, in addition, prejudice arises from counsel's performance. *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus. The establishment of prejudice requires proof that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different. *Id.* at paragraph three of the syllabus. The burden is on the defendant to prove ineffectiveness of counsel. *State v. Smith* (1985), 17 Ohio St.3d 98. Trial counsel is strongly presumed to have rendered adequate assistance. *Id.*

Much of appellant's assertions claiming ineffective assistance of counsel involve trial tactics. Debatable trial tactics and strategies do not constitute a denial of effective assistance of counsel. *State v. Clayton* (1980), 62 Ohio St.2d 45, 49, 402 N.E.2d 1189. An attorney's selection of which witnesses to call at trial falls within the purview of trial tactics and generally will not constitute ineffective assistance of counsel. *State v. Coulter* (1992), 75 Ohio App.3d 219, 598 N.E.2d 1324. Asking specific questions of a witness, even an expert witness, also falls under the realm of trial tactics.

The witnesses appellant wished to call to testify about his behavior at his place of employment were cumulative of other evidence admitted at the trial. Appellant's claims about evidence regarding his mother and the failure to request a continuance are barred by res judicata. The information appellant asserts he wished to convey under oath also was cumulative to legal arguments presented at trial. *State v. Lawson* (1995), 103 Ohio App.3d 307, 659 N.E.2d 362. This court will not second guess every aspect of the defense attorney's presentation at the penalty phase of appellant's trial. The existence of alternative or additional mitigation theories does not establish ineffective assistance of counsel. *State v. Combs* (1994), 100 Ohio App.3d 90, 105, 652 N.E.2d 205.

Appellant's third assignment of error is overruled.

140

*State v. Mitts,* No. 76963, 2000 WL 1433952, *4-5 (Ohio Ct. App. Sept. 28, 2000).

Before specifically addressing this claim, the Court of Appeals stated as follows:

> In support of his petition, appellant attached what appears to be possible questions and answers for various defense witnesses who were his family members. No context is offered as to when these exhibits were created or by whom. The trial court did not abuse it discretion by discounting this     evidence.
>
> Appellant also attached notes allegedly given to his attorney about his background to be used in mitigation. The Supreme Court considered appellant's background, including his childhood, Coast Guard service, and that he was gainfully employed all of his life when conducting its independent sentence assessment. Although appellant argues the jury only was to consider intoxication as a defense, the record reflects the jury was aware of evidence challenging the idea he exhibited racial hatred and showing his prior history with drinking alcohol. During the penalty phase of the trial, appellant's former in-laws testified about his personality and history. Appellant's siblings testified about their family history. Nearly all of the evidence appellant now points to as mitigation was offered at trial or would be merely cumulative of what was admitted.
>
> The trial court correctly afforded little weight to the evidence submitted in support of appellant's petition for post-conviction relief.

*Id.* at *3-4.[18]

The state court held that Mitts's claim regarding his mother and his claim that counsel

failed to request a continuance were barred by *res judicata.*  Because this Court previously held

---

[18]This ruling by the Court of Appeals was not issued in that portion of the state-court opinion addressing Mitts's ineffective assistance claim; rather it was issued in the context of a separate claim for relief.  The ruling is reproduced here, however, because it addresses some of the issues raised in Mitts's instant ineffective assistance claim.

141

that ineffective assistance claims are not barred by *res judicata* under Ohio law where the petitioner presents evidence outside the direct appeal record, *see supra* Section III, Subpart C(2)(a), the Court will address these sub-claims on the merits under a *de novo* standard.  *See Hill v. Mitchell,* 400 F.3d 308, 314 (6th Cir. 2005) (applying *de novo* review to the merits of petitioner's constitutional claim where petitioner was not required to raise the claim on direct appeal).  The state court applied the *Strickland* standard to the remaining sub-claims.  Although the state court did not expressly cite to *Strickland,* it cited to a state court case, *State v. Bradley,* which clearly employed the *Strickland* standard to address claims of ineffective assistance of counsel.  Accordingly, the Court's review of the remaining sub-claims is limited to determining whether the state court's application of clearly established Supreme Court law was objectively unreasonable.

The U.S. Supreme Court has held that an attorney has a duty to make reasonable investigations or to make a reasonable decision that makes certain investigations unnecessary:

> "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."

142

*Wiggins v. Smith,* 539 U.S. 510, 521-22 (2003) (quoting *Strickland v. Washington,* 466 U.S. 668, 690-691 (1984)). The Supreme Court has also stated that "*Strickland* does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing. . . . [This] conclusion[ ] would interfere with the 'constitutionally protected independence of counsel' at the heart of *Strickland,* 466 U.S., at 689, 104 S.Ct. 2052." *Wiggins,* 539 U.S. at 533. Furthermore, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Burger v. Kemp,* 483 U.S. 776, 789 (1987) (quoting *Strickland,* 466 U.S. at 689).

In *Wiggins v. Smith,* the U.S. Supreme Court on habeas review addressed the merits of an ineffective assistance of counsel claim raised by a capital defendant. In *Wiggins,* the petitioner argued that his attorneys' failure to investigate his background and to present mitigating evidence of his life history during his capital sentencing proceedings violated the Sixth Amendment. *Id*. at 514. The Supreme Court stated that its principal concern in determining whether defense counsel exercised reasonable professional judgment was not whether counsel should have presented a mitigation case, but rather, "whether the investigation supporting counsel's decision not to introduce mitigating evidence of [petitioner's] background *was itself reasonable.*" *Id.* at 522-23. The Court found that defense counsel conducted some investigation into petitioner's life history but prematurely terminated their investigation into potential mitigating evidence. *Id.* at 521, 523-24, 534. The Court concluded that the evidence counsel uncovered in the petitioner's social

service records "would have led a reasonably competent attorney to investigate further." *Id.* at 534.  The social services records revealed the following facts:

> Petitioner's mother was a chronic alcoholic; Wiggins was shuttled from foster home to foster home and displayed some emotional difficulties while there; he had frequent, lengthy absences from school; and, on at least one occasion, his mother left him and his siblings alone for days without food.  As the Federal District Court emphasized, any reasonably competent attorney would have realized that pursuing these leads was necessary to making an informed choice among possible defenses, particularly given the apparent absence of any aggravating factors in petitioner's background.

*Id.* at 525 (citation to record omitted).

In light of the above, the Supreme Court held that the state court's assumption that counsel's investigation was adequate reflected an unreasonable application of *Strickland.  Id.* at 528-29 ("[T]he [state court's] conclusion that the *scope* of counsel's investigation into petitioner's background met the legal standards set in *Strickland* represented an objectively unreasonable application of our precedent.").

In *Wiggins,* the Supreme Court held that counsel's conduct fell short of the standards for capital defense work set forth by the American Bar Association ("ABA") – standards to which the Court has referred as guides to determining what is reasonable.

> The ABA Guidelines provide that investigations into mitigating evidence "should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C), p. 93

144

> (1989) (emphasis added). Despite these well-defined norms, however, counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources. Cf. *id.,* 11.8.6, p. 133 (noting that among the topics counsel should consider presenting are medical history, educational history, employment and training history, *family and social history,* prior adult and juvenile correctional experience, and religious and cultural influences (emphasis added)); 1 ABA Standards for Criminal Justice 4-4.1, commentary, p. 4-55 (2d ed.1982).

*Id.* at 524-525 (parenthetical omitted).  The *Wiggins* Court also stated that a cursory investigation does not automatically justify a tactical decision regarding sentencing strategy.  *Id*. at 527.  "Rather, a reviewing court must consider the reasonableness of the investigation said to support that strategy."  *Id*. (quoting *Strickland,* 466 U.S. at 691).

In the instant case, Mitts was represented at trial by attorneys Thomas M. Shaughnessy, Thomas O'Malley, and Mark Rudy.[19]  *Petition,* at 6.  On September 29, 1994, the trial court granted defense counsel's motion to appoint Dr. James Eisenberg to examine Mitts and to appear as a defense witness at trial.  *ECF No. 14, Appendix, Volume I,* at 56.  The fee for the psychiatrist was not to exceed $2500.00.  *Id*.

While the habeas petition was pending, the parties jointly requested and obtained permission to conduct discovery on the habeas claims.  *ECF Nos. 54, 55.*  The parties then deposed Dr. Eisenberg, Susan Evanson and petitioner Harry Mitts and filed briefs discussing the implications of discovery.  *ECF Nos. 65, 66, 70, 71.*

---

[19]Thomas Shaughnessy, Mitts's lead counsel at trial, has passed away.  *See ECF No. 49,* at 2 n.1.

145

In his deposition, Dr. Eisenberg stated that Shaughnessy asked him to evaluate petitioner "on the issue of alcoholism for possible testimony at mitigation." *ECF No. 63, Deposition of James R. Eisenberg, Ph.D., August 24, 2004,* ("Eisenberg Dep."), at 7.  Dr. Eisenberg, who is a psychologist, stated in his deposition that he is not an expert in alcoholism and that he told this to defense counsel. *Id.  See also ECF No. 17, Appendix, Volume IV,* at 143, *Petition for Post-Conviction Relief, Exh. M-2* (Affidavit of James R. Eisenberg, Ph.D) (stating that he is not an expert on the physiological effects of alcohol intoxication).  Defense counsel even acknowledged this at trial. *Tr.,* at 1485.  Dr. Eisenberg also said he never met with Shaughnessy prior to trial. *Id*.  He stated that there was never any discussion about mitigation theory, and that the first time he had a discussion with Shaughnessy about the testimony he would provide occurred outside the courtroom on the day he was called to testify. *Id.* at 12.

> I was waiting to testify in the lobby outside the courtroom. And before being called to testify [Shaughnessy] came out from the courtroom and we had a brief conversation about my testimony.  The fact that he wanted me to testify to the fact that Mr. Mitts had an alcoholic blackout and the fact that I couldn't and wouldn't testify to that issue.
>
> There was some discussion about what he – why he would be putting me on at all if I wouldn't be testifying about that. And obviously, I was called to testify."

*Id.* at 12-13.

In his deposition, Dr. Eisenberg stated that he could not testify to the blackout because he did not believe Mitts was in a blackout. *Id*. at 22.  He said that Mitts never told him that he did

146

not remember the events of August 14, 1994, and that "from early on . . . [Mitts] was able to give

[Eisenberg] a fairly detailed account of the events that led to his arrest."  *Id*. at 13, 17 (stating that

Mitts's accounts of the events and the records from the court psychiatric clinic negate the theory

of an alcoholic blackout).  In an earlier affidavit prepared in 1996, Dr. Eisenberg stated that in his

experience with over 150 capital cases, he has never had so little contact or lack of cooperation

from a defense attorney.  *ECF No. 17, Appendix, Volume IV,* at 144, *Petition for Post-*

*Conviction Relief, Exh. M-3*.  Similarly, Susan Evanson, who was asked by Dr. Eisenberg to be

the mitigation specialist on the case, stated in her deposition that Shaughnessy "totally ignored

[her] existence."  *ECF No. 64, Deposition of Susan Evanson, August 24, 2004* ("Evanson

Dep."), at 5, 19.

      In his affidavit, Dr. Eisenberg stated that in spite of his attempts to present and discuss

other psychological issues affecting Mitts, Shaughnessy insisted that he focus on the effects of

alcohol.  *See ECF No. 17, Appendix, Volume IV,* at 143, *Petition for Post-Conviction Relief,*

*Exh. M-2*.  Years later, Dr. Eisenberg provided similar testimony in his deposition:

> Mr. Shaughnessy was so focus [*sic*] on just one issue, the
> notion that [Mitts] was in an alcoholic blackout, that he was not
> willing to listen to any other possible mitigating factors that might
> be present in Mr. Mitts's case. . . . I think there were a number of
> issues that we could present to the jury that they might consider as
> mitigation.

*Eisenberg Dep*. at 14.  One of these issues was the presence of a personality disorder.  After

administering a personality test, Dr. Eisenberg concluded that Mitts suffered from an avoidant

personality disorder that was exacerbated by alcohol abuse.  *Id*. at 10-11.  He stated that Mitts

147

showed a pattern of behavior indicative of individuals who lack self-confidence and social skills, withdraw from others and rely upon fantasy to gain a sense of satisfaction.  *Id.* at 10.  Dr. Eisenberg stated that Mitts never had sex with his first wife and his second wife began a relationship with a police officer (whom she later married and who is the step-father of Mitts's daughter).  *Id.*  Dr. Eisenberg's notes indicate that Mitts and his first wife divorced because his wife was having an affair, and that Mitts's second wife had an affair with a police officer which humiliated him again.  *Eisenberg Dep., Plaintiff's Exh. 2,* at 2.  The notes also indicate that Mitts enlisted in the Coast Guard but felt ashamed that his father would not allow him to join the Navy.  *Id*.  Dr. Eisenberg stated in his deposition that he believed Mitts suffered a lot of shame and humiliation after his failed relationships.  Mitts then began to cut off relationships and developed an avoidant lifestyle because he did not want to get hurt again.  *Eisenberg Dep.,* at 10.  The history of failed relationships led to development of the avoidant personality disorder which, according to Eisenberg, seriously impairs functioning in all areas.  *Id.* at 10, 29.  In addition to the failed relationships and personality disorder, Dr. Eisenberg mentioned a number of mitigating factors that could have been presented, including Mitts's ability to adjust to prison life and his alcohol abuse.  *Id*. at 14-16.

Consistent with the testimony Dr. Eisenberg provided in his deposition, Shaughnessy clearly and expressly focused on alcohol intoxication as the principal mitigating evidence in the case.  In his opening argument during the mitigation phase of trial, Shaughnessy stated to the jury that alcohol intoxication was the *only* mitigating evidence in the case:  "I have no explanation for you, I'm not going to offer you one.  Alcohol intoxication is the only thing that may mitigate."  *Tr.,*

at 1387.  During closing argument, Mitts's attorneys again focused on alcohol intoxication as the principle mitigating factor.  *Tr.,* at 1534-35.  However, counsel also told the jury that it should "consider everything," including factors the attorneys had not discussed, and identified factors besides alcohol that the jury should consider.  *Id*. at 1386, 1519-21, 1530.

The questions posed by counsel during both phases of trial, and counsel's comments to the Court even before voir dire, *see Tr.,* at 9, indicate that counsel was aware of some aspects of Mitts's background, such as his employment history, marital status and lack of a criminal record. However, unlike the evidence uncovered by counsel in *Wiggins,* Mitts's life history did not reveal evidence that would have led a reasonably competent attorney to investigate further.  Moreover, Drs. McKee and Eisenberg both testified at trial that Mitts had a happy childhood.  *See Tr.,* at 1176 (Testimony of Dr. McKee) ("He described himself as a happy child."); *id.* at 1464 (Testimony of Dr. Eisenberg) ("[Mitts c]omes from a fairly decent background.  He enjoyed his childhood.  There was nothing unusual about it . . . .").  *See also ECF No. 39, Transcript, Volume I,* at 40 (Testimony of Dr. McKee, Competency Hearing) ("[Mitts] had no distinct memories of any unhappy occurrences during his childhood").[20]

---

[20]Attached to Dr. Eisenberg's deposition is a timeline of Mitts's life history.  It is unclear who drafted this timeline, but the first page indicates that when Mitts was five (5) years old, he discovered his one-month old brother dead in his crib.  *Eisenberg Dep., Plaintiff's Exhibit 2,* at 9. Also, according to Evanson's social history report, Mitts's sister stated that Mitts's father hit petitioner on many occasions with an airplane propellor.  *Amended Post-Conviction Petition, Exh. J-3, J-4.  See also ECF No. 17, Appendix, Volume IV,* at 140, *Petition for Post-Conviction Relief, Exh. L-2* (Affidavit of Susan Evanson) (stating that Mitts was subject to physical abuse by his father including getting hit with an airplane propellor).  However, neither Dr. Eisenberg nor Dr. McKee raised these incidents as traumatic childhood experiences.

The most noteworthy aspect of Mitts's argument centers on counsel's decision to focus on alcohol intoxication during the mitigation phase of trial.  It is obvious by the jury's verdict of guilt that evidence of Mitts's intoxication was insufficient to preclude a finding of specific intent – an element of the aggravated murder counts.  Despite the guilty verdict, counsel decided to focus on alcohol intoxication as the principle mitigating factor, or as Shaughnessy termed it, the "only thing that may mitigate."  After a thorough review of the record, the Court finds no evidence that defense counsel chose alcohol intoxication as the principle mitigation theory after conducting a thorough investigation of alternative theories of mitigation, or, that a reasonable professional judgment supports the limitation on counsel's investigation.

Other evidence suggests that the decision to pursue a mitigation theory that focused on alcohol intoxication was not strategic.  During the course of the trial Shaughnessy referred to psychologists as "Dr. Feelgood[s]" and made a remark about "the psychiatrist and their voodoo psychobabble."  *Tr.,* at 1248-49, 1252.  Although the Court cannot state decisively that counsel's decision to focus on alcohol intoxication represented a personal hostility to mitigation based on social history and/or psychological evaluation, or, in the alternative, that his decision to terminate his investigation was based on a reasonable belief that further investigation into mitigating evidence would have been fruitless, *see Wiggins,* 539 U.S. at 525, counsel's decision not to make a simple inquiry into the research and conclusions of the expert whose appointment he specifically requested was objectively unreasonable.  Further inquiry into Dr. Eisenberg's and Ms. Evanson's findings would have led to the discovery of a number of potential mitigating factors, including Mitts's IQ scores, avoidant personality disorder, potential history of mental illness, alcohol abuse,

150

and suicidal thoughts,[21] *see Amended Post-Conviction Petition*, *Exh. J-3, J-4*, which counsel

could have then assessed for potential mitigating value. *See generally ECF No. 17, Appendix,*

*Volume IV,* at 139-44, *Petition for Post-Conviction Relief, Exhs. L-M* (Affidavits of Susan

Evanson and Dr. Eisenberg) (listing information Evanson and Dr. Eisenberg would have testified

to).

The Ohio Court of Appeals did not address whether counsel's investigation into potential

mitigating evidence was adequate.  The state court simply determined that much of Mitts's claims

involve trial tactics and that the evidence Mitts wished to convey at trial would have been

cumulative.  The state court completely neglected to assess the reasonableness of counsel's

investigation.  *See Wiggins,* 539 U.S. at 527.  The Court finds that the state court's failure to

address the adequacy of defense counsel's investigation represents an objectively unreasonable

application of *Strickland*.

However, "[i]n order for counsel's inadequate performance to constitute a Sixth

Amendment violation, petitioner must show that counsel's failures prejudiced his defense."

*Wiggins,* 539 U.S. at 534.  To establish prejudice, a "defendant must show that there is a

reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

would have been different.  A reasonable probability is a probability sufficient to undermine

confidence in the outcome." *Id.* (quoting *Strickland,* 466 U.S. at 694).  The *Wiggins* court held

that "[i]n assessing prejudice, we reweigh the evidence in aggravation against the totality of

---

[21]According to Dr. McKee's sanity report, however, Mitts denied having suicidal ideas.
*Amended Post-Conviction Petition, Exh. I-9.*

151

available mitigating evidence." *Id*.  In *Wiggins*, the Court held that its review was not

circumscribed by a state court conclusion with respect to prejudice because neither of the state

courts reached that prong of the *Strickland* analysis.  Similarly, this Court's review of prejudice is

not restricted because the Ohio Court of Appeals did not reach the prejudice prong of

*Strickland*.[22]

  The Ohio Court of Appeals correctly noted that much of the mitigating evidence now

articulated by Mitts was presented at trial.  However, Mitts does present some evidence in his

habeas briefs that was not fully developed at trial and some that was not presented at all.  This

includes evidence regarding Mitts's personality disorder, violent fantasy life and alcohol abuse.

Nonetheless, after evaluating the totality of the evidence – both that adduced at trial and that

adduced in the habeas proceedings – the Court finds that it is unlikely that this supplemental

information, combined with the evidence adduced at trial, would have influenced the jury.  The

mitigating evidence that was not presented or not fully developed in this case is substantially

weaker than the mitigating evidence uncovered in *Wiggins* and *Williams v. Taylor*, 529 U.S.

362, 395-96 (2000).  *See Johnson v. Bell,* 344 F.3d 567, 574 (6th Cir. 2003).

  First, evidence of Mitts's background was elicited at trial.  During the guilt-phase of the

trial (and counsel informed the sentencing jury that it could consider testimony from the first phase

---

[22]The Court of Common Pleas on post-conviction review, however, did address the issue of prejudice.  It is unclear whether this Court can look to the Court of Common Pleas' decision in this regard since the Court has determined that the decision of the Court of Appeals represents the last reasoned state-court judgment on this claim.  Furthermore, the Court of Common Pleas did not cite to *Strickland* in its ruling.

of trial), the defense called Dr. Sonia McKee, a psychiatrist at the court psychiatric clinic.

Counsel asked Dr. McKee about Mitts's background, prior criminal record, employment history,

marital status, relationship with his child, and his hobbies.  *Tr.*, at 1176-80.  He also asked Dr.

McKee (and again asked Dr. Eisenberg) to explain the purpose of taking a social history.  *Id*. at

1173, 1174, 1462.  Dr. McKee testified that Mitts moved a lot while he was growing up, served

in the Coast Guard, worked steadily throughout his life after leaving the Coast Guard, had a good

relationship with his daughter and ex-wife, and enjoyed fishing, target shooting and gun collecting.

*Id*. at 1176, 1177, 1180.  When asked by defense counsel about her findings with respect to the

latter two hobbies, Dr. McKee testified that Mitts repeatedly watched "cops and robbers" type

movies, identified with the "good guys" in the movies (the policemen), and engaged in a fantasy life

that was violent in nature.  *Id*. at 1193-94.  She testified that the gun collecting and target

shooting, which Mitts described as an obsession in his life and his only social outlet, coupled with

his social isolation, led her to conclude that Mitts had a violent fantasy life.[23]  *Id.* at 1195-96.

---

[23]Attached to Mitts's post-conviction petition is a sanity report prepared by Dr. McKee.
*Amended Post-Conviction Petition, Exh. I-2.*  The report discusses in detail Mitts's interest in
firearms:

> In October of 1993, [Mitts] reported that he became
> interested in guns and shooting as sport.  He stated, "I wanted
> something I hadn't gotten all my life, a sense of fulfillment." . . . .
> [Mitts] stated that one day he stopped in a gun store and saw a
> gun that "reminded [him] of Mel Gibson's gun."  He bought the
> gun, which was a .9mm Ruger on a subsequent visit and started
> going to a gun range to practice shooting.  He also subscribed to a
> "handgun magazine," around that time.  About three months later,
> he purchased a .22 caliber handgun because "my accuracy was no
> good with the .9mm."  He purchased a .44 Magnum handgun in

During the penalty phase of trial, Shaughnessy asked Dr. Eisenberg about Mitts's history and background.  Dr. Eisenberg testified that Mitts had a very unusual background for a criminal defendant because he had no history of criminal conduct, no history of violence, and no history of any unusual acting out.  *Tr.,* at 1464.  He also testified that Mitts had an excellent work record, was honorably discharged from the Coast Guard, and "seemed to be a basically ordinary man who lived a relatively ordinary life up until the time that he was arrested." *Id*. at 1464, 1466-67. He then testified that overtime, Mitts began to withdraw from relationships.  "He was burned a few times in marriage and he began to choose not to have relationships with people.  I think there is an issue of shame associated with that."  *Id*. at 1464-65.  Dr. Eisenberg then testified that Mitts broke off his relationship with his family, the only support system he continued to have, and found himself living "a relatively ordinary, but isolated life."  *Id*. at 1465.  Dr. Eisenberg's deposition reveals that some of the mitigating evidence that Eisenberg claimed could have been presented at trial was, in fact, introduced into evidence.  *Eisenberg Dep.,* at 14, 26-27.

Counsel's failure to fully pursue the theory that Mitts engaged in a "violent fantasy life" was not unreasonable.  At the competency hearing (which took place outside the presence of the jury), Dr. McKee testified that Mitts did not exhibit any overt violent behavior but did engage in a violent fantasy life.  *ECF No. 39, Transcript, Volume I,* at 98.  Defense counsel pursued this theory during the competency hearing.  *Id*.  During that hearing, Dr. McKee explained that Mitts

---

the Spring of 1994 which he stated was for the "traditional Dirty Harry – Clint Eastwood, stuff, the magnum shot."

*Id*., *Exh. I-2, I-3.*

154

preferred violent movies and identified with the characters in the movies who engaged in violent

acts; she stated that Mitts "fantasized himself in the role of the police officers." *Id*. at 98, 100.  Dr.

McKee concluded that the degree of Mitts's fascination – he indicated that he would watch these

movies up to 35 or 40 times – was outside the range of normal behavior.  *Id*. at 98-99, 102-104.

Accordingly, she considered Mitts's fascination to be clinically significant.  *Id*. at 102.  When

asked for a potential explanation for Mitts's behavior, Dr. McKee stated that under certain

circumstances law-abiding citizens with no history of violence who have "a particularly vivid

fantasy life of violent behavior[,] may have an experience where their inhibitions or their

prohibitions against certain behavior are removed or loosened such as one commonly experiences

with alcohol intoxication." *Id*. at 106.

 Although Dr. McKee mentioned this fantasy life during her trial testimony, counsel did not

develop this theory at trial and did not elicit evidence that the fantasy life was clinically significant.

Nonetheless, it is unlikely that the jury would have given this evidence significant mitigating weight.

"The *Strickland* Court further cautioned that 'a court must indulge a strong presumption that

counsel's conduct falls within the wide range of reasonable professional assistance; that is, the

defendant must overcome the presumption that, under the circumstances, the challenged action

might be considered sound trial strategy.'" *Bugh v. Mitchell,* 329 F.3d 496, 513 (6th Cir. 2003)

(quoting *Strickland*, 466 U.S. at 689) (internal quotation marks omitted).  Although Mitts's

unusual fascination with violent movies might be clinically significant, counsel could have concluded

that the jury would not sympathize with an individual who harbored such a fascination or that the

jury would not find that Mitts's obsession with guns lessened his culpability for the egregious

155

offenses he was found guilty of committing.  Furthermore, Mitts does not show that, but for counsel's failure to present this evidence, the jury's sentencing verdict would have been different.

Similarly, Mitts does not show that the jury would have given significant mitigating weight to testimony regarding his avoidant personality disorder.  Evidence that Mitts experienced feelings of shame and humiliation associated with his failed relationships and consequently developed an avoidant lifestyle is significantly dissimilar from the mitigating evidence in *Wiggins* and *Williams v. Taylor*, 529 U.S. 362, 395-96 (2000) (holding that an investigation would have revealed that petitioner's parents were imprisoned for criminal neglect of petitioner and his siblings and petitioner had a nightmarish childhood, was severely and repeatedly beaten by his father and was borderline mentally retarded).  *See also Harries v. Bell,* 417 F.3d 631, 639-40 (6th Cir. 2005) (finding prejudice where an adequate investigation would have revealed, among other excruciating details, that petitioner had a traumatic childhood, suffered significant physical abuse, and had a mental illness).  While counsel could have presented additional factors to the jury that hold some mitigating weight, such as evidence that Mitts had a full-scale IQ of 85 or the ability to adjust to prison life,[24] Mitts fails to show a reasonable probability that, but for counsel's failure to introduce this evidence at trial, he would have received a different verdict.

---

[24]In *Williams*, the Supreme Court found that petitioner was prejudiced by counsel's deficient representation.  529 U.S. at 396.  There, the Court found that counsel failed to return the phone call of an individual who had offered to testify that Williams "seemed to thrive in a more regimented and structured environment."  *Id*.  However, in addition to this available evidence that Williams could adjust to prison life, the Court found that defense counsel failed to conduct an investigation that would have uncovered records evidencing petitioner's "nightmarish childhood." *Id*. at 395.

Mitts also argues that counsel failed to adequately prepare the witnesses, including his former in-laws, the Fontanas, which resulted in an inaccurate and incomplete depiction of his background and the omission of relevant mitigating factors. He states that questions were prepared for the Fontanas' testimony but were ignored by defense counsel. *Petition,* at 5 (citing *Amended Post-Conviction Petition, Exh. B*). Most of these questions, however, were asked to and/or answered by the Fontanas at trial.

Mr. Fontana testified that Mitts is his ex-son-in-law, and stated that he had a good relationship with Mitts during the time Mitts was married to Fontana's daughter. *Tr.,* at 1395, 1397. Mrs. Fontana testified that she considers Mitts as her son. *Id.* at 1409. She stated that since Mitts's divorce to her daughter, Mitts did not come to see them because he felt that they were angry with him. *Id.* at 1411. Both Mr. and Mrs. Fontana testified that the only opportunity they had to see their granddaughter since the divorce was if Mitts brought her to see them. *Id*. at 1402, 1405, 1411. Both testified that Mitts was a good father. *Id*. at 1405, 1414. As for the remaining questions in Exhibit B, Mitts does not demonstrate that counsel was deficient for failing to pose these questions to the Fontanas or that the outcome of the trial would have been different had the questions been asked.

Mitts argues that counsel failed to obtain an alcohol counselor who could explain the effects of alcohol on the decision-making process. Mitts does not show a reasonable probability that testimony of an alcohol counselor would have led to a different sentence. Furthermore, the same testimony could have been elicited from the experts already available to counsel. In fact, Dr.

157

McKee testified that she specializes in alcohol and substance abuse.  The record reflects that evidence of alcohol abuse, however, was not presented at trial.

Dr. Eisenberg indicated in his deposition that Mitts abused alcohol.  *Eisenberg Dep.,* at 10.  In her sanity report, Dr. McKee concluded as follows:  "It is my opinion with reasonable medical certainty that Mr. Mitts is experiencing an inability to recall certain events of August 14, 1994 secondary to voluntary Alcohol intoxication."  *Amended Post-Conviction Petition, Exh. I-9.*  However, in that report, Dr. McKee also discusses Mitts's history of alcohol consumption and substance abuse and makes a notation of alcohol abuse.  *Amended Post-Conviction Petition, Exhs. I-5, I-9.  See also ECF No. 67, Deposition of Harry D. Mitts, Jr., May 4, 2004,* at 24 (stating that he stopped drinking nine months prior to the shootings). Neither testified at trial that Mitts was an alcoholic or abused alcohol; rather, both doctors provided testimony on *voluntary* intoxication at trial.   Furthermore, at sentencing, defense counsel asked the trial court to consider Mitts's alcohol *abuse*; he did not, however, make this request to the jury during trial.  *Tr.,* at 1585.  Although neither Dr. McKee nor Dr. Eisenberg testified at trial that Mitts abused alcohol, Dr. McKee did testify to Mitts's history of alcohol consumption during his time at the Coast Guard.  *Tr.,* at 1167, 1188-89.  Most importantly, Mitts does not demonstrate that he was prejudiced by counsel's failure to introduce evidence of alcohol abuse at trial.  He does not show that the jury would have struck a different balance had it been presented with this evidence.

Mitts also contends that counsel should have submitted his medical records into evidence because he stated to medical personnel that he wanted them to "just kill me!  I killed a cop."

158

Mitts argues that this statement is consistent with remorse and inconsistent with the intoxication

defense.  However, similar evidence was already introduced at trial.  Tracey Griffin testified that

she read a newspaper article stating that Mitts requested forgiveness from the families of the

victims.  After reading that article, Griffin visited Mitts in jail for the purpose of forgiving him.  *Tr.,*

at 670-71, 682.  Officer Mackey testified that Mitts "ask[ed] how the other officer was, if he was

going to be okay."  *Id*. at 818.  Sergeant Wolske testified that when he was in the ambulance with

the petitioner, Mitts "basically said a couple of times, why are you doing this, let me die."  *Tr.,* at

958-59.  Sergeant Wolske testified that at the hospital Mitts "kept asking what happened to the

policeman he shot" and when the nurse told him that the officer had died, Mitts said "oh shit, and

laid back down on the cot."  *Id*. at 961.  A flight nurse testified that when he was in the emergency

room with the petitioner, Mitts repeatedly asked "how's the cop?" and after a nurse told Mitts

that the officer was dead, Mitts "had a period where he didn't say much and then he said, 'You

might as well kill me now.'"  *Id*. at 1102.

Respondent argues that the introduction of some of the mitigating evidence that Mitts

claims should have been presented at trial could have been harmful to his case.  *Return of Writ,* at

27-28.  The Court agrees.

Mitts argues that counsel failed to call as witnesses his former employer Thomas Harrigan

and his former co-workers Gary Patterson and Stanley Schramek.  Again, Mitts fails to show

how the failure to call these or other individuals as witnesses caused him prejudice.  Furthermore,

the record reflects that the testimony of some of these individuals would not have been helpful and

159

might have been damaging to the case.  *See Amended Post-Conviction Petition, Exh. A.*

Exhibit A to the amended post-conviction petition lists names and telephone numbers of various

individuals, including Mitts's family members and former co-workers.  Although it is unclear who

prepared this document, the Exhibit appears to include notes from interviews conducted before

the mitigation phase.  Despite any positive opinions reflected in these notes, the Exhibit reveals

unhelpful or potentially damaging information.  According to the notes, Harrigan heard that Mitts

was involved in a couple of bar fights after work and indicated that Mitts frustrated easily, and

Patterson saw Mitts get frustrated over minor things.  *Exh. A-I, A-2.*

In addition, Mitts claims that defense counsel failed to introduce into evidence a report

prepared by the court psychiatric clinic, which provided a detailed background and history on

Mitts, or to call Rita Haynes, the person who prepared the report, as a witness.  He states that the

report revealed his extreme remorse and suicidal thoughts.  However, the report prepared by Rita

Haynes included the following damaging statement:

> [Mitts] indicated that he seldom loses his temper, but
> when he does, it is "like outrage."  He added, "and I don't know
> why but when it happens, I have no control over it."  According to
> the defendant, when he is very angry, he does not become
> physically violent.  He just becomes "abusive with words."

*Amended Post-Conviction Petition, Exh. H-3.*  Accordingly, Mitts has not overcome the

presumption that, under the circumstances, counsel's failure to introduce this report into evidence

or to call Rita Haynes as a witness "might be considered sound trial strategy."  *Bugh v. Mitchell,*

329 F.3d 496, 514 (6th Cir. 2003) (citing *Strickland,* 466 U.S. at 689).

Mitts also argues that counsel refused to allow him to testify under oath.  Again, Mitts does not overcome the presumption that under the circumstances, counsel's decision might be considered sound trial strategy.  Had Mitts testified at trial, the prosecution could have severely damaged the defense case during cross-examination by focusing on the testimony that Mitts shot and killed a police officer, wounded two others, uttered racial slurs to an African-American man before shooting and killing him, and conducted himself without any signs of intoxication on the night of the shootings.  Furthermore, the prosecutor could have portrayed Mitts as a liar who fabricated his inability to recall the incident.

Finally, the Court will review Mitts's claim regarding his mother and his claim that counsel failed to request a continuance.  Mitts argues that counsel failed to introduce evidence regarding his mother's mental condition.  In her deposition, Evanson stated that Mitts told her that his mother was mentally unstable but Mitts would not allow her to speak with his mother.  *Evanson Dep.,* at 27.  However, the Sixth Circuit has held that defendant's resistance to disclosure of information does not excuse counsel's duty to independently investigate.  *Coleman v. Mitchell,* 268 F.3d 417, 449-450 (6th Cir. 2001).  The record reflects that Mitts also made comments about his mother's mental health before trial.  In a prior interview, Mitts stated: "Most of the time [my mother] does not know who I am.  She is not all there mentally.  She may be schizophrenic.  She believes lots of people are out to hurt her."  *ECF No. 17, Appendix, Volume IV,* at 231, *First Amended Petition etc.* ("Amended Post-Conviction Petition")*, Exh. H-6* (Social history report prepared by Rita Haynes, Court Psychiatric Clinic, September 2, 1994).  He indicated, however, that to the best of his knowledge she has never been diagnosed with a mental illness.  *Id*.

161

In an interview with Dr. McKee, Mitts described his mother as "strange" and indicated that she had "paranoid ideas." *Amended Post-Conviction Petition*, *Exh. I-5* (Sanity report by Dr. Sonia McKee, Court Psychiatric Clinic, September 7, 1994).  However, he stated that no one in his family, including his mother, has been treated for psychiatric illness.  *Id. Exhs. I-4, I-5.* Moreover, Dr. McKee concluded that Mitts did not have a severe mental disease or defect on August 14, 1994, and stated in her report that Mitts had no prior history of mental illness or defect prior to that date.  *Id. Exhs. I-10, I-11.*  Mitts does not provide any evidence to dispute Dr. McKee's findings.  Mitts's unsupported allegations about his mother are insufficient to show that Mitts suffered from psychological or psychiatric problems.

Besides Mitts's personality disorder and violent fantasy life, which the Court has previously considered, and Mitts's IQ scores, which the Court will now address, there is nothing in the record suggesting that Mitts had a psychological history that warranted further investigation by counsel.  With respect to Mitts's IQ scores, it is important to note that Mitts does not allege, and the record does not suggest, that he is mentally retarded or even borderline mentally retarded. *See Atkins v. Virginia,* 536 U.S. 304 (2002); *State v. Lott,* 779 N.E.2d 1011, 1014 (Ohio 2002).  He only makes vague allegations regarding potential mental illness in his family:

> Petitioner did file a motion for funds for expert psychological assistance in the state [post-conviction] court, which could have been used to demonstrate the importance of evidence regarding any mental illness in the family.  Psychological assistance would have been important to explain how his mother's history affected Petitioner's mental health, and consequently, his personal and moral culpability for this crime.

162

*Traverse,* at 22 (internal citation omitted).  *Cf. Coleman v. Mitchell,* 268 F.3d 417, 450-52 (6th

Cir. 2001) (finding prejudice given petitioner's low I.Q. score of 82, psychiatric problems

(including borderline personality disorder, a likelihood of organic brain dysfunction, and probable

manic-depressive psychosis) and deprived background (among other things, petitioner was

exposed to group sex and his grandmother involved him in her voodoo practice)); *Brewer v.

Aiken*, 935 F.2d 850, 857 (7th Cir. 1991).  Moreover, of all the potential mitigating factors that

Dr. Eisenberg claimed could have been presented at trial, mental illness was not one of them.

　　　　Mitts also argues that counsel failed to request a continuance after the guilty verdict to

allow adequate time to prepare mitigation.  He argues that once the blackout theory failed during

the guilt phase, counsel should have moved for a continuance to attempt to develop another theory

for mitigation.  *Traverse,* at 16.  He argues that counsel's failure to do so constituted a breach of

his duty to investigate.  *Id.*  Mitts argues that counsel continued to pursue the blackout theory even

though Dr. Eisenberg, Ms. Evanson and Mitts himself told counsel that Mitts was not in a

blackout.  *Id.* at 16-17.  Mitts fails to show that he was prejudiced by counsel's alleged error.  He

does not show a reasonable probability that the mitigating evidence he wished to convey to the

jury would have led to the imposition of a different sentence.

　　　　Mitts concedes that some of his background information was presented to the jury, but

argues that counsel's reliance on the lie that Mitts did not know what he was doing because of the

alleged blackout "tarnishe[d] the integrity of the information that did get considered."  *Traverse,* at

16.  This argument is speculative.

During opening argument in the mitigation phase, counsel told the jury it could consider Dr. McKee's testimony, including her testimony that Mitts was unable to lay down memories. *Tr.,* at 1389-90.  During closing argument, Mitts's attorneys reminded the jury of Dr. McKee's finding that Mitts suffered from a blackout and stated that Mitts was unable to lay down memory for the events.  *Id.* at 1517-18, 1538.  Counsel also presented evidence that Mitts's could not remember the incident.  During his testimony, Dr. Eisenberg agreed that there was some memory impairment.  *Id*. at 1468, 1471, 1476.  (It is difficult to reconcile this testimony with Dr. Eisenberg's affidavit where he opined that the alcohol consumption did not impair Mitts's memory.  *See ECF No. 17, Appendix, Volume IV,* at 143, *Petition for Post-Conviction Relief, Exh. M-2*).  Accordingly, counsel did pursue the theory that Mitts was unable to recall the shootings.  However, there is no showing that this theory prejudiced Mitts.  To the contrary, counsel argued that Mitts was so intoxicated to the point that he could not recall the incident.  *See Tr.,* at 1538.

Mitts argues that counsel relied on the lie that Mitts "did not know what he was doing because of the alleged blackout."  Although counsel attempted to elicit testimony from Dr. Eisenberg regarding whether an intoxicated person could act without purpose, *Tr.,* at 1480-84, he raised this issue only in response to the prosecutor's cross-examination of Dr. Eisenberg.  *See Tr.,* at 1471-73 (cross-examining the psychologist about whether Mitts had purpose and whether other individuals he has examined in the past were able to form purpose at the time of the offense). The transcript of defense counsel's direct examination reveals that counsel elicited testimony about a number of mitigating factors in Mitts's social history and did not probe Dr. Eisenberg about the

164

issue of purpose or specific intent.  *Tr.,* at 1453-69.  There was one instance during Dr. McKee's direct examination where counsel mentioned the term blackout, but counsel avoided any discussion of specific intent.  *Id.* at 1468.  Furthermore, counsel's opening and closing arguments focused on alcohol intoxication – not to dispel the idea that Mitts could form specific intent – but rather, as a mitigating factor.  The Court does note that during closing argument counsel asked the jury whether Mitts could "act rational enough to conform to the requirements of the law" and stated that "it's not until we become drunk . . . to the point we don't know what we're doing, that we no longer remember," *id.* at 1518, 1538.  Even if counsel made arguments relating to purpose and rational behavior despite the finding by the jury that Mitts formed the specific intent to kill, counsel was asking the jury to consider intoxication as a *mitigating* factor.  In fact, Dr. Eisenberg testified that voluntary alcohol intoxication is an issue that is relevant to mitigation, *id.* at 1484, and the prosecutor even conceded at closing argument that intoxication may be considered as mitigation, *id.,* at 1553.

Furthermore, the Court is reluctant to find that defense counsel fabricated the blackout theory in the absence of strong evidence suggesting such a fabrication.  The only evidence that Mitts did not have a blackout is from Mitts himself and from Dr. Eisenberg who stated that he did not believe Mitts was in a blackout.  *ECF No. 63, Deposition of James R. Eisenberg, Ph.D., August 24, 2004,* ("Eisenberg Dep."), at 17, 22 (stating that "from early on . . . [Mitts] was able to give [Eisenberg] a fairly detailed account of the events that led to his arrest.").  It is unclear whether Mitts is being truthful when he states that he did not suffer from a blackout or whether his

165

recollection of the offense is based on information collected from witnesses and other individuals.[25]

Importantly, after the habeas petition was filed, Mitts testified in his deposition about the events

that occurred on the date of the offense.  He stated:

> "[I p]ulled a bottle of bourbon off the top shelf, and I
> poured one.  But I don't remember drinking it.  This is the kicker.
> This is the part where the memory is not there. . . . I can see when
> I first poured that drink, I can see it at the bottom of the glass.
> Can still see the bourbon that was there, I remember the glass. . . .
> And then nothing.  I don't know what happened during that time;
> it was like a blackout if you want to call it that, whatever it was."

*ECF No. 67, Deposition of Harry D. Mitts, Jr., May 4, 2004*, ("Mitts Dep.") at 9-10.  It is true

that the testimony Mitts provided in his affidavit and deposition regarding the incident is much

more detailed than what Mitts told Dr. McKee prior to trial, which would support the argument

that counsel told Mitts to say that he did not recall the shootings.  *Compare Amended Post-*

_____

[25]During the mitigation phase, Mitts addressed the jury in an unsworn statement where he
stated as follows:

> "For the most part that night I don't remember what
> happened, just bits and pieces.  I remember pouring a drink, going
> to my car and getting a jacket for whatever reason and listening to
> helicopter rotar blades, never really piecing it all together til
> different police officers and people of the community testified as
> to what happened . . . ."

*Tr.,* at 1493-94.  The record reveals that Mitts told various people that he did not recall the
shootings.  Tracey Griffin testified that Mitts told her he did not recall anything that had happened.
*Tr.,* at 682.  According to the sanity report, Mitts stated that he had no recollection of shooting
anyone and indicated that "there is about eight hours that I can't remember."  *Amended Post-
Conviction Petition, Exh. I-6.*  Dr. McKee stated in the sanity report that Mitts was unable to
recall certain events that occurred on August 14, 1994, due to voluntary alcohol intoxication. *Id.* at
I-10.  She also stated that Mitts may have a genuine amnesia for the incident.  *Id.*  According to
Mitts, however, he maintained this blackout theory because counsel pressed him to do so.

166

*Conviction Petition*, Exh. K-6, K-7, *with id.* Exh. I-6, *and Tr.,* at 1187.  Nonetheless, Mitts

did testify in his deposition that his "memory is not there" for at least some part of the evening,

what he experienced "was like a blackout," and he did not remember a number of aspects of the

evening, including being arrested.  *See Mitts Dep.* at 42.  Accordingly, the Court is not convinced

that Mitts's memory of the events surrounding the incident is fully intact.

Mitts argues that counsel should have prepared and presented some other theory to the

jury during the mitigation phase because Dr. McKee's testimony indicated that a blackout would

not have affected Mitts's ability to make decisions at the time of the offense.  *Traverse,* at 16.  As

previously stated, counsel focused on alcohol intoxication as a mitigating factor, not as a complete

defense to murder.  *See Tr.,* at 1391.  Furthermore, the jury recommended that Mitts receive the

death penalty after hearing evidence about Mitts's alcohol intoxication, lack of a criminal record,

close, loving relationship with his daughter and other factors relevant to mitigation.  Despite this

evidence, the jury found that the mitigating factors that were presented at trial did not outweigh the

aggravating circumstances.  Even should counsel have abandoned the theory that Mitts could not

remember the shootings, the jury was presented with a number of mitigating factors and there is no

indication that Mitts was prejudiced by the inclusion of evidence and arguments regarding his

impaired memory.

Despite counsel's claim during opening argument that alcohol is the only mitigating

evidence and counsel's focus on alcohol intoxication throughout the closing argument, evidence of

Mitts's family history and background was presented to the jury.  The trial court instructed the

167

jury that the opening and closing arguments of counsel are not evidence, and that it may consider

various mitigating factors, including any factors relative to whether Mitts should be sentenced to

death.  *Tr.,* at 1559, 1565-66.  Most importantly, Mitts fails to demonstrate a reasonable

probability that the additional mitigating evidence would have led to a different verdict.  *Wiggins,*

539 U.S. at 537 (stating that there was a reasonable probability that at least one juror would have

struck a different balance had the jury been able to consider petitioner's excruciating life history as

mitigating evidence).  Accordingly, this claim is dismissed on the merits.

### B.  Second Ground for Relief - Ineffective Assistance of Counsel During the Guilt Phase

Mitts argues that he was denied the effective assistance of counsel in the guilt-innocence

phase of the trial because counsel: (a) was in a hurry to try the case, and therefore, did not

adequately investigate alternative defenses or strategies; (c) insisted on a blackout defense even

though Mitts informed counsel, the mitigation specialist Susan Evanson, and the psychologist Dr.

Eisenberg, that he was not blacked out during the incident; and (d) did not request an expert to

support this defense.[26]  *Petition,* at 9-10; *Traverse,* at 25.

The last reasoned state court judgment on this issue was rendered by the Ohio Court of

Appeals on post-conviction review.   That court held as follows:

> In his seventh assignment of error, appellant argues his
> attorney was ineffective during the guilt phase of the trial.

_____

[26]The Court previously held that sub-claim (b) was procedurally defaulted.  *See supra*
Section III, Subpart(C)(2)(b).  Accordingly, sub-claim (b) will not be addressed here.

> Appellant's claims [that] his attorney did not adequately prepare for trial, conduct voir dire properly, and insisted on presenting a black-out defense are barred by res judicata.
>
> Appellant's seventh assignment of error is meritless.

*State v. Mitts*, No. 76963, 2000 WL 1433952, at *6 (Ohio Ct. App. Sept. 28, 2000).

It is not clear that the entirety of this claim was "adjudicated on the merits" in state court. Accordingly, the Court will review the claim *de novo.  See supra* Section III, Subpart A;  *Maples v. Stegall,* 340 F.3d 433, 435, 437 (6th Cir. 2003).

In sub-claim (a), Mitts alleges that trial counsel was in a hurry to try the case.  Mitts argues that the rush to trial, which began a little over two months after the shootings, caused him prejudice because counsel did not adequately investigate alternative defenses (besides the blackout defense) as he was required to do.  *Traverse*, at 23.  To support this argument, Mitts alleges that counsel called Dr. McKee to the witness stand during the first phase of the trial in order to establish that Mitts did not form the specific intent to kill because he was intoxicated. "Counsel did this without talking to Dr. McKee ahead of time [and] Dr. McKee could not support trial counsel's [defense theory], thereby contaminating the jury's perception of the evidence that was presented."  *Id*.  Mitts argues that the rush to trial negatively affected the jury's consideration of the mitigating evidence, and caused him prejudice by impairing the mitigation team's ability to advise counsel of his options.  *Id*. at 23-24.  Mitts also claims that trial counsel insisted on presenting a "blackout defense" during the first phase of the trial even though Mitts said he had not blacked out during the incident (sub-claim (c)), and that counsel did not request an

169

expert to support this defense (sub-claim (d)).  *Traverse*, at 25.  Rather, counsel relied on Dr. McKee, an expert he had not interviewed, to support a defense he had insufficient time to develop.  *Id.*  As a result of this unsuccessful defense, argues Mitts, the trial court refused to grant his request for a jury instruction on intoxication, which would have negated the element of specific intent, and defense counsel lost his credibility in presenting this defense again in the mitigation phase.  *Id*.

In his habeas petition, Mitts argues that he was not in a blackout on the night of the offense.  Dr. Eisenberg also testified that in his opinion Mitts did not suffer from a blackout.  For the reasons previously stated in the first ground for relief, *supra,* the Court is reluctant to find that defense counsel fabricated the blackout theory in the absence of strong evidence suggesting such a fabrication.  Furthermore, the Court need not determine Mitts's credibility in arguing that he did not suffer from a blackout because there was overwhelming evidence of guilt, and, after the habeas petition was filed, Mitts testified in his deposition to having an incomplete memory for at least some part of the evening.

The Sixth Circuit previously addressed a similar claim of ineffective assistance of counsel in *Combs v. Coyle,* 205 F.3d 269 (6th Cir. 2000).  In *Combs,* the defense's only expert witness testified during the guilt phase regarding petitioner's drug and alcohol abuse and his intoxication on the day of the offense.  On cross-examination, the expert testified that in his opinion the defendant, although intoxicated, acted purposefully and intentionally.  *Id*. at 287.  The Sixth Circuit held that

counsel's decision to present the testimony was made without undertaking a full investigation.  *Id.*

at 288.

> [The expert's] opinion regarding whether [petitioner]
> lacked the requisite intent to commit the crimes was crucial to the
> defense theory; defense counsel's failure to have questioned [the
> expert] in this regard prior to trial is inexcusable. Defense counsel
> should have known [the expert's] opinion on this ultimate issue
> and should have prepared accordingly.

> Regardless of whether . . . counsel should have known or
> instead actually knew [the expert's] opinion regarding
> [petitioner's] intent, however, counsel's decision to put him on the
> stand was objectively unreasonable. . . . [the expert's] testimony
> directly contradicted the sole defense theory that [petitioner]
> lacked the requisite intent to commit murder. Although defense
> counsel presented substantial testimonial evidence that [petitioner]
> was in fact intoxicated at the time of the shootings, this testimony
> was rendered worthless when the defense's own expert testified
> that [petitioner's] intoxication did not legally excuse his crime.
> Furthermore, not only did [the expert's] testimony destroy any
> hope of a successful intoxication defense, but it also helped the
> prosecution to establish one of the elements of its case in chief.
> Quite simply, this testimony was completely devastating to the
> defense, and counsel's decision to present it was objectively
> unreasonable.

*Combs,* 205 F.3d at 288.  The Sixth Circuit held that counsel's error in this regard was

sufficiently prejudicial to satisfy the *Strickland* test.  *Id.* at 290.   "Presentation of [the expert's]

testimony is perhaps the most devastating error. . . . the testimony provided the State with its most

powerful evidence of purpose."  *Id.*

A few years later, the Sixth Circuit addressed another ineffective assistance claim in *Hicks*

*v. Collins,* 384 F.3d 204 (6th Cir. 2004).  In *Hicks,* a court-appointed psychologist was directed

171

to evaluate petitioner's competency and to determine if petitioner was insane on the day of the offense. *Id*. at 213. The psychologist, who did not hold herself out as a "cocaine expert," testified at trial that petitioner's criminal acts were consistent with cocaine intoxication and that petitioner was probably impaired; nonetheless, the psychologist opined that petitioner acted with purpose and intent. *Id*. at 213. At an evidentiary hearing before the district court on habeas review, petitioner offered the testimony of an individual who petitioner claimed was an expert on the effects of cocaine use. *Id*. at 214.

The *Hicks* court stated that the psychologist's testimony was damaging to the defense case but concluded that petitioner was not denied the effective assistance of counsel. *Id*. at 213-15. The court distinguished *Combs*. First, the court held that there was overwhelming evidence of petitioner's guilt; therefore, petitioner failed to satisfy the prejudice prong of *Strickland. Id.* at 215. Next, the court stated that petitioner was a malingerer who refused to assist his counsel in the preparation of his defense. *Id*. The court held that "[t]he decision to employ [the psychologist] was a direct result of [petitioner's] refusal to cooperate with his counsel." *Id*. Third, the court stated that most importantly, even had the jury been informed of cocaine psychosis and its effects, the result of the proceeding would not have been different. *Id*. The expert at the evidentiary hearing, like the psychologist, testified that petitioner's actions were purposeful and that "certainly people can do purposeful actions when they're involved in cocaine psychosis." *Id*.

172

In the present case, Dr. McKee's testimony contradicted the sole defense theory that Mitts lacked the requisite intent to commit murder.  Defense counsel's comments during side bar reflect his failure to interview the witness before she testified.  *Tr.,* at 1206 ("the lady [Dr. McKee], as I *guessed* that she would, was going to say that the defense is bull shit, which is about what she's saying") (emphasis added).  *See also Tr.,* at 1200.  Counsel's examination of Dr. McKee at the pre-trial competency hearing reveals further evidence of his deficient performance at trial.  At the competency hearing, defense counsel asked Dr. McKee whether someone in an alcohol blackout could form the specific intent to kill.  *ECF No. 39, Transcript, Volume I,* at 120.  The prosecutor objected to the question and the trial court sustained the objection.  *Id*.  Accordingly, counsel was aware of the importance of this line of inquiry but failed to adequately interview his witness or to ascertain her opinion before trial.

Nevertheless, the Court finds that Mitts does not establish prejudice under *Strickland*.  In light of the overwhelming evidence of guilt, the unsuccessful blackout defense did not prejudice Mitts.  Mitts does not suggest any alternative defense that could have been presented during the guilt phase.  Furthermore, the record reveals that there was not "substantial testimonial evidence" that Mitts was intoxicated at the time of the shootings; even if there was some evidence in this regard, the evidence was not strong enough to demonstrate that Mitts was unable to form specific intent.

Even though Dr. McKee did not support counsel's blackout theory, Mitts does not show that another expert would have testified that Mitts was unable to form the specific intent to kill due to his intoxication.  During the mitigation phase, Dr. Eisenberg stated that alcohol consumption led

173

directly to the shootings, lowered Mitts's inhibitions and that, in his opinion, but for the alcohol it is

unlikely that the incident would have occurred.  *Tr.,* at 1468-69, 1471.  *See id.* at 1467 (testifying

that it was clear from the medical records as well as other available reports that Mitts was highly

intoxicated at the time of the offense).  He also stated that an intoxicated person can do things

without purpose or intent.  *Id*. at 1481-83.  However, Dr. Eisenberg stated that he did not have

enough evidence to determine whether Mitts had purpose to shoot the victims; and he testified that

the majority of the individuals whom he has evaluated as having alcohol impairment "were able to

have knowledge and purpose at the time [of the offense]."  *Id*. at 1471-73.  He also testified that

the alcohol intoxication did not excuse Mitts's conduct.  *Id*. at 1470, 1476, 1477.

With respect to counsel's failure to request a continuance to investigate alternative

defenses, Mitts fails to overcome the strong presumption that counsel's decision was sound trial

strategy based on the overwhelming evidence against Mitts.  Furthermore, Mitts does not show

that he was prejudiced by the failure to request a continuance.  He does not demonstrate that

counsel could have effectively rebutted the State's overwhelming evidence had he requested a

continuance to investigate alternative defenses.  *See United States v. Meeker,* 411 F.3d 736,

749 (6th Cir. 2005).  Furthermore, as Respondent aptly notes, counsel was able to keep the

pressure on the prosecution by forcing it to develop its evidence quickly.  *Return of Writ,* at 33.

As for the trial court's refusal to grant petitioner's request for a voluntary intoxication

instruction, there was insufficient evidence to warrant such an instruction even without Dr.

McKee's testimony.  *See infra* Section IV, Part D (Sixth Ground for Relief).  Mitts's argument

regarding counsel's decision to present the blackout defense again in the mitigation phase was

previously addressed in the first ground for relief.  Accordingly, this claim is dismissed.

### C.       Fifth Ground for Relief - Consecutive vs. Concurrent Sentences

In the fifth ground for relief, Mitts contends that the trial court erred when it denied

defense counsel's request to instruct the jury that it may recommend consecutive life sentences on

the two counts of aggravated murder.  *Petition,* at 12.  Mitts also argues that the trial court's

response to a jury question about consecutive and concurrent sentencing was erroneous.  *Id.*

During sentencing deliberations, the jury asked the following question to the court: "Would a

verdict of life imprisonment on count one and count two [the aggravated murder counts] be served

consecutively or concurrently?"  *Id.*  The trial court responded as follows:

> Counts one and two are separate and distinct counts.
> And the matter or the question as to consecutive or concurrent
> sentencing is up to the Court, is placed upon the Court.

*Tr.,* at 1579.

According to Mitts, the question indicates that the jury was clearly considering a life

option, and was concerned about the number of years Mitts would be incarcerated before he

would be eligible for parole.  *Petition,* at 12.  Mitts states that the jury believed that information

about his chances for release were relevant to its decision.  *Id.*  Had the jury known that the court

could order that the sentences be served consecutively, argues Mitts, it might have recommended

a life sentence.  *Petition*, at 12-13.  Mitts contends that the trial court's refusal to allow the jury to

recommend consecutive sentences or to commit to the imposition of consecutive sentencing in

response to the jury's inquiry violated his constitutional rights and rendered the verdict unreliable.

*Petition,* at 13; *Traverse,* at 32.

The Ohio Supreme Court, on direct review, dismissed the claim on the merits.  The court stated as follows:

> The court did not err by refusing to give Mitts's requested instruction because it is not an accurate statement of the law. See *State v. Scott* (1986), 26 Ohio St.3d 92, 101, 26 OBR 79, 87, 497 N.E.2d 55, 63. Under Ohio law, "[a] jury has no option of recommending whether life sentences **529 should run consecutively or concurrently." *State v. Allard* (1996), 75 Ohio St.3d 482, 492, 663 N.E.2d 1277, 1287, citing *State v. Grant*
>
> (1993), 67 Ohio St.3d 465, 482, 620 N.E.2d 50, 69; see, also, R.C. 2929.03(D)(2).
>
> . . . .
>
> In *State v. Allard,* 75 Ohio St.3d at 492, 663 N.E.2d at 1287, when faced with the same issue, we responded that "assertions regarding the jury's possible motives for asking about consecutive and concurrent sentences are purely speculative" and "the trial court's response to the jury's question was proper, since a jury has no option of recommending whether life sentences should run consecutively or concurrently."
>
> Mitts relies on *Simmons v. South Carolina* (1994), 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133. *Simmons* held that a trial judge violated an accused's due process rights by refusing to instruct the jury that a life sentence, under the facts and the applicable law, carried with it no possibility of parole. Mitts's reliance on *Simmons* is misplaced. In *Simmons,* South Carolina statutes prohibited Simmons's release on parole. This information was relevant given the prosecution's argument of Simmons's future dangerousness and the evidence that the public misunderstood the meaning of "life imprisonment" in South Carolina. In *Simmons,* a plurality reasoned that, to the extent that the jury's

176

> misunderstanding (that Simmons could be released on parole)
> pervaded the jury's deliberations, it had the effect of creating a
> false choice between sentencing petitioner to death and sentencing
> him to a limited period of incarceration. *Id.* By contrast, in Mitts's
> case the prosecutor did not argue future dangerousness and there
> was no misunderstanding by the jury--the law in Ohio is that the
> judge is to make the determination of whether sentences will be
> served concurrently or consecutively.  Moreover, counsel's
> argument that it was unrealistic to think that the trial judge would
> impose concurrent sentences here is speculative. Accordingly we
> overrule Mitts's first proposition of law.

*State v. Mitts*, 690 N.E.2d 522, 528-29 (Ohio 1998).

Mitts argues that the state court decision was based on an unreasonable application of

*Simmons.  Traverse*, at 33.  He contends that under *Simmons*, a jury is entitled to the truth when

considering whether a defendant should be sentenced to death, and argues that the jury should

have received a truthful answer about the trial court's intentions vis-à-vis a life sentence.  *Id.*  This

argument is without merit.

In *Simmons*, the U.S. Supreme Court held that a capital sentencing jury must be informed

that the defendant is parole ineligible where the defendant's future dangerousness is at issue and

state law prohibits the defendant's release on parole.  512 U.S. at 156.  There are two significant

differences between *Simmons* and the instant case.  First, the defendant in *Simmons* was parole

ineligible, and the jury was not informed of this crucial fact.  In the present case, the jury

instructions indicated that Mitts *was* eligible for parole.  *Tr.,* at 1570.  Second, the prosecutor's

case for imposing the death sentence in *Simmons* rested at least in part on the theory that the

defendant posed a future danger to society.  *Simmons,* 512 U.S. at 162, 168-69.  Here, there is

177

no indication, let alone allegation, that the government requested that the jury consider Mitts's

future dangerousness when recommending the appropriate punishment.  *See Coe v. Bell*, 161

F.3d 320, 347 (6th Cir. 1998) (distinguishing *Simmons*).

       The *Simmons* Court held:

> [W]e generally will defer to a State's determination as to
> what a jury should and should not be told about sentencing. In a
> State in which parole is available, how the jury's knowledge of
> parole availability will affect the decision whether or not to impose
> the death penalty is speculative, and we shall not lightly second-
> guess a decision whether or not to inform a jury of information
> regarding parole . . . . But if the State rests its case for imposing
> the death penalty at least in part on the premise that the defendant
> will be dangerous in the future, the fact that the alternative
> sentence to death is life without parole will necessarily undercut
> the State's argument regarding the threat the defendant poses to
> society. Because truthful information of parole ineligibility allows
> the defendant to "deny or explain" the showing of future
> dangerousness, due process plainly requires that he be allowed to
> bring it to the jury's attention by way of argument by defense
> counsel or an instruction from the court.

*Simmons,* 512 U.S. at 168-69.

       In the present case, the government did not make any showing of future dangerousness,

and there is no allegation that Mitts was denied the opportunity to rebut information that the jury

considered and might have relied upon in imposing the death penalty.  *Gardner v. Florida*, 430

U.S. 349, 362 (1977) (holding that a person cannot be executed "on the basis of information

which he had no opportunity to deny or explain").  Furthermore, Mitts's arguments regarding the

jury's possible motives for asking the question are speculative.  *State v. Allard,* 663 N.E.2d

1277, 1287 (Ohio 1996).  Most importantly, the Ohio Supreme Court has held that the question

of concurrent or consecutive sentencing is a matter for the court, not the jury, and therefore need

not be considered by the jury.  *Id.*; *State v. Grant,* 620 N.E.2d 50, 69 (Ohio 1993).

Accordingly, the Court concludes that the judgment of the Ohio Supreme Court represents an

objectively reasonable application of *Simmons*.  This claim is dismissed on the merits.

    **D.**       **Sixth Ground for Relief - Voluntary Intoxication Instruction**

       In the sixth ground for relief, Mitts argues that the trial court erred when it denied his

request to instruct the jury on the defense of voluntary intoxication where a reasonable jury could

have found that Mitts could not form the specific intent to kill.[27] *Petition,* at 14.  Mitts argues that

the evidence was sufficient to require an instruction, and discussed a number of witnesses who

testified that Mitts was drinking alcohol and/or seemed intoxicated at the time of the offense.

*Traverse,* at 34-36.

       On direct appeal to the Ohio Supreme Court, Mitts argued that the trial court's failure to

instruct the jury on voluntary intoxication violated Ohio law *and* his federal constitutional rights.

The Ohio Supreme Court addressed the state law aspects of the claim and held as follows:

> As we recognized in *State v. Fox* (1981), 68 Ohio St.2d
> 53, 54-55, 22 O.O.3d 259, 260, 428 N.E.2d 410, 411, "[t]he
> common law and statutory rule in American jurisprudence is that
> voluntary intoxication is not a defense to any crime." Nonetheless,
> "where specific intent is a necessary element, * * * if the
> intoxication was such as to preclude the formation of such intent,
> the fact of intoxication may be shown to negative this element."

---

[27]Although voluntary intoxication is no longer an affirmative defense in Ohio, *see* R.C.
§ 2901.21(C), it was available as an affirmative defense at the time of Mitts's offense.  *Hicks v.
Collins,* 384 F.3d 204, 222 n.11 (6th Cir. 2004).

*Fox,* 68 Ohio St.2d at 55, 22 O.O.3d at 260, 428 N.E.2d at 411-412.

In denying the defense request for an instruction on intoxication, the trial court relied on *State v. Hicks* (1989), 43 Ohio St.3d 72, 538 N.E.2d 1030. In *Hicks,* the trial court did not instruct on voluntary intoxication despite evidence of intoxication. On appeal Hicks claimed that he was so intoxicated, through cocaine, that he could not form the specific intent to kill. The *Hicks* court recognized that "[t]he issue of intoxication is not raised as a defense to the element of purpose * * * merely because the evidence suggests reduced inhibitions, impaired judgment or blurred appreciation by the defendant of the consequences of his conduct." *Id.* at syllabus.

It is within the sound discretion of the trial court to determine whether the evidence is sufficient to require a jury instruction on intoxication. *State v. Wolons* (1989), 44 Ohio St.3d 64, 541 N.E.2d 443, paragraph two of the syllabus; *State v. Fox,* 68 Ohio St.2d 53, 22 O.O.3d 259, 428 N.E.2d 410. Evidence of intoxication is sufficient to raise the intoxication defense only where, if believed, it would support acquittal. *State v. Hicks,* 43 Ohio St.3d at 75, 538 N.E.2d at 1034.

Here, there was evidence that Mitts was intoxicated during the police standoff, but the jury still could not have reasonably found that he lacked the capacity to form a specific intent to kill at the time of the murders. Testimony from witnesses who observed Mitts before or during the shootings does not support a finding that Mitts was so intoxicated that he did not intend what he was doing when he shot the victims. Around 8:00 p.m., when Timothy Rhone encountered Mitts in the hallway, Mitts displayed no signs of intoxication. Mitts held the gun "[p]erfectly steady" when he aimed it at Rhone's head. After 8:00 p.m., when Griffin saw Mitts walk up, aim, and shoot Bryant, Mitts was not staggering. Daniel O'Brien saw Mitts just after he killed Bryant and when Mitts shot at the first responding police car. O'Brien testified that Mitts was not staggering as he walked around, and he had no trouble ejecting the clip from his weapon,

180

reloading, and firing several times at a police car.

Between 8:30 and 9:00 p.m., after Mitts shot Lt. Kaiser and Sgt. Glivar, Lt. Kaiser tried to negotiate with Mitts for twenty or thirty minutes. Mitts threatened to kill Bryant's girlfriend, Griffin, as well as the entire police department. By refusing to surrender and demanding that the police come to his apartment and kill him, Mitts demonstrated that he was acting purposefully and knew what he had done and what he was doing. At that time, Mitts said he had been drinking, but he did not say how much and his speech was not slurred.

Officer Mackey, who talked with Mitts even later, also noted that Mitts said he had been drinking, but Mitts was "calm" and "never angry," and his speech pattern did not indicate intoxication. Further, Mitts read the label on Glivar's shotgun and fired it twice, although he was unfamiliar with that weapon. Sgt. Robert Sackett, who joined in Mitts's lengthy conversations with Officer Mackey, thought Mitts seemed "completely sober."

Chief Salerno, who first talked with Mitts around 8:30 p.m. during the police standoff, testified that Mitts would "giggle and laugh" at times, and at other times would "start getting angry." Mitts told Salerno that he had finished drinking a bottle of bourbon and was now drinking scotch. Salerno thought Mitts was drunk, but Mitts told him exactly what he had done, *i.e.,* killed a black man and shot two police officers. Detective Ronald Arco also thought Mitts was intoxicated when he overheard Mitts on the telephone around 9:42 p.m.

Police Sergeant Gary Wolske, who stayed with Mitts after he was arrested around 2:00 a.m., described him as quiet, neither combative nor confused, and apparently sober. A nurse who first treated Mitts testified that he displayed no signs of intoxication. A Life Flight nurse, who saw Mitts later, thought he had been drinking, but his speech was not impaired. Mitts indicated that he knew what he had done because he told the nurse, "I'm a cop killer and you might as well kill me now." Mitts

181

also said, "I think I killed a nigger."

> Mitts's strongest evidence of intoxication is his blood-alcohol level of .21 grams per one hundred milliliters taken at 3:43 a.m. Although the blood-alcohol level is evidence that Mitts was intoxicated at the time of the blood test, more than six hours after the shootings, it does not compel an intoxication instruction because the jury could not have inferred from it that the intoxication precluded Mitts from forming the intent to purposefully commit the murders.

> The evidence of intoxication could not have supported a verdict of acquittal. The trial court was correct in determining that an intoxication instruction was not required. Accordingly, we reject the fourth proposition of law.

*State v. Mitts,* 690 N.E.2d 522, 527-28 (Ohio 1998).

In his Traverse, Mitts argues that the Ohio Supreme Court did not address the due process implications of his claim. *Id*. at 37. Mitts argues that it is the jury's role to determine whether he is guilty of every element of the offense, and the trial court's failure to provide the requested instruction improperly restricted that role by depriving him of a jury determination of whether he had the specific intent to kill. *Id*.

The Ohio Supreme Court decided the issue solely on the basis of state law and did not address Mitts's federal claim. Because this claim was not "adjudicated on the merits" in state court, AEDPA deference does not apply and the Court reviews the claim *de novo. See Maldonado v. Wilson,* ___ F.3d ____, No. 03-4528, 2005 WL 1654766, at *4-5 (July 15, 2005). *See supra* Section III, Subpart A.

182

In the instant case, the evidence at trial was clearly insufficient to warrant an instruction on

voluntary intoxication.  *See Neuman v. Rivers*, 125 F.3d 315, 324 (6th Cir. 1997)  (affirming

district court's finding that the trial court's failure to instruct the jury on the defense of voluntary

intoxication was not constitutional error where there was insufficient evidence to warrant the

instruction); *Mathews v. United States,* 485 U.S. 58, 63 (1988) ("As a general proposition a

defendant is entitled to an instruction as to any recognized defense for which there exists evidence

sufficient for a reasonable jury to find in his favor.").  *See also Hill v. Mitchell*, 400 F.3d 308,

321-23 (6th Cir. 2005) (applying AEDPA deference and rejecting petitioner's claim that the trial

court's failure to instruct the jury on intoxication during the guilt phase of the trial deprived him of

due process).  Several witnesses testified that Mitts did not display typical signs of intoxication at

the time of the offense, *see e.g., Tr.,* at 699 (Testimony of Timothy Rhone); *id.* at 826-27

(Testimony of Officer John Mackey), or when he was at the hospital following the shootings, *see*

*Tr.,* at 960 (Testimony of Sergeant Gary Wolske); *id.* at 1073 (Testimony of Nurse Janine

Seuffert).  Most importantly, the defense's own expert witness testified that an intoxicated person

has the ability to form specific intent and can shoot someone purposefully.  *Tr.,* at 1201-02, 1223

(Testimony of Dr. Sonia McKee).

The fact that a few witnesses testified that Mitts seemed intoxicated or slurred his speech

does not alter the Court's finding.  Officer Salerno testified that Mitts's demeanor was "consistent

with a person that would be intoxicated." *Tr.,* at 922, 933.  However, he also testified that Mitts

did not have any trouble telling him what he intended to do and then follow through. *Id*. at 943.

Furthermore, Officer Salerno testified that Mitts told him "that it's all over with now, I shot a

couple of copes [*sic*] and I killed a fucking nigger." *Id*. at 921. Detective Arko, who testified that

Mitts sounded highly intoxicated, *see Tr.,* at 1239-40, also testified that his team spoke to Mitts at

9:42 P.M. *Id*. at 1241. In light of this evidence, the failure to provide an instruction on voluntary

intoxication did not deprive Mitts of a fair trial.

The only federal case cited by Mitts in support of this claim is *United States v. Gaudin*,

515 U.S. 506 (1995). *Gaudin*, however, has no bearing on the instant claim. In that case, the

trial court refused to submit the question of "materiality" to the jury and instructed the jury that

materiality was a matter for the court. *Id*. at 507-08. The U.S. Supreme Court held that the

defendant had the right to have a jury determine the "materiality" of his false statements where

materiality was one of the elements of the offense with which he was charged. *Id*. at 507, 509,

522-23. Here, the trial court specifically instructed the jury on the element of purpose and

specific intent. *Tr.,* at 1338-40. Moreover, the jury was free to consider evidence of Mitts's

intoxication to determine whether Mitts had the purpose to kill. *Id*. at 1339-40 (instructing the

jury that "[t]he purpose with which a person brings about a result is determined from the manner in

which it is done, the weapon used and all other facts and circumstances in evidence," and

instructing the jury that it may consider the evidence introduced by both sides to determine

whether Mitts specifically intended to cause the death of Glivar and Bryant). Accordingly, the

failure to instruct the jury on the defense of voluntary intoxication was not constitutional error.

This claim is therefore dismissed.

184

### E.    Ninth Ground for Relief - Ineffective Assistance of Trial Counsel

Mitts contends that trial counsel was ineffective in failing to object to the use of the term "recommendation" throughout the trial and in the jury instructions (sub-claim 9(b)), and in failing to object to the trial court's "acquittal-first" instruction (sub-claim 9(a)). *Petition,* at 19. Even considering the claims cumulatively, *see Traverse,* at 57, the Court finds that these claims lack merit.

The Ohio Supreme Court addressed this issue on the merits during Mitts's direct appeal. The state court held as follows:

> Reversal of a conviction or sentence on the grounds of ineffective assistance of counsel requires that the defendant show, first, that counsel's performance was deficient and, second, that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial. *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693. To demonstrate that counsel is deficient, appellant must show that counsel's performance fell below an objective standard of reasonable representation. *State v. Bradley* (1989), 42 Ohio St.3d  136, 538 N.E.2d 373, paragraph two of the syllabus. To demonstrate prejudice, appellant must prove that there exists a reasonable probability that were it not for counsel's error, the result of the trial would have been different. *Id.* at paragraph three of the syllabus.

> Mitts's claims of ineffective assistance do not meet the *Strickland* standard. Since we have previously concluded that the trial court's "acquittal first" instruction, "reasonable doubt" definition, and use of the term "recommendation" were not erroneous, counsel's performance was not deficient for failing to raise these issues. (See discussion of Propositions of Law V and VI, above.)

185

*State v. Mitts*, 690 N.E.2d 522, 531-32 (Ohio 1998).

The Ohio Supreme Court correctly identified the governing legal rule, *Strickland v. Washington*.  Accordingly, the Court's review is limited to determining whether the state court's application of *Strickland* was objectively reasonable.

In sub-claim (b), Mitts argues that counsel failed to object to the court's instruction that the death verdict was only a "recommendation" and to the prosecutor's repeated references to the jury's "recommendation."  *Traverse,* at 49.  Trial counsel's failure to object to the use of the term "recommendation" was not unconstitutionally deficient because the jury's death verdict *was* merely a recommendation.  *Mapes v. Coyle,* 171 F.3d 408, 427 (6th Cir. 1999); *Greer v. Mitchell,* 264 F.3d 663, 684 (6th Cir. 2001); *Hicks v. Collins,* 384 F.3d 204, 223 (6th Cir. 2004).  Accordingly, the Court finds that the Ohio Supreme Court's application of *Strickland* was objectively reasonable.  Sub-claim (b) is dismissed.

Mitts also argues that counsel was ineffective in failing to object to the court's so-called "acquittal-first" instruction during the penalty phase of trial.  *Petition,* at 19.  He also claims that the prosecutor argued without objection that the jury must reject the death penalty before considering a life option, and that this objection-free argument further misled the jury and exacerbated the impropriety of the instruction.  *Traverse,* at 49, 56.  In the afore-quoted ruling, the Ohio Supreme Court held that counsel was not ineffective in failing to object to this instruction because the instruction was not erroneous.  The state court did not reach the prejudice prong of the *Strickland* analysis.  Accordingly, in assessing prejudice, the Court's review is not

186

circumscribed by the state court judgment.  *See Wiggins v. Smith,* 539 U.S. 510, 534 (2003).

As for Mitts's argument that the prosecutor's remarks exacerbated the impropriety of the trial

court's instruction, the Court previously concluded that the prosecutor's remarks did not deprive

Mitts of a fair trial.  *See supra note* 14.  To the extent Mitts incorporates the arguments raised in

his eighth ground for relief (explaining why the "acquittal-first" instruction was improper) to

support this claim, *see Traverse,* at 48, the Court will only consider those arguments that were

presented to the Ohio Supreme Court.  *See supra note* 13.

Mitts does not even begin to explain how counsel's failure to object constituted deficient

performance, and does not demonstrate a reasonable probability that, but for counsel's failure to

object, the outcome of the proceedings would have been different.  He simply makes a

generalized allegation of prejudice, *see Petition,* at 20, and argues that "the failure to properly

charge the jury resulted in an inability of the jury to properly consider mitigation and life sentence

options and undermined the reliability of the entire process."  *Traverse,* at 49.  These allegations

are insufficient to demonstrate deficient performance and resulting prejudice.

In *State v. Brooks,* 661 N.E.2d 1030, 1034-35 (Ohio 1996), the Ohio Supreme Court

held that the following instruction – "You are now required to determine unanimously that the

death penalty is inappropriate before you can consider a life sentence" – was reversible error.

The *Brooks* court found that the instruction was prejudicial to the defendant because "it gave

jurors the impression that a single juror could not prevent a death penalty recommendation on his

or her conviction that the aggravating circumstances . . . do not outweigh the mitigating factors."

*State v. Davis,* 666 N.E.2d 1099, 1108 (Ohio 1996).  In the instant case, the jury was not given

the instruction prohibited in *Brooks.*  Moreover, shortly after the trial court read the instructions

and verdict forms to Mitts's jury, it stated as follows:  "[Y]ou should not surrender honest

convictions in order to be congenial or to reach a verdict solely because of the other jurors."  *Tr.,*

at 1573-74.  Even assuming, *arguendo,* that the instructions in this case warranted a *Brooks*

objection, counsel was not ineffective for failing to anticipate *Brooks.  See Lucas v. O'Dea,* 179

F.3d 412, 419-20 (6th Cir. 1999); *Davie v. Mitchell,* 291 F.Supp.2d 573, 630 (N.D. Ohio,

2003).  Even should counsel have anticipated *Brooks*, *see Lucas,* 179 F.3d at 420,  Mitts cannot

demonstrate a reasonable probability that a timely objection would have led to a different

outcome.  A review of Ohio case law supports this conclusion.  Ohio defendants have raised

challenges to instructions similar to those at issue in this claim on the grounds that they represented

improper "acquittal-first" instructions.  The Ohio Supreme Court rejected these challenges *after* it

issued its ruling in *Brooks.  See State v. Davis,* 666 N.E.2d at 1108-09 (distinguishing *Brooks*);

*State v. Taylor,* 676 N.E.2d 82, 95-96 (Ohio 1997).  Furthermore, in light of the overwhelming

balance of aggravating circumstances in this case, the Court finds that Mitts does not demonstrate

a reasonable probability that, but for counsel's failure to object to the "acquittal-first" instruction,

the jury would have returned a life verdict.  *See Hicks v. Collins,* 384 F.3d 204, 224 (6th Cir.

2004).  Accordingly, even were Mitts able to show that the state court's application of *Strickland*

was unreasonable, he cannot demonstrate prejudice.

Furthermore, Mitts does not show that the Ohio Supreme Court's ruling was contrary to

clearly established Supreme Court law.  Neither *Mills v. Maryland,* 486 U.S. 367 (1988), nor

188

*McKoy v. North Carolina*, 494 U.S. 433 (1990), addressed an ineffective assistance of counsel claim. The Court further notes that the Sixth Circuit in *Davis* did not address an ineffective assistance of counsel claim. Finally, the Court notes that the Sixth Circuit in *Mapes* remanded a case to the district court for an evidentiary hearing to evaluate whether appellate counsel was ineffective for failing to raise certain trial errors, including, *inter alia*, the trial court's "acquittal-first" instruction. 171 F.3d at 427-29. The *Mapes* court found that the petitioner's ineffective assistance of *trial counsel* claim was procedurally defaulted. *Id.* at 427. The court, however, discussed trial counsel's performance insofar as it was relevant to assessing whether appellate counsel was ineffective in failing to raise it. *Id.* The court held that when the trial errors (the "acquittal-first" instruction, the fact that the jury was wrongly precluded from even considering Mapes's unsworn statement as mitigating, and the good possibility that the sentencing jury was not unanimous in light of one juror's ambiguous (or lack of) assent to the verdict) were considered together with trial counsel's failure to investigate any mitigating factors, "prejudice is almost self-evident." *Id.* at 426-27. Accordingly, the Court did not specifically find, either in *dicta* or on the merits, that trial counsel was ineffective only in failing to object to the "acquittal-first" instruction.

Because Mitts fails to demonstrate that he was prejudiced by counsel's failure to object, sub-claim (a) is dismissed. Therefore, sub-claims 9(a) and 9(b) are dismissed on the merits.

### F.      Twelfth Ground for Relief - Ineffective Assistance of Appellate Counsel

In the twelfth ground for relief, Mitts argues that he was denied the effective assistance of counsel during his direct appeal. First, Mitts argues that appellate counsel was ineffective in failing

189

to raise the following instances of prosecutorial misconduct:  (a) the prosecutor improperly argued that the jury must reject the death penalty before considering a life option; (b) the prosecutor improperly argued that the jury should consider the nature and circumstances of the offense and the manner and means of the killings as aggravating circumstances; and (c) the prosecutor improperly asked the jury to consider victim impact evidence as an aggravating circumstance. Next, Mitts argues that appellate counsel was deficient in failing to argue on appeal that trial counsel was ineffective.  Mitts cites the following omissions by trial counsel:  (d) failing to object to prosecutorial misconduct; (e) failing to object to erroneous and prejudicial jury instructions (specifically, the "acquittal-first" instruction and the "recommendation" instruction); (f) failing to present a reasonable defense theory during both phases of the trial by calling Dr. McKee as a witness; and (g) failing to adequately investigate, prepare and present a reasonable theory of mitigation by making reasonable use of a mitigation or psychology expert.  *Petition*, at 22-23; *Traverse,* at 65.

The last reasoned state court decision on this entire claim was rendered by the Ohio Supreme Court on *Murnahan* review.  The state court considered and rejected the claim on the merits:

> {¶ 4} The two-prong analysis found in *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674, is the appropriate standard by which to determine whether a defendant has received ineffective assistance of appellate counsel. See *State v. Sheppard* (2001), 91 Ohio St.3d 329, 330, 744 N.E.2d 770; *State v. Spivey* (1998), 84 Ohio St.3d 24, 25, 701 N.E.2d 696; *State v. Reed* (1996), 74 Ohio St.3d 534, 534-535, 660 N.E.2d 456.

190

{¶ 5} In order to show ineffective assistance, Mitts "must prove that his counsel were deficient for failing to raise the issues he now presents and that there was a reasonable probability of success had he presented those claims on appeal." *Sheppard,* 91 Ohio St.3d at 330, 744 N.E.2d 770, citing *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph three of the syllabus. Moreover, to justify reopening his appeal, Mitts "bears the burden of establishing that there was a 'genuine issue' as to whether he has a 'colorable claim' of ineffective assistance of counsel on appeal." *Spivey,* 84 Ohio St.3d at 25, 701 N.E.2d 696.

{¶ 6} We have reviewed Mitts's assertions of deficient performance by appellate counsel and find that Mitts has failed to raise "a genuine issue as to whether [he] was deprived of the effective assistance of counsel on appeal" before the court of appeals, as required by App.R. 26(B)(5).

{¶ 7} Accordingly, the judgment of the court of appeals is affirmed.

*State v. Mitts,* 784 N.E.2d 698, 699-700 (Ohio 2003).

Mitts argues that the Ohio Supreme Court identified the correct standard to be applied, namely, *Strickland v. Washington,* but did not analyze his claim pursuant to that standard. *Traverse,* at 64.  The Court disagrees.  After expressly identifying *Strickland* as the governing principle, the Ohio Supreme Court cited to a state court decision to identify the elements of *Strickland,*[28] and then applied *Strickland* to Mitts's claim in paragraph 6 of its ruling.  Because the Ohio Supreme Court correctly identified the governing legal principle and applied that principle

---

[28]To be more precise, the Ohio Supreme Court cited *State v. Sheppard,* 744 N.E.2d 770 (Ohio 2001), and *Sheppard* cited *State v. Bradley,* 538 N.E.2d 373 (Ohio 1989), for the *Strickland* standard.

to Mitts's claim, this Court's review is limited to determining whether the state court decision represented an unreasonable application of clearly established Supreme Court law to the facts.

The Court finds that the judgment of the Ohio Supreme Court was objectively reasonable. In the eleventh ground for relief, the Court addressed the instances of prosecutorial misconduct which form the basis for sub-claims 12(a), (b), (c) and (d) and found that the prosecutor's remarks did not deprive Mitts of a fair trial.  As there was no underlying misconduct, appellate counsel was not ineffective in failing to raise these claims on appeal, or in failing to argue that trial counsel was deficient in failing to object to this alleged misconduct.  Accordingly, these sub-claims are dismissed.

In the ninth ground for relief, the Court dismissed petitioner's claim that he was denied the effective assistance of counsel where trial counsel failed to object to the jury instructions articulated in sub-claim (e).  As petitioner cannot prevail on his ineffective assistance of trial counsel claim, he necessarily cannot prevail on his argument that appellate counsel was deficient in failing to argue that trial counsel was ineffective in this regard.  Accordingly, sub-claim (e) is dismissed.

Finally, in the first and second grounds for relief, the Court held that Mitts was not prejudiced by counsel's failure to present a reasonable defense theory during both phases of trial by calling Dr. McKee as a witness.  Furthermore, in the first ground for relief, the Court held that Mitts was not prejudiced by counsel's failure to adequately investigate, prepare and present mitigating evidence.  Accordingly, sub-claims (f)-(g) are dismissed.

192

The Sixth Circuit's decision in *Mapes* does not alter this Court's holding.  As discussed above, the *Mapes* court remanded a case to the district court for an evidentiary hearing to evaluate whether appellate counsel was ineffective for failing to raise certain trial errors, including, *inter alia*, the trial court's "acquittal-first" instruction.  171 F.3d at 427-29.  However, there were at least two errors that appellate counsel failed to raise in *Mapes* that are not present here.  First, over trial counsel's objection, the trial court in *Mapes* "accepted a death recommendation from the jury despite one juror's obvious hesitation," and second, the trial court wrongly precluded the sentencing jury from considering Mapes's only mitigating evidence.  *Id*. at 427.  The *Mapes* court also stated that trial counsel failed to investigate *any* mitigating factors and presented no mitigation defense except for an unsworn statement by the defendant.  *Id*. at 425, 427.  Here, the record suggests that trial counsel did conduct some investigation into mitigating evidence.  Furthermore, there is no doubt that Mitts's counsel presented mitigating evidence at sentencing.  Accordingly, petitioner's twelfth claim is dismissed.

## V.    CONCLUSION

The Sixth Circuit has held that a district court need not wait until a petitioner moves for a Certificate of Appealabilty (hereinafter "COA") before issuing a COA for claims raised in the petition.  *Castro v. United State*s, 310 F.3d 900 (6th Cir. 2002).  The Sixth Circuit has stated that "a district judge who has just denied a habeas petition  . . . . will have an intimate knowledge of both the record and the relevant law and could simply determine whether to issue the certificate of appealability when [ ]he denies the initial petition."  *Id.* at 901 (citing *Lyons v. Ohio Adult*

193

*Parole Auth.,* 105 F.3d 1063, 1072 (6th Cir. 1997)).

Furthermore, the Sixth Circuit has determined that neither a blanket grant nor a blanket

denial of a COA as to all issues is an appropriate means by which to conclude a capital habeas

case as it "undermine[s] the gate keeping function of certificates of appealability, which ideally

should separate the constitutional claims that merit the close attention of counsel and this court

from those claims that have little or no viability." *Porterfield v. Bell*, 258 F.3d 484, 487 (6th Cir.

2001).  Thus, in concluding this Opinion, it is now appropriate to determine whether to grant a

COA as to any of the claims presented in the petition pursuant to 28 U.S.C. § 2253.  That statute

states in relevant part as follows:

> (c)(1) Unless a circuit justice or judge issues a certificate
> of appealability, an appeal may not be taken to the court of
> appeals from –
>
> > (A) the final order in a habeas corpus
> > proceeding in which the detention complained of
> > arises out of process issued by a State court;
>
> ***
>
> (2) A certificate of appealability may issue under
> paragraph (1) only if the applicant has made a substantial showing
> of the denial of a constitutional right.

In *Slack v. McDaniel*, 529 U.S. 473 (2000), the U.S. Supreme Court held as follows:

> "To obtain a COA under § 2253(c), a habeas prisoner
> must make a substantial showing of the denial of a constitutional
> right, a demonstration that, under *Barefoo*t [*v. Estelle,* 463 U.S.

194

> 880 (1983)], includes showing that reasonable jurists could
> debate whether (or, for that matter, agree that) the petition should
> have been resolved in a different manner or that the issues
> presented were "'adequate to deserve encouragement to proceed
> further.'"

*Id.* at 483-84 (quoting *Barefoo*t, 463 U.S. at 893 n.4).

The Court went on to distinguish the analysis a habeas court must perform for claims that are dismissed on procedural grounds and those that are dismissed on the merits. If the claim is not procedurally defaulted, a habeas court need only determine whether reasonable jurists would find the district court's decision "debatable or wrong." *Id.* at 484. A more complicated analysis is required where the district court has determined that the claim is procedurally defaulted. In those instances, the Supreme Court stated that a COA should issue if "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right *and* that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.* (emphasis added).

After taking the above standard into consideration, the Court certifies claim 1 and part of claim 12 for appeal. The Court's reasoning is set forth below.

The Court certifies claim 1 for appeal (ineffective assistance in failing to investigate, prepare and adequately present mitigating evidence). The Court finds, as it did in its Opinion, that counsel's inadequate investigation into available mitigating evidence did not prejudice petitioner. The information presented by Mitts in his habeas petition and uncovered by Dr. Eisenberg and others during their interviews with Mitts did not reveal the type of egregious social and

195

psychological history found in prior Supreme Court cases, including *Wiggins v. Smith, Williams v. Taylor*, and *Coleman v. Mitchell*.  While the Court found that counsel's deficient performance did not prejudice petitioner, a reasonable jurist could conclude to the contrary.  A jurist of reason might conclude that there is a reasonable probability that at least one juror would have struck a different balance had the jury been able to consider the totality of available mitigating evidence.  Because the Court finds that Mitts's first claim merits a COA, it necessarily finds that sub-claims 12(f)[29] and 12(g)[30] should also be certified for appeal.

The Court need not decide whether it will issue a COA on claims 3 and 10 because these claims were withdrawn.  *See Traverse,* at 28, 58.  The Court will not grant a COA for the rest of the claims.

The Court found that claims 2(b), 7, 8, 9(c), (d), (e) (f), and 11 were procedurally defaulted.  The Court finds that reasonable jurists would not debate the defaulted status of claim

---

[29]Sub-claim 12(f) alleges ineffective assistance of appellate counsel for failing to argue that trial counsel was ineffective in failing to present a reasonable defense theory during both phases of the trial by calling Dr. McKee as a witness.  This sub-claim primarily appears to relate to claim 2 (trial counsel's ineffectiveness during the *guilt phase* of trial).  However, sub-claim 12(f) alleges that trial counsel failed to present a reasonable defense theory "during both phases of trial."  This argument presumably has two parts.  First, trial counsel was allegedly ineffective for failing to present a reasonable defense theory during the guilt phase by calling Dr. McKee as a witness.  Second, trial counsel was allegedly ineffective *during the mitigation phase* because counsel failed to present a reasonable theory of mitigation in that he continued to pursue the blackout theory during the mitigation phase.  *See Traverse,* at 16 (arguing that after Dr. McKee testified in the guilt phase and was unable to support counsel's blackout theory, counsel should have abandoned the theory during the mitigation phase; and counsel's pursuit of the blackout theory "tarnishe[d] the integrity" of the mitigation evidence that was presented).  To the extent sub-claim 12(f) relates to trial counsel's conduct during the mitigation phase, the Court certifies it for appeal.

[30]Sub-claim 12(g) alleges ineffective assistance of appellate counsel for failing to argue that trial counsel was ineffective in failing to adequately investigate, prepare and present a reasonable theory of mitigation by making reasonable use of a mitigation or psychology expert.

196

2(b) (ineffective assistance in failing to properly conduct *voir dire*).  Mitts did not present

evidence *dehors* the record in support of his claim that counsel was ineffective in failing to

question the venire on racial prejudice.  Accordingly, this sub-claim could have been raised on

direct appeal.  Even if the default ruling were debatable, the Court finds that a jurist of reason

would not debate whether this sub-claim states a valid claim of the denial of a constitutional right.

The Court finds, as it did in its Opinion, that Mitts does not overcome the presumption that

counsel's decision not to question the jurors on racial prejudice was reasonable trial strategy, and

there is no evidence, let alone allegation, that racial bias tainted the impaneled jury.

The Court finds that reasonable jurists would not debate the defaulted status of claims 7

(instruction that death verdict is recommendation) and 8 ("acquittal-first" instruction).  In those

claims, the court utilized a plain-error review.  As noted earlier, "[c]ontrolling precedent in our

circuit indicates that plain error review does not constitute a waiver of state procedural default

rules."  *Seymour v. Walker,* 224 F.3d 542, 557 (6th Cir. 2000).  Absent procedural default, the

Court would grant a COA as to claim 8.  Given the disparate holdings of *Mapes, Coe, Scott,*

*Roe,* and *Davis,* jurists of reason can debate this issue.  To further clarify Sixth Circuit law on this

issue, the Court would have granted a COA as to claim 8 were it not defaulted.[31]

————————————————

[31]The Court notes in passing that the Ohio Supreme Court, in ruling on this issue on direct
appeal, utilized plain-error analysis and issued the following ruling on this claim:

> The court did *not* instruct the jury that it could consider
> lesser penalties only if it first unanimously rejected the death
> penalty. Instead, the court instructed that if all twelve members of
> the jury found that the state had not proved that the aggravating
> circumstances outweighed mitigating factors, then it must choose
> between the possible life sentences. That instruction is consistent

197

Next, the Court finds that jurists of reason would not debate the defaulted status of claims 9(c), (d), (e), (f) (ineffective assistance in failing to object to prosecutorial misconduct) and 11 (prosecutorial misconduct).  These claims were raised only as part of an ineffective assistance of appellate counsel claim on *Murnahan* review.  Accordingly, these claims "rest[ ] on a theory which is separate and distinct from the one previously considered and rejected in state court." *Wong v. Money,* 142 F.3d 313, 322 (6th Cir. 1998).  Mitts argued on direct appeal that trial counsel failed to object to prosecutorial misconduct, but did not identify the specific instances of misconduct to which trial counsel failed to object.  Accordingly, the Ohio Supreme Court rejected the claim.  The Court finds, as it did in its Opinion, that these claims are unexhausted yet procedurally defaulted.  Even if the default ruling were debatable, a jurist of reason would not debate whether they state a valid claim of the denial of a constitutional right.  Petitioner did not demonstrate that the alleged instances of prosecutorial misconduct deprived him of a fair trial.

The Court will not grant a COA for claim 4 (expert assistance).  The Court found that this claim was procedurally defaulted.  In its Opinion, the Court found that the state court did not use

---

with R.C. 2929.03(D)(2) and does not constitute error. *State v. Taylor,* 78 Ohio St.3d at 28-29, 676 N.E.2d at 95; *State v. Davis* (1996), 76 Ohio St.3d 107, 116- 118, 666 N.E.2d 1099, 1108-1109.

*State v. Mitts,* 690 N.E.2d 522, 531 (Ohio 1998).

As the Court noted in its Opinion, the trial court did not actually instruct the jury that "if all *twelve* members" found that the State had not proved that the aggravating circumstances outweighed the mitigating factors, then the jury must choose between the possible life sentences. Nonetheless, in the last two cases cited by the Ohio Supreme Court in this sub-claim (*State v. Taylor* and *State v. Davis*), the state court upheld instructions similar to the ones at issue in Mitts's case.  This discrepancy does not alter the Court's COA analysis on this claim.

198

the term *res judicata* in its ruling.  Furthermore, the state court considered and rejected

petitioner's claim on the merits.  The Court finds that a jurist of reason could debate its procedural

ruling.  A reasonable jurist could conclude that the state court did not clearly and expressly rely on

a procedural bar to deny the claim.  Nevertheless, a jurist of reason would not debate whether

claim 4 states a valid claim of the denial of a constitutional right.  Mitts did not show that the state

court decision was contrary to, or involved an unreasonable application of, clearly established

Supreme Court law, and did not establish ineffective assistance of counsel under the standard set

forth in *Strickland*.  Accordingly, the Court will not grant a COA on this claim.

Of the remaining claims (which are not defaulted), the Court finds that no jurist of reason

would debate the Court's finding that they lack merit.  In claim 2 (ineffective assistance in guilt

phase), the Court determined that Mitts was not prejudiced by counsel's decision to call Dr.

McKee to the witness stand, and that Mitts did not establish ineffective assistance under the

*Strickland* standard for all other sub-claims.  The Court finds, as it did in its Opinion, that there

was overwhelming evidence of guilt and counsel was not ineffective for failing to request a

continuance to investigate alternative defenses.  Furthermore, Mitts does not show that another

expert would have testified that he was unable to form specific intent to kill due to alcohol

intoxication and does not suggest any alternative defense that could have been presented.  A

reasonable jurist would not debate the Court's decision.

In claim 5 (consecutive and concurrent sentencing), the Court determined that the Ohio

Supreme Court did not unreasonably apply *Simmons v. South Carolina,* 512 U.S. 154 (1994),

199

when it overruled petitioner's claim that the trial court erred in refusing to instruct the jury that it may recommend consecutive life sentences on the two counts of aggravated murder.  As the Court stated in its Opinion, *Simmons* is distinguishable.  There, the Supreme Court held that a capital sentencing jury must be informed that the defendant is parole ineligible where the defendant's future dangerousness is at issue and state law prohibits the defendant's release on parole.  *Id.* at 156.  Furthermore, the Ohio Supreme Court has held that the question of concurrent or consecutive sentencing is a matter for the court, not the jury, and therefore need not be considered by the jury.  Reasonable jurists would not debate the Court's decision.

In claim 6 (failure to instruct on voluntary intoxication), the Court determined that Mitts's constitutional rights were not violated by the trial court's failure to instruct the jury on voluntary intoxication.  The Court found that the evidence was insufficient to warrant such an instruction.  The Court finds that jurists of reason would not debate its decision.

The Court will not grant a COA for sub-claims  9(a) and (b) (ineffective assistance of trial counsel).  In sub-claim (b), the Court found that trial counsel's failure to object to the use of the term "recommendation" throughout the trial and in the jury instructions was not unconstitutionally deficient because the jury's death verdict was merely a recommendation.  In sub-claim (a), the Court found that Mitts was not prejudiced by counsel's failure to object to the "acquittal-first" instruction because the Ohio Supreme Court has upheld similar instructions even after it issued its ruling in *State v. Brooks*, 661 N.E.2d 1030 (Ohio 1996), and there was an overwhelming

balance of aggravating circumstances in this case.  The Court finds that jurists of reason would not find the Court's decision debatable or wrong.

In sub-claims 12(a), (b), (c), (d), (e) and (f) (ineffective assistance of appellate counsel), the Court found that appellate counsel was not ineffective for failing to raise certain instances of prosecutorial misconduct and for failing to argue that trial counsel was ineffective for particular acts and omissions.  The Court held that the prosecutor's comments did not deprive petitioner of a fair trial, petitioner did not demonstrate both deficient performance and resulting prejudice due to trial counsel's failure to object to two penalty-phase instructions, and Mitts was not prejudiced by counsel's decision to call Dr. McKee as a witness.[32]  The Court finds that reasonable jurists would not find its decision debatable or wrong.

For the reasons stated in this Opinion, the Court finds that none of the claims asserted in Mitts's Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254 are well-taken.  Accordingly, Mitts's request for habeas corpus relief is denied and his Petition (**ECF No. 27**) is hereby dismissed.

The Court hereby issues a certificate of appealability pursuant to 28 U.S.C. § 2253(c) as set forth in the above analysis.

---

[32]As previously indicated, the Court is only certifying sub-claim 12(f) for appeal to the extent this sub-claim is related to claim 1.  *See supra note* 29.  To the extent this sub-claim alleges that appellate counsel was ineffective in failing to raise trial counsel's deficient performance during the *guilt phase* of trial, the Court will not grant a COA.  A reasonable jurist would not debate the Court's decision that Mitts was not prejudiced by counsel's decision to call Dr. McKee as a witness.

**IT IS SO ORDERED.**

*/s/ Dan Aaron Polster      9/29/2005*
**Dan Aaron Polster**
**United States District Judge**